**2017-1175, -1760, -1811**

# United States Court of Appeals
# for the Federal Circuit

TINNUS ENTERPRISES, LLC, ZURU LTD.,

*Plaintiffs-Appellees,*

v.

TELEBRANDS CORPORATION, BED BATH & BEYOND, INC.,
FRY'S ELECTRONICS, INC., KOHL'S DEPARTMENT STORES, INC.,
THE KROGER COMPANY, SEARS HOLDING CORPORATION,
TOYS 'R' US-DELAWARE, INC., WALGREENS BOOTS ALLIANCE, INC.,

*Defendants-Appellants.*

*Appeals from the United States District Court for the Eastern District
of Texas in Nos. 6:16-cv-00033-RWS-JDL and 6:16-cv-00034-RWS-JDL, Judge
Robert Schroeder III.*

## OPENING BRIEF OF DEFENDANTS-APPELLANTS

D. Michael Underhill
Eric J. Maurer
Stacey K. Grigsby
BOIES SCHILLER FLEXNER
1401 New York Ave., NW
Washington, DC 20005
202.237.2727

*Counsel for Defendant-Appellant
Telebrands Corp.*

Robert T. Maldonado
Elana B. Araj
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
212.278.0400

*Counsel for all Defendants-
Appellants*

May 19, 2017

# <u>CERTIFICATES OF INTEREST</u>

Counsel for Telebrands Corp. certifies that:

1.      The full name of every party or amicus represented by me is:

Telebrands Corp.

2.      The name of the real party in interest (if the party named in the caption

is not the real party in interest) represented by me is:  None.

3.      All parent corporations and any publicly held companies that own 10

percent or more of the stock of the party represented by me are:  None.

4.      The names of all law firms and the partners or associates that appeared

for the party or amicus now represented by me in the trial court or agency or are

expected to appear in this court are:

- BOIES SCHILLER FLEXNER:  D. Michael Underhill; Jonathan Shaw; Eric J. Maurer; Amy L. Neuhardt, Stacey K. Grigsby, William Bloom, Joseph Alm;

- COOPER & DUNHAM LLP:  Robert T. Maldonado, Tonia A. Sayour, Elana B. Araj; and

- Lance Lee, Gregory Love, and Kate Ferguson.

Dated:  May 19, 2017

*/s/ D. Michael Underhill*

D. Michael Underhill
BOIES SCHILLER FLEXNER
1401 New York Ave., NW
Washington, DC 20005
Telephone:  202.237.2727

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Bed Bath & Beyond Inc. certifies that:

1.    The full name of every party or amicus represented by me is: Bed Bath & Beyond Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:  None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

- COOPER & DUNHAM LLP:  Robert T. Maldonado, Tonia A. Sayour, Elana B. Araj; and

- Lance Lee and Gregory Love

Dated:  May 19, 2017

/s/ *Robert T. Maldonado*

Robert T. Maldonado
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone:  212.278.0400

ii

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Fry's Electronics, Inc. certifies that:

1.      The full name of every party or amicus represented by me is: Fry's

Electronics, Inc.

2.      The name of the real party in interest (if the party named in the

caption is not the real party in interest) represented by me is:  None.

3.      All parent corporations and any publicly held companies that own 10

percent or more of the stock of the party represented by me are:  None.

4.      The names of all law firms and the partners or associates that appeared

for the party or amicus now represented by me in the trial court or agency or are

expected to appear in this court are:

- COOPER & DUNHAM LLP:  Robert T. Maldonado, Tonia A. Sayour,
  Elana B. Araj; and

- Lance Lee and Gregory Love

Dated:  May 19, 2017

/s/ *Robert T. Maldonado*

Robert T. Maldonado
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone:  212.278.0400

iii

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Kohl's Department Stores, Inc. certifies that:

1.     The full name of every party or amicus represented by me is: Kohl's

Department Stores, Inc.

2.     The name of the real party in interest (if the party named in the

caption is not the real party in interest) represented by me is:  None.

3.     All parent corporations and any publicly held companies that own 10

percent or more of the stock of the party represented by me are:  None.

4.     The names of all law firms and the partners or associates that

appeared for the party or amicus now represented by me in the trial court or agency

or are expected to appear in this court are:

- COOPER & DUNHAM LLP:  Robert T. Maldonado, Tonia A. Sayour, Elana B. Araj; and

- Lance Lee and Gregory Love

Dated:  May 19, 2017

/s/ *Robert T. Maldonado*

Robert T. Maldonado
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone:  212.278.0400

iv

## <u>CERTIFICATE OF INTEREST</u>

Counsel for The Kroger Company certifies that:

1.     The full name of every party or amicus represented by me is: The

Kroger Company.

2.     The name of the real party in interest (if the party named in the

caption is not the real party in interest) represented by me is:  None.

3.     All parent corporations and any publicly held companies that own 10

percent or more of the stock of the party represented by me are:  None.

4.     The names of all law firms and the partners or associates that

appeared for the party or amicus now represented by me in the trial court or agency

or are expected to appear in this court are:

- COOPER & DUNHAM LLP:  Robert T. Maldonado, Tonia A. Sayour, Elana B. Araj; and

- Lance Lee and Gregory Love

Dated:  May 19, 2017

/s/ *Robert T. Maldonado*
Robert T. Maldonado
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone:  212.278.0400

## **CERTIFICATE OF INTEREST**

Counsel for Sears Holding Corporation certifies that:

1.      The full name of every party or amicus represented by me is: Sears Holding Corporation.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  None.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:  None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

- COOPER & DUNHAM LLP:  Robert T. Maldonado, Tonia A. Sayour, Elana B. Araj; and

- Lance Lee and Gregory Love

Dated:  May 19, 2017

/s/ *Robert T. Maldonado*

Robert T. Maldonado
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone:  212.278.0400

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Toys 'R' Us-Delaware, Inc. certifies that:

1.      The full name of every party or amicus represented by me is: Toys 'R' Us-Delaware, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  None.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:  None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

- COOPER & DUNHAM LLP:  Robert T. Maldonado, Tonia A. Sayour, Elana B. Araj; and

- Lance Lee and Gregory Love

Dated:  May 19, 2017

/s/ *Robert T. Maldonado*
Robert T. Maldonado
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone:  212.278.0400

## CERTIFICATE OF INTEREST

Counsel for **Walgreens Boots Alliance, Inc.** certifies that:

1.    The full name of every party or amicus represented by me is:

Walgreens Boots Alliance, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  None.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:  None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

- COOPER & DUNHAM LLP:  Robert T. Maldonado, Tonia A. Sayour, Elana B. Araj; and

- Lance Lee and Gregory Love

Dated:  May 19, 2017                    /s/ *Robert T. Maldonado*
                                        Robert T. Maldonado
                                        COOPER & DUNHAM LLP
                                        30 Rockefeller Plaza
                                        New York, NY 10112
                                        Telephone:  212.278.0400

# TABLE OF CONTENTS

CERTIFICATES OF INTEREST ................................................................. i

STATEMENT OF RELATED CASES ................................................... xiv

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES ..............................................................2

STATEMENT OF THE CASE ..................................................................3

    I.      Introduction ........................................................................3

    II.     Zuru's Lawsuits and Telebrands' Development of the Accused Battle Balloon Products .........................................................4

    III.    Technology Background ......................................................7

         A.     Prior Art Fluid-Delivery Housings .............................7

         B.     Prior Art Methods of Sealing and Closing Containers .............10

         C.     The Patents In Suit:  '749 and '282 Patents..............................13

             1.     The specifications .........................................................13

             2.     The claims....................................................................14

    IV.    Preliminary Injunction Background ....................................16

         A.     Zuru I Claim Constructions ......................................16

         B.     The Preliminary Injunction Proceedings ...................16

         C.     The Claim Constructions Used by the Court to Grant the Preliminary Injunctions............................................18

    V.     PTAB Proceedings .............................................................19

SUMMARY OF THE ARGUMENT ......................................................21

A.   The District Court Erred in Finding No Substantial Issue of Obviousness for the '749 and '282 Patents ..............................21

B.   The District Court Erred in Finding No Substantial Non-Infringement Issue for the '749 Patent .....................................22

C.   The District Court Erred in Finding Irreparable Harm.............23

ARGUMENT ...........................................................................................23

I.   Standard of Review ........................................................................23

II.  The District Court Erred in Finding that Zuru Proved Likelihood of Success on the Merits ...........................................................................24

A.   The District Court Erred in Finding that there Was No Substantial Issue of Obviousness for the '749 and '282 Patents .....................................................................................24

1.   The district court erred in misinterpreting "fluid" to exclude gasses...............................................................26

2.   The district court erred in interpreting and applying "the sufficiently limited to permit . . . to detach" limitation....................................................................28

a.   The prior art need not expressly disclose a method of detaching a container by shaking in order for there to be a motivation to combine......29

b.   The district court erred in finding that the prior art does not disclose an "elastic fastener" that is "sufficiently limited to permit" a container to detach "upon . . . at least partially filling the container" ...........................................................31

c.   The district court improperly ignored evidence that the elastic ring in the obviousness combination was necessarily capable of being shaken off ...........................................................34

3.    The District Court's Finding of Secondary Considerations Was Not Based on Substantial Evidence ........................................................39

B.    The District Court Erred in Finding No Substantial Issue of Non-Infringement for the '749 Patent ......................................40

1.    The district court's construction of "common face" is legally erroneous............................................................41

2.    The district court erred in finding that Battle Balloons has a "plurality of holes" in a "common face"...............48

3.    The district court erroneously applied the "second end" limitation to the Battle Balloons housing ..............51

III.    The District Court Erred In Finding Irreparable Harm ......................59

A.    Zuru Did Not Establish Price Erosion ......................................59

B.    Zuru Did Not Establish That Telebrands Harmed Customer Relationships...........................................................................60

CONCLUSION .....................................................................................61

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373 (Fed. Cir. 2016) ................................................... 38

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343 (Fed. Cir. 2001) .. 24

*August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278 (Fed. Cir. 2011) .................... 48

*Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015 (Fed. Cir. 1985), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999) (en banc) .......................................... 39

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990) ................................. 24, 28

*Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361 (Fed. Cir. 2000) ................ 40

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) .................................................................................................... 23

*Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339 (Fed. Cir. 2000) ............................ 26

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464 (Fed. Cir. 1990) .... 29

*KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007) ............................................. 30

*MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284 (Fed. Cir. 2015) ..... 38

*PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159 (Fed. Cir. 2008) ......... 48

*Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344 (Fed. Cir. 2012) ...................... 35

*Telebrands Corp. v. Tinnus Enters., LLC*, PGR2015-00018, 2016 WL 7985419 (PTAB Dec. 30, 2016) ..................................................................... 20

*Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190 (Fed. Cir. 2017) ...... xiv, 4

*Wind Tower Trade Coal. v. United States*, 741 F.3d 89 (Fed. Cir. 2014) .............. 24

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................... 4, 23

**Statutes**

28 U.S.C. § 1292 ................................................................................1

28 U.S.C. § 1338 ................................................................................1

35 U.S.C. § 103 ...............................................................................20

35 U.S.C. § 112 ...............................................................................20

## STATEMENT OF RELATED CASES

No other appeal in or from these civil actions in the lower court was previously before this or any other appellate court.

There are four other cases that may potentially be affected by this Court's decision in the pending consolidated appeal. They are as follows:

1. *Tinnus Enters., LLC, et al. v. Telebrands Corp. et al.*, 6:15-cv-00551-RC-JDL (E.D. Tex.) (Zuru I) involves U.S. Patent No. 9,051,066, which is the parent patent to the two patents at issue in this appeal, U.S. Patent Nos. 9,242,749 and 9,315,282. This Court already considered Telebrands' appeal of a preliminary injunction based on the '066 patent. *See Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190 (Fed. Cir. 2017). Zuru I is currently stayed pending the patentee's appeal of the Patent Trial and Appeal Board's final written decision, which concluded that all claims of the '066 patent are unpatentable as indefinite.

2. *Tinnus Enters., LLC v. Telebrands Corp.*, No. 17-1726 (Fed. Cir.), is the patent owner's appeal of the PTAB's final written decision concluding that all claims of the '066 patent are unpatentable as indefinite.

3. *Tinnus Enters., LLC, et al. v. Telebrands Corp. et al.*, 6:17-cv-00170- RWS-JDL (E.D. Tex.) (Zuru III) involves the '749 patent, the '282 patent, U.S. Patent No. 9,527,612, and U.S. Patent No. 9,533,779. Tinnus

and Zuru have sought a preliminary injunction against Telebrands, Bulbhead.com, Inc., and Bed Bath and Beyond, Inc. based on alleged infringement by a new Telebrands product, Easy Einstein, which is not at issue in any of the other lawsuits. The district court has not yet ruled on the motion for preliminary injunction.

4. *Zuru Ltd. v. Telebrands Corp.*, Civil Action No. 15-cv-00548-CCC-MF (D.N.J.), involves Lanham Act, tortious interference and unfair competition claims pertaining to the same products at issue in the appeal and the patent claims asserted in the Texas litigation.

# JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of Texas had jurisdiction over these patent infringement actions under 28 U.S.C. § 1338(a).

This Court has jurisdiction over the district court's October 31, 2016 preliminary injunction order pursuant to 28 U.S.C. § 1292(a)(1) and (c)(1). Telebrands timely appealed to this Court on November 2, 2016.

This Court has jurisdiction over the district court's February 16, 2017 denial of the motion for reconsideration of the preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1) and (c)(1).   Telebrands timely appealed to this Court on March 2, 2017.

This Court has jurisdiction over the district court's February 14, 2017 preliminary injunction order pursuant to 28 U.S.C. § 1292(a)(1) and (c)(1).   Bed Bath & Beyond Inc., Fry's Electronics, Kohl's Department Stores, Sears Holdings Corporation, The Kroger Co., Toys "R" Us-Delaware, Inc., and Walgreens Boots Alliance, Inc. (the "Retailers") timely appealed to this Court on March 15, 2017.

## **STATEMENT OF THE ISSUES**

Telebrands' and the Retailers' (collectively, "Telebrands") consolidated appeal asks the Court to conclude that the district court abused its discretion in finding that Zuru and Tinnus (collectively, "Zuru") made a clear showing that they are entitled to a preliminary injunction against Telebrands' Battle Balloons product for alleged infringement of U.S. Patent Nos. 9,242,749 and 9,315,282. This appeal presents the following questions:

1.    Whether the district court erred in finding no substantial question as to the validity of the '749 and '282 patents based on obviousness;

2.    Whether the district court erred in finding Zuru likely to establish that Battle Balloons infringes claim 1 of the '749 patent; and

3.    Whether the district court erred in finding that any harm Zuru suffered as a result of the alleged infringement is irreparable.

## STATEMENT OF THE CASE

### I.    Introduction

This infringement action involves patents directed to a system for filling and sealing containers with fluids.  Appx97 at 1:19-21, Appx109 at 1:20-24.  Zuru asserts the '749 and '282 patents against Telebrands' Battle Balloons product, a toy whose plastic housing can be screwed onto a hose or faucet to permit the filling and sealing of multiple balloons with water.  The PTAB has instituted PGRs for both patents.  Appx6872-6906, Appx6910-6949.

This appeal differs from the one that this Court addressed in Zuru I in at least four very significant respects:

- The '749 and '282 patents at issue here have broader claim scope than the '066 patent that was at issue in Zuru I, including with respect to the critical "elastic fastener" limitation;

- Telebrands asserts here a new prior art reference—the 1991 Donaldson patent— that teaches the  "elastic fastener" limitation;

- The accused product here is a different product—called Battle Balloons—that the magistrate judge found, based on a '066 claim limitation that is also found in the '749 patent, was not a colorable variation of the Balloon Bonanza product; and

- The highly deferential "plain error" standard of review that this Court

3

applied to the court's preliminary injunction validity determinations in Zuru I does not apply here.[1]

Rather than assess whether the patents in suit here were "vulnerable" and whether Zuru carried its burden of proving that Telebrands' defenses lacked "substantial merit," the court below disregarded Telebrands' key evidence and credited Zuru with arguments and non-existent evidence that Zuru never offered. Because Zuru did not come close to making a "clear showing" that it was entitled to a preliminary injunction, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), this Court should reverse.

## II.    Zuru's Lawsuits and Telebrands' Development of the Accused Battle Balloon Products

Telebrands is a leading developer and marketer of consumer products, and has received many awards for its achievements. Appx2728-2729, Appx2735-2737. In December 2014—before publication of any Zuru patent application or issuance of any Zuru patent, Appx89, Appx100, Appx1700—Telebrands began marketing Balloon Bonanza, a toy product for filling and sealing multiple balloons. Appx2729. Balloon Bonanza is *not* the subject of the preliminary injunction that is at issue in the current appeal.

---

[1] In Zuru I, this Court applied the "plain error" standard of review to Telebrands' invalidity defenses because of a failure to object to the magistrate judge's validity findings. *Tinnus*, 846 F.3d at 1205-207. That is not an issue here, where all grounds of appeal were preserved below. *See* Appx4660-4670; Appx6492-6499.

On June 9, 2015, Zuru's '066 patent issued.  Appx1700.  In *Tinnus Enterprises, LLC, et al. v. Telebrands Corp. et al.*, 6:15-cv-00551-RC-JDL (E.D. Tex.) ("Zuru I"), Zuru asserted the patent against Telebrands' Balloon Bonanza product.  The district court preliminarily enjoined Telebrands on December 22, 2015.  Appx1738-1739. That preliminary injunction is not at issue here.



**Battle Balloons**

In the interim, Telebrands redesigned its balloon-filling product, which it finalized in late 2015.  Appx2729.  The new product is Battle Balloons, Appx2729, the subject of the preliminary injunction that is at issue in this appeal. Unlike Balloon Bonanza (below, left), which had a flat-faced housing with multiple holes, the Battle Balloons (below, right) housing is larger, with helical steps.  Appx2730.



**Prior Product's Housing:
Balloon Bonanza Side View**



**New Product's Housing:
Battle Balloons Side View**

As illustrated above and to the right, the helical steps start near the middle of the housing and progress up along the sides of the housing.  Each helical step has a single hole for receiving one hollow tube, to be used to fill a balloon.  Appx2335. The configuration of the  housing is an important feature of the claims.

In response to Telebrands' introduction of *Battle Balloons*, Zuru moved in Zuru I to hold Telebrands in contempt of the earlier preliminary injunction that the court had issued against *Balloon Bonanza*.  Appx1739.  The magistrate judge denied the motion, finding "that the modifications to the housing of the Battle Balloons products are significant, such that the Battle Balloons products are more than colorably different from the Balloon Bonanza products."  Appx1745. The magistrate judge found that the differences between the two products implicated "claim elements the examiner had found to be significant when issuing the '066 Patent." *Id.* These elements included the limitation, also present in the '749 patent claims, requiring a "plurality of holes extending through a common face of the housing at a second end."  Appx1743-1744.   Zuru did not object to the magistrate judge's report and recommendation.

The '749 patent—a continuation of the '066 patent—issued on January 26, 2016.  Appx89.  That same day, Zuru filed this lawsuit against Battle Balloons, its second patent infringement action against Telebrands ("Zuru II").  Appx61, Appx120.  The patent owner, Tinnus, simultaneously filed suit against Wal-Mart,

6

in *Tinnus Enterprises, LLC, et al. v. Wal-Mart Stores, Inc. et al.*, 6:16-cv-00034-RWS-JDL (E.D. Tex.) ("Retailer Action"). Appx3846-3847. On April 19, 2016, the '282 patent issued. Appx100. Zuru then amended its complaint in Zuru II to add the '282 patent, Appx61, Appx134, and Tinnus amended its complaint in the Retailer Action to add the other Retailer defendants and the '282 patent. Appx10047-10050.

## III.    Technology Background

The "Technical Field" of Zuru's patents is "a system and method for filling containers with fluids." Appx97 at 1:19-21, Appx109 at 1:20-24. "Fluids" can include gases, such as "gaseous . . . medications," and liquids, such as urine and blood. Appx97 at 1:26-27; *see also* Appx97 at 2:41-42, Appx98 at 3:17-19, Appx211 ¶10; Appx2344 ¶59; Appx2358 ¶113. The inventions are also directed to sealing the filled containers. The claimed inventions have multiple applications, including in the medical field, and can use different types of containers, including balloons and test tubes. Appx97 at 1:26-27, Appx98 at 3:17-22, 3:28-38.

### A.    Prior Art Fluid-Delivery Housings

Zuru's patents are recent additions to a very crowded field. The prior art is replete with housings of all shapes and sizes for delivering fluids to multiple containers. For example, a 2010 patent publication to Furey, and an unrelated

7

product called the "Air Force Inflator" that was offered to the public at least by June 2013, each delivers fluid to expandable containers using tubes extending from a flat-faced housing.  Appx2545, Appx2592.  The Furey device is for delivering a liquid, the Air Force Inflator is for delivering a gas (air). Appx2551 ¶42, Appx2592.





**Furey Fig. 1 (Appx2545-2546)**          **Air Force Inflator (Appx2592)**

Similarly, a 2002 patent to Weir discloses a balloon-filling device shaped like a vase, in which the balloons touch one another, both before and after they are inflated with air.  Appx2652-2653; Appx2655 at 2:23-34.







**Weir Fig. 1 (Appx2653)**    **Weir Fig. 2 (Appx2654)**

A 2013 patent publication to Saggio, Appx2537, and a 2008 patent publication to Boise, Appx1848, disclose balloon-filling devices with tubes extending from a tubular housing, as shown below. Saggio's housing is for "fill[ing] a large number of balloons 10 simultaneously" with water. Appx2542 ¶24. Boise's housing performs the same function; Boise further states that "the device can fill any number of balloons with any substance, e.g. liquid, gas . . . ." Appx1887 ¶21.



**Saggio Fig. 7 (Appx2540)**          **Boise Fig. 5 (Appx1853)**

### B.    Prior Art Methods of Sealing and Closing Containers

Like the Zuru patents, the prior art recognized that, after balloons or other containers are filled with a fluid, tying or closing the containers can be difficult and/or tedious, particularly for children. Appx2541 ¶¶3-4, Appx2602 at 1:34-57. Thus, the prior art disclosed automatically sealing or closing the containers after they are filled with a fluid, including with (1) an internal elastic membrane in a balloon or (2) an elastic ring (*e.g.*, an O-ring or rubber band):





| **Saggio's Specialized Balloon (red highlighting added) (Appx2538)** | **Excerpted Donaldson Fig. 1 (red highlighting added) (Appx2597)** |
|---|---|

For example, Saggio—the same reference discussed above as teaching a housing for simultaneously filling balloons with water—also discloses balloons having an internal elastic membrane 18 that automatically seals water in the balloons when they are detached from the housing. Appx2538-2540, Appx2541 at ¶¶7, 17-21; Appx4508.

In addition, Donaldson, a 1991 patent, discloses an elastic ring (the O-ring depicted below) that performs three functions:

- clamping the balloon onto a cylindrical tube while the balloon is being filled;

- detaching—and permitting the balloon to detach with it—after the balloon is at least partially filled with fluid; and

- automatically sealing the balloon upon detachment.

Appx2596 at Abstract; Appx2602 at 2:39-41, Appx2602 at 1:64-68, Appx2603-

11

2604 at 4:65-5:10.   Zuru's technical expert admitted in his deposition that

Donaldson discloses an O-ring that detaches after a balloon at least partially fills

with fluid and the cylinder upon which the O-ring sits accelerates away from the

O-ring.  Appx6026 at 300:18-301:4, 301:24-302:7.

The O-ring 20 of Donaldson is illustrated below:

 

**Donaldson Fig. 1**
**(red highlighting added)**
**(Appx2597)**

**Donaldson Fig. 5**
**(red highlighting added)**
**(Appx2599)**

Yet another prior art reference, a 2005 patent publication to Lee[2], similarly

discloses using an elastic ring (a rubber band) that:

- clamps a balloon onto a tube while the balloon is being filled;

- detaches—and permits the balloon to detach with it—after the

  balloon is at least partially filled with fluid and a force is applied to it;

---

[2] Like the Zuru patents, Lee has applications in the medical field.  Appx2615 ¶17.

and

- automatically seals the balloon upon detachment.

Appx2616 ¶33.



**Lee (Appx2277)**

### C.    The Patents In Suit:  '749 and '282 Patents

#### 1.    The specifications

The '749 and '282 patents disclose systems for simultaneously filling and sealing containers with fluids.  After reaching a desired size, the containers can be removed by pulling them off  by hand, by shaking them off, or by their simply falling off. Appx98 at 3:46-65, 4:57-59; Appx110 at 3:51-4:3, 4:63-67.   The patents acknowledge that the shape of the housing is unimportant to this functionality. Appx99 at 6:17-24; Appx111 at 6:17-24.



13

The patents teach that elastic fasteners—such as rubber bands or O-rings—can be used to detachably hold the containers on tubes.  Appx97 at 2:55-57; Appx98 at 3:4-6.  The patents do not attempt to differentiate the O-rings/rubber bands that are described in the patent from those used in the prior art.  Indeed, Zuru's expert conceded in his deposition that Donaldson's prior art elastic fastener is *structurally identical* to the patents' elastic fastener.   Appx6033 at 329:5-10; *cf.* Appx6025 at 295:3-12. The Zuru patents do not suggest that an elastic fastener must have certain dimensions or specify a quantitative strength metric.   Appx3747 ¶¶7-9.  The patents also state that the claimed fastener can be used with different types of fluids (*e.g.*, gases and liquids).  Appx3747 ¶8.

## 2.    The claims

The '749 patent has a single claim (claim 1); the '282 patent has one independent claim (claim 1), and two dependent claims. Zuru alleges that Battle Balloons infringes all four claims, which are apparatus claims that use functional claim language.

Claim 1 of the '749 patent is similar to—but broader than—claim 1 of the parent '066 patent.  *Compare* Appx99 *with* Appx1710; *see also* Appx2533 ¶13 (PTO states that "claim 1 of the pending application is broader than patent claim 1 of the '066 patent").  Both claims include the "plurality of holes extending through a common face of the housing at a second end" limitation on which the magistrate

14

judge relied to deny Zuru's contempt motion in Zuru I.  Appx99 at 6:36-38, Appx1710 at 6:31-33, Appx1742, Appx1745.  In contrast to the '066 patent claims, which require that shaking a container that is substantially filled with water must actually *cause* the container to detach, the '749 patent merely provides that detachment is *permitted* upon the container being at least partially filled with "fluid" and/or shaken.  Specifically, the '066 patent recites "each elastic fastener configured to provide a connecting force . . . such that shaking the hollow tubes in a state in which the containers are substantially filled with water overcomes the connecting force and *causes* the containers to detach . . . ." Appx1710 at 6:41-51 (emphasis added).  In contrast, the '749 patent recites "each elastic fastener being sufficiently limited to *permit* its respective container to detach . . . upon one or more of (1) at least partially filling the container with a fluid and (2) shaking the housing . . . ."  Appx99 at 6:50-54 (emphasis added).

The independent claims of the '749 and '282 patents are substantially the same as one another, with two exceptions.  Appx99, Appx111.  First, claim 1 of the '282 patent omits the "plurality of holes extending through a common face of the housing at a second end" limitation.  Appx111.  Second, claim 1 of the '282 patent adds a requirement that at least two containers press against one another in both unfilled and filled states.  *Id.*

15

## IV.    Preliminary Injunction Background

### A.    Zuru I Claim Constructions

On April 28, 2016, the district court issued its claim construction opinion in Zuru I for the '066 patent.  Appx2487, Appx2512.  Some of the same claim terms are also present in the asserted claims of the '749 and '282 patents that are the subject of this appeal. The claim constructions of principal relevance to this appeal are:

| Term | Court's Construction |
|---|---|
| "common face" ('749 patent) | "a shared outer surface of the housing through which a plurality of holes extend," Appx2496 |
| "second end" ('749 patent) | "an outer limit of the housing distinct from the first end," Appx2499 |
| "shaking" ('749 and '282 patents) | "applying an acceleration," Appx2509 |

The magistrate judge purported to apply these constructions in its July 12, 2016 opinion recommending issuance of a preliminary injunction against Telebrands.  Appx11-12, Appx19.

### B.    The Preliminary Injunction Proceedings

On May 3, 2016, Zuru moved for a preliminary injunction against Telebrands in Zuru II, based on the '749 and '282 patents.  Appx184.  On May 13, 2016, plaintiff Tinnus (but not Zuru) moved for a preliminary injunction against the Retailers in the Retailer Action based on the '066, '749, and '282 patents.  Appx10104.  Both motions were directed only at Battle Balloons.

16

In June 2016, the magistrate judge consolidated Zuru II and the Retailer Action and held a preliminary injunction hearing on both motions. Appx3846, App6108. On July 12, the magistrate judge issued a report recommending a preliminary injunction against Telebrands with respect to the Battle Balloons product and the '749 and '282 patents. That report and recommendation addressed only Zuru's motion against Telebrands, not Tinnus's motion against the Retailers. Appx1, Appx44. The district court judge adopted the recommendations on September 29. Appx30, Appx42. The court ordered the parties to "submit to the Court a proposed bond amount and injunctive order . . . ." Appx41.

In response, Plaintiffs Zuru and Tinnus jointly requested that the Retailers be "subject to the injunctive order . . . ." Appx5934.[3] The district court denied this request, stating that there was a "separate motion" pending against the Retailers, and that "the Court will rule on that motion in turn." Appx44. On November 1, the magistrate judge denied that separate motion as "moot," but ruled that he would "take up the question regarding whether a further injunction should issue against the retailers in the context of supplemental briefing . . . ." Appx6109. The district court subsequently granted the preliminary injunction against the Retailers,

---

[3] The only movant for a preliminary injunction against the Retailers was Tinnus, not Zuru. At the preliminary injunction hearing, in response to the Retailers' motion to dismiss for failure to join an indispensable party, Plaintiff Zuru stated that it would abide by an order joining it as an "involuntary plaintiff." Appx441 at 6:6-19. In response, the magistrate judge joined it in the Retailer action as an "involuntary plaintiff." Appx4443 at 8:7-8.

on the '749 and '282 patents only (i.e., not with respect to the '066 patent).

Appx6629, Appx6635, Appx7022-7023.

## C.    The Claim Constructions Used by the Court to Grant the Preliminary Injunctions

In its July 12 opinion recommending that Telebrands be preliminarily

enjoined, the magistrate judge purported to apply the Zuru I constructions of

"common face," "second end," and "shaking."  Appx11-12, Appx19.  In response

to Telebrands' non-infringement arguments, however, the magistrate judge

"clarifie[d]" that the phrase, "outer limit," in the construction of "second end"

actually means "outer surface."  Appx11, Appx13-14.  The chart below shows the

court's original and clarified constructions of "second end":

| Court's Original Construction of "Second End" | Court's Clarified Construction of "Second End" |
|---|---|
| "an outer *limit* of the housing distinct from the first end," Appx2499 (emphasis added) | "an outer *surface* of the housing distinct from the first end," Appx14 (emphasis added) |

The district court judge applied this clarified construction in its order

adopting the magistrate judge's preliminary injunction recommendation against

Telebrands.  Appx33-34.  But after the preliminary injunction issued against

Telebrands and before one issued against the Retailers, the district court changed

its mind.  In a claim construction proceeding for the '749 patent, Telebrands

argued that the district court's clarified construction improperly broadened "second

18

end" to include all outer surfaces that are distinct from the first end.  Appx7072.

Telebrands also urged that if "the Court does intend for 'limit' to be synonymous

with 'surface,' that construction should be reflected in the definition so that the

experts aren't arguing about the word 'limit' in front of the fact finder . . . ."

Appx6581.  The magistrate judge rejected Telebrands' request and erroneously

suggested that "Defendants' expert" was "continuously modifying" the

interpretation of the lower court's construction, *even though it was actually the

testimony of Zuru's expert that the court cited*.  Appx7072, Appx7096-7098,

App7103.

On March 14, 2017—the day the court issued the preliminary injunction

against the Retailers—the district court stated that "'surface' is *not* included in the

definition of 'limit.'"  Appx6838 (emphasis added).  Instead, the court stated that

"the term 'limit' as used in the construction of 'second end' is synonymous with

the plain and ordinary meaning of an 'end' of the housing. . . .  With these

clarifications, the Magistrate Judge's construction is clear and there are no further

clarifications required."  Appx6838-6839.

## V.    PTAB Proceedings

On August 8 and 12, 2016, Telebrands filed PGR petitions with the PTAB

for the '749 and '282 patents, raising many of the same invalidity defenses that it

presented to the district court.  Appx5128-5129, Appx5132-5134, Appx5274-5276.

On February 21, 2017, the PTAB instituted post grant review of both the '749 and

'282 patents.  Appx6872-6906, Appx6910-6949.  For the '749 patent, the PTAB

concluded that Telebrands "has established that it is more likely than not that it

will prevail under 35 U.S.C. § 103 on its challenges to claim 1 as obvious over the

combination of Cooper, Saggio, and Donaldson, and to claim 1 as obvious over the

combination of Saggio and Donaldson."  Appx6905.  For the '282 patent, the

PTAB concluded that Telebrands "has established that it is more likely than not of

prevailing on its challenge under 35 U.S.C. § 103(a) that claims 1-3 would have

been obvious over the combination of Cooper, Saggio, and Donaldson," and that

"it is more likely than not that it will prevail on its challenge, under 35 U.S.C. §

112(b), to claims 1-3 as unpatentable for indefiniteness."  Appx6947.[4]  Telebrands

notified the district court about both of these institution decisions.  Appx6869,

Appx6907.   On May 5, 2017, the PTAB denied the patent owner's request for a

rehearing of both institution decisions.  On May 16, 2017, Tinnus filed a petition

for a writ of mandamus with this Court seeking an order "directing the United

States Patent and Trademark Office, Patent Trial and Appeal Board, to deny

institution in two PGR proceedings."  *In re Tinnus Enterprises LLC*, Case No.

2017-121 (Fed. Cir.).  On May 19, that petition was denied.

---

[4] The PTAB previously concluded that all claims of the parent '066 patent that had
not already been disclaimed are unpatentable for indefiniteness under 35 U.S.C. §
112(b).  *Telebrands Corp. v. Tinnus Enters., LLC*, PGR2015-00018, 2016 WL
7985419, at *14 (PTAB Dec. 30, 2016).

# SUMMARY OF THE ARGUMENT

The district court erred in finding likelihood of success on the merits and irreparable harm.

### A.    The District Court Erred in Finding No Substantial Issue of Obviousness for the '749 and '282 Patents

Zuru did not come close to establishing that Telebrands' obviousness defenses lacked substantial merit. The district court improperly rejected Telebrands' straightforward obviousness combination of 1) one or more prior art devices having tubes for simultaneously filling multiple containers with fluid, with 2) prior art elastic fasteners that both clamp containers on tubes and then seal the containers with fluid inside, after the containers detach from the tube. The district court improperly rejected Telebrands' prior art references as inapposite because some of them disclosed devices for filling containers with gasses such as air, rather than water. In so doing, it overlooked that the claims of the patents-in-suit do not specify water or liquid but rather expressly recite apparatuses for filling containers "with fluid," which includes both gasses and liquids. Appx98-99 at 3:17-19, 6:55-56.

The district court also misconstrued the claim limitation that requires an elastic fastener that is sufficiently weak to "permit" a container to detach upon "at least partially filling the container" and/or "shaking the housing." Appx99 at 6:46-

54.  Ignoring the specification and plain meaning of the term "permit," the court misinterpreted the claims as excluding prior art elastic fasteners that detach after force has been applied manually or through mechanical means.  The district court also improperly ignored the unrebutted evidence that the prior art fasteners were *necessarily capable* of being detached by shaking; it erroneously focused instead on the irrelevant inquiry of whether the prior art disclosed a person manually shaking the elastic fasteners off the tubes.

### B.    The District Court Erred in Finding No Substantial Non-Infringement Issue for the '749 Patent

The district court's '749 patent infringement analysis is premised on claim constructions that are inconsistent with the file history.  During prosecution, the patentee distinguished a prior art reference on the grounds that it did not teach the "plurality of holes extending through a common face of the housing at a second end."  But as misconstrued by the district court, that limitation now reads directly on the same prior art that was distinguished during prosecution. The district court also ignored that Battle Balloons does not have a "plurality of holes" in a "common face" because each step of the housing is a discrete surface with only a single hole, not a plurality of holes. Finally, the district court inconsistently applied the "second end" limitation to Battle Balloons and the prior art.

### C.    The District Court Erred in Finding Irreparable Harm

Zuru's own pricing data for its Bunch O Balloons product demonstrates that there was no irreparable price erosion harm attributable to Telebrands' Battle Balloons.  And the evidence is also too scant to establish proof that any other alleged harms were "irreparable."

## ARGUMENT

### I.    Standard of Review

"[I]njunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.

On appeal from the grant of a preliminary injunction, appellate courts "review the District Court's legal rulings *de novo* and its ultimate decision to issue the preliminary injunction for abuse of discretion."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006).  A court abuses its discretion if it commits "a clear error of judgment in weighing the relevant factors or exercise[s] its discretion based on an error of law or clearly erroneous fact finding." *Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 95 (Fed. Cir.

23

2014) (internal citation and quotation marks omitted); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.").

## II.    The District Court Erred in Finding that Zuru Proved Likelihood of Success on the Merits

"Vulnerability is the issue at the preliminary injunction stage . . . ." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2001).  If Telebrands asserted an invalidity or non-infringement defense that Zuru "cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Id.* at 1350-51.

### A.    The District Court Erred in Finding that there Was No Substantial Issue of Obviousness for the '749 and '282 Patents

The district court erred in rejecting Telebrands' strong evidence that one of ordinary skill in the art would have found it obvious to combine the above-described prior art fluid-delivery housings such as Saggio or Air Force Inflator with the conventional elastic rings taught in Donaldson or Lee.  Appx3749 ¶14. For example, Telebrands showed that the '749 claim was rendered obvious either

24

by (1) the combinations of Saggio and Cooper[5] plus Donaldson or Lee; or (2) the combination of Air Force Inflator plus Donaldson or Lee.  Appx3749 ¶14.  For the '282 patent claims, the claims are rendered obvious "by any of the prior art combinations that render the claims of the . . . '749 patent obvious" because claim 1 of the '282 patent is broader in all respects except one:  it additionally requires pressing of two or more containers.  Appx12051.  On that point, Telebrands presented unrebutted expert testimony that it would have been obvious to modify balloon filling devices to include the "pressing" limitation added to the '282 patent's claim 1.  Appx2359 at ¶¶117-118.  Telebrands alternatively urged a combination of Weir plus Donaldson or Lee.  Appx2360-2363 at ¶¶118-125.[6]

As explained below, in finding Telebrands' obviousness arguments not to be substantial, the district court:

- improperly distinguished prior art based on the court's erroneous construction of "fluid" that neither party advocated;

- improperly distinguished the prior art based on the court's erroneous

_____

[5] Cooper teaches that a flat-faced housing design was obvious.  Appx2350-2355, Appx2643-2648.  But the district court's construction of the "common face of the housing at a second end" limitation in the '749 patent rendered Cooper unnecessary because, under the court's extremely broad constructions, the housing need not be flat.  App4492 at ll. 10-22; Appx4605-4620, Appx5454, Appx5458-5463.

[6] At the preliminary injunction hearing and in its objections to the magistrate judge's recommendations, Telebrands focused on the combination of Saggio with Donaldson, Appx4506-4510, Appx4567-4569—the two primary references relied upon by PTAB to initiate invalidity proceedings.  Appx6905, Appx6947.

interpretation of—and application of—the "sufficiently limited"
limitation;

- improperly credited unsupported Zuru attorney arguments that
  Donaldson did not disclose the "sufficiently limited to permit . . .
  detach[ment] . . . upon . . . at least partially filling" and/or "shaking"
  limitation without any evidence or supporting expert testimony; and

- erroneously concluded that secondary considerations overcome any
  finding of obviousness.

At a minimum, the "very open question[s]" discussed in this section
preclude a ruling that Plaintiffs made a clear showing on invalidity. *See Helifix Ltd.
v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1351 (Fed. Cir. 2000).

### 1. The district court erred in misinterpreting "fluid" to exclude gasses

Asserted claim 1 of the '749 patent, and claims 1-3 of the '282 patent recite
apparatuses "configured to fill the containers . . . with fluid . . . ." Appx99 at 6:55-
56, Appx111 at 6:52-53. The parties agreed that the patents' use of "fluids" refers
to both liquids *and gases*. Appx211 ¶10; Appx2344 ¶59; Appx2358 ¶113;
Appx1681; Appx97-98 at 1:26-27, 2:41-42, 3:17-19, 3:28-30.

Nevertheless, the magistrate judge repeatedly and erroneously equated
"fluid" with liquids and thereby distinguished claim 1 in the '749 and '282 patents

from the prior art on the irrelevant grounds that the prior art references did not

teach the use of "water":

- "as was the case with Weir [an air-filling device], neither Donaldson nor the Air Force Inflator discloses a mechanism for filling containers with a fluid such as *water*. . . . Again, Telebrands has not plausibly connected these teachings to containers filled with *fluid*." Appx20-21 (emphasis added).

- "[Telebrands' expert] *concedes* these references do not disclose 'water balloons' . . . ." Appx15 (emphasis added).

- "However, neither Weir nor Donaldson teaches a method for filling a container with *fluid* and corresponding detachment thereof by partially filling or shaking. . . . Donaldson teaches mechanically sealing a balloon that is *not filled with water* . . . ." (Appx15 (emphasis added).

- "[Telebrands' expert] does not explain how it would have been obvious to apply the teachings of Weir and Donaldson to balloons filled with water . . . ." Appx15.

-  "The term 'unfilled state' [in '282 claim 1] simply means a state in which there is no water in the containers." Appx9.

The district court judge erroneously adopted these findings without

modification. Appx30. In particular, the district judge concluded that the findings

were not problematic because "[t]he Magistrate Judge's finding of no *motivation to*

*combine* the prior art references was not based on including or excluding air . . . ."

Appx36 (emphasis added). This statement is clearly incorrect: the adopted

findings of the magistrate judge specifically found the *references to be irrelevant*

*to the invalidity analysis.* For example, while distinguishing a prior art combination

of the Air Force Inflator with Donaldson (both of which use gas), the district court

27

expressly states that "as was the case with Weir [another air-filled reference], neither Donaldson nor the Air Force Inflator discloses a mechanism for filling containers with a fluid such as *water*. . . . Again, Telebrands has not plausibly connected these teachings to containers filled with *fluid*." Appx20-21 (emphasis added). But both Air Force Inflator and Donaldson unambiguously taught the use of a "fluid," as that term is defined in the specification and agreed upon by the parties. Appx211 ¶10; Appx2344 ¶59; Appx2358 ¶113; Appx1681; Appx97-98 at 1:26-27, 2:41-42, 3:17-19, 3:28-30. The magistrate judge also discounted a combination of Donaldson with Weir—both of which use gas—because the combination did not teach the use of water. Appx15-16.

Because it applied an erroneous construction of "fluid" that was restricted to water, the district court abused its discretion. *Cooter*, 496 U.S. at 405 ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.").

### 2. The district court erred in interpreting and applying "the sufficiently limited to permit . . . to detach" limitation

The '749 and '282 patent claims require each elastic fastener to be "configured to restrict detachment" such that the restriction is "sufficiently limited to permit [the elastic fastener's] respective container to detach . . . upon *one or more of* (1) at least partially filling the container with a fluid and (2) shaking the

housing." Appx99 at 6:47-54 (emphasis added); Appx111 at 6:43-50. The district court erred in its analysis of the prior art's teachings regarding this limitation:

1. It committed legal error in interpreting the law regarding motivation to combine, which paved the way for the court to then ignore Telebrands' largely unrebutted evidence on that issue ;

2. It interpreted "permit" to mean "caused by" instead of its plain and ordinary meaning, "allow";

3. It ignored that the Donaldson reference unambiguously discloses an elastic ring that detaches "upon at least partially filling"; and

4. It ignored unrebutted evidence that the prior art O-rings/rubber bands used in the obviousness combinations were inherently capable of performing the "shaking" function.

### a. The prior art need not expressly disclose a method of detaching a container by shaking in order for there to be a motivation to combine

The '749 and '282 claims are apparatus claims—they "cover what a device *is*, not what a device *does*." *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) (emphasis in original). The relevant inquiry is therefore whether the claims are "unobviously different" from the prior art, not whether they "*operate* differently . . . ." *Id.* at 1468 & n.2. (emphasis in original). In other words, if there is an obvious combination of prior art references that

includes an "elastic fastener" *capable* of performing the claimed functions, the

claims are obvious—regardless of whether the prior art explicitly discloses an

elastic fastener actually performing that function.

Here, the district court judge characterized the magistrate judge as having

found "no motivation to combine . . . based on . . . the prior art not disclosing a

*method* for filling a container with fluid and detaching it by shaking or partially

filling the container."  Appx36 (emphasis added). The district court's statement is

clearly incorrect. First, the claims at issue are apparatus claims, not method claims.

Second, the magistrate judge's report and recommendation does not include the

district judge's stated conclusion; in fact, it barely mentions motivation to

combine.  Appx21, Appx23.  Third, even assuming for the sake of argument that

the magistrate judge had indeed reached this conclusion, it is erroneous: "any need

or problem known in the field of endeavor at the time of invention and addressed

by the patent can provide a reason for combining the elements in the manner

claimed." *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 420 (2007).  And here,

Telebrands offered *undisputed* evidence of motivations to combine O-rings/rubber

bands with well-known fluid-delivery housings, including that: 1)  O-rings/rubber

bands eliminate the need to use hands to hold the containers on the tubes (each of

the prior art housings has several tubes); 2) Donaldson and Lee teach that O-rings

can be used to hold containers on tubes and seal balloons; and 3) O-rings/rubber

bands are cheaper, easier, and more convenient than Saggio's disclosed way of automatically closing a balloon.  *See* Appx4508; Appx2349 ¶71; Appx2541 ¶¶3-5; Appx2602 at 1:10-49; Appx3749-3752 ¶¶14-17, 24-25; Appx4603-4604; Appx5482.

The inquiry that the court should have undertaken but did not is whether Telebrands' proffered obvious combination of a prior art fluid-delivery housings such as Saggio or Air Force Inflator with the conventional elastic rings taught in Donaldson or Lee results in an apparatus with elastic fasteners that are necessarily capable of performing the claimed functions.  As discussed below, it does.

> **b.    The district court erred in finding that the prior art does not disclose an "elastic fastener" that is "sufficiently limited to permit" a container to detach "upon . . . at least partially filling the container"**

The elastic fastener used in the claimed apparatus must be either (1) "sufficiently limited to permit [the elastic fastener's] respective container to detach . . . upon . . . at least partially filling the container with a fluid"; or (2) "sufficiently limited to permit [the elastic fastener's] respective container to detach . . . upon . . . shaking the housing."    Appx99 at 6:47-54; Appx111 at 6:43-50.[7]  Because the court below committed an error of law and made clearly erroneous factual errors in

---

[7] Of course, the fastener also meets the claims if it is capable of performing *both* of these functions.

interpreting and applying part (1) of this functional limitation, it then improperly applied the obviousness combinations urged by Telebrands.

First, the court erroneously interpreted "sufficiently limited to *permit*" detachment to mean "sufficiently limited to *cause*" detachment.  For example, the magistrate judge stated that "Donaldson is actually distinguishable from the present invention, *as Donaldson does not teach removing the container by partially filling . . . .*"  Appx16.[8]  But the magistrate judge is wrong that claim language imposes a causation requirement; the claim states that the elastic fastener "permits" (*i.e.*, *allows*) detachment upon at least partially filling.  Thus, if a container detaches when it is at least partially filled with a fluid, it meets this limitation, even if some other force (such as shaking or removal by hand) aids its detachment.

This conclusion is compelled by the intrinsic record.  The '749 and '282 specifications disclose an embodiment where the containers "may be detached" by "pulling them away" from the tubes after filling. Appx98 at 3:46-49, 4:57-59; Appx110 at 3:51-54, 4:63-67.  These disclosures consistently use the permissive language, "may be detached."  The related '066 patent shows that Zuru well

---

[8] The district court thereby purported to distinguish the "sufficiently limited" limitation in the claims from Donaldson's and Lee's elastic rings based on Donaldson's using a "mechanical release that includes a firing pin" (Appx15) to initiate the filling of the balloon with pressurized gas (*i.e.*, the "fluid"), and Lee's disclosure that that its rubber band is pushed off after at least partially filling. Appx15-16, Appx21, Appx23.

understood the difference between *permitting* detachment and *causing* detachment. Specifically, the '066 patent claims recite that shaking a container substantially filled with water "causes" the containers to detach. Appx1710 at 6:41-51. Zuru's decision to use the word "permit" in the '749 and '282 patents (instead of "causes") was deliberate and must be given meaning.

The district court abused its discretion by erroneously interpreting "permits" to mean "caused by." Donaldson and Lee explicitly disclose elastic rings that permit (*allow*) detachment of balloons after at least partially filling them with a gas, *i.e.*, a fluid. Appx2602 at 1:64-68, Appx2603-2604 at 4:65-5:10; Appx2616 ¶33; Appx2348-2349 ¶¶69, 74; Appx4506-4507 at 71:20-72:5.

Second, even if the "sufficiently limited" limitation were interpreted to require that the container "must" detach "upon" "at least partially filling," Donaldson would still meet the limitation. Donaldson discloses that automatic detachment occurs during or just after filling with a fluid, stating that the balloon "is automatically released and sealed *when a predetermined inflation pressure is achieved*." Appx2602 at 1:66-68 (emphasis added); *see also* Appx2603-2604 at 4:53-5:10. And the undisputed expert testimony below was that Donaldson's "O-ring also allows the balloon and the O-ring to release from the hollow tube after the balloon is at least partially filled with a fluid." Appx2348 at ¶69 (citing Appx2603-2604 at 4:53-5:10); *see also* Appx4506-4507 at 71:20-72:5.

33

### c. The district court improperly ignored evidence that the elastic ring in the obviousness combination was necessarily capable of being shaken off

The "sufficiently limited to permit" detachment limitation is also met if the "elastic fastener" is configured to permit detachment upon "shaking the housing." Appx99 at 6:47-54; Appx111 at 6:43-50. Although the district court correctly defined "shaking" to mean "applying an acceleration," Appx19, Appx2509, the district court incorrectly compared the limitation to the prior art in two ways.

First, the magistrate judge ignored evidence that the prior art O-rings and rubber bands disclosed in Donaldson and Lee were *inherently capable* of being shaken off. Instead, it adopted two red herrings urged by Zuru: 1) that the mechanical mechanisms in the prior art allegedly caused the O-rings in the disclosed apparatuses to release the balloons, and 2) that there is no express teaching of detachment by manual shaking. Appx15-16, Appx20-21, Appx23. But neither "fact" has anything to do with obviousness. Telebrands' obviousness case correctly focused on the physical characteristics of the O-rings in the prior art—not the *mechanisms* that Donaldson or Lee use to detach the containers. Appx4507 at 72:6-19; Appx3749-3750 ¶¶ 14-20; Appx2349 ¶¶ 71-72; *see also* Appx3485, Appx4602-4603, Appx5463.

The *unrebutted* evidence is that the disclosed O-rings are *necessarily* capable of detaching if sufficiently shaken. Appx3748-3750 ¶¶10-11, 19-20,

Appx4504-4510 at 69:25-71:2; 74:14-75:18; *see also* Appx2350 ¶¶ 78-79,

Appx2644-2648 ¶¶84-95.[9]  It is therefore irrelevant that Lee and Donaldson do not

themselves explicitly describe shaking. *Santarus, Inc. v. Par Pharm., Inc.*, 694

F.3d 1344, 1354 (Fed. Cir. 2012) ("To hold otherwise would allow any

formulation—no matter how obvious—to become patentable merely by testing and

claiming an inherent property.")

Nevertheless, the district court adopted the magistrate judge's

recommendations in full, Appx30, without acknowledging Telebrands' objection

that the magistrate judge ignored the real issue: the *capabilities* of the disclosed O-

rings. Appx35-38.  The district court simply commented that inherency is a "high

standard," but did not explain why Telebrands allegedly had not met it here.  In

fact, Telebrands did meet the standard. Telebrands' expert was the only one to

opine on the issue; he explained why a sufficient acceleration would *necessarily*

cause detachment.  Appx4507 at 72:6-19; Appx3749-3750 ¶¶14-20; Appx2349

¶¶71-72; *see also* Appx3485, Appx4602-4603, Appx5463.  Although the district

court cited two paragraphs from Zuru's expert, Appx37 (citing Appx3018-3019

¶¶59-60), they do not address inherency, let alone the inherent characteristics of

---

[9] The prior art elastic fasteners are agnostic as to the source of the detaching
force—it could be a hand pulling at it, gravity, or some other acceleration.

the fastener disclosed in Donaldson.[10]

The reason why Zuru's expert ignored the O-ring of Donaldson and instead attempted to distract attention to the irrelevant mechanism that Donaldson used to fill the balloon is that the O-ring is inarguably capable of being removed with "an acceleration" (i.e., "shaking," as defined by the district court).  Donaldson teaches that the O-ring can be detached after at least partially filling a balloon with fluid, and that detachment from a cylindrical tube occurs when that tube moves away from the balloon and O-ring.  Specifically, as shown below, Donaldson's O-ring and balloon are seated on the outer surface of a cylindrical tube.  Appx2597-2598.  After firing pin 60 punctures container 56, "fluid" in the container escapes, filling the balloon and causing the surface upon which the O-ring and balloon are seated to disappear, causing the balloon to release. Appx2603-2604 at 4:33-44, 5:2-6; *see also* Appx2596 at Abstract.

---

[10] Plaintiffs' expert's testimony is irrelevant to inherency. He merely restates the limitation and summarily claims that it is absent:  "[a]s with Donaldson, the elastic fastener of Lee is not 'sufficiently limited to permit its respective container to detach from its respective tube upon one or more of (1) at least partially filling the container with fluid and (2) shaking the housing.'"  Appx3018-3019 ¶59.  His conclusory statement is not even competent for consideration on a summary judgment motion,  *Techsearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371-72 (Fed. Cir. 2002), let alone a preliminary injunction motion.







**Donaldson Fig. 1 (Appx2597)**       **Donaldson Fig. 5 (Appx2599)**
**(red highlighting added)**       **(red highlighting added)**

Donaldson unambiguously discloses an O-ring that is capable of detaching

when the tube upon which it is attached accelerates away (*i.e.*, is "shaken," per the

district court's construction).[11]   And even assuming for the sake of argument that

the mechanism applying that acceleration were somehow relevant, Donaldson, at a

minimum, discloses an O-ring that is *capable* of being released in response to a

force that one of ordinary skill in the art would necessarily know could be applied

by shaking.  Appx4509-4510 at 74:14-75:10; Appx3748-3750 ¶¶10-11, 19-20.

---

[11] After the district court granted the motion for preliminary injunction but before it
issued the October 31 preliminary injunction order, Zuru's technical expert
confirmed in his deposition that Donaldson discloses an O-ring that detaches after
the cylinder upon which the O-ring sits accelerates away from the O-ring.
Appx6026 at 300:18-301:4, 301:24-302:7.  Telebrands brought this testimony to
the district court's attention in a motion for reconsideration a week before the court
issued the October 31 preliminary injunction order.  Appx5990.  The Retailers
cited this testimony in their objections to the magistrate judge's recommendations.
Appx6494.

Second, "the test for obviousness is not whether" a particular prior art

structure is "bodily incorporated" into another; the test is what the combined

teachings of the references would have suggested to those of ordinary skill in the

art. *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d

1373, 1381 (Fed. Cir. 2016) (quoting *In re Keller*, 642 F.2d 413, 425 (CCPA

1981)) (internal quotation marks omitted); *see MCM Portfolio LLC v. Hewlett-

Packard Co.*, 812 F.3d 1284, 1294 (Fed. Cir. 2015).  Thus, even assuming for the

sake of argument that the district court is correct that O-rings are indeed

"frequently designed specifically not to detach upon shaking," Appx37[12], that

conclusion begs the question of whether *the O-rings used in the obvious*

*combination asserted by Telebrands* would have detached upon shaking.  As

described above, Donaldson's and Lee's elastic rings would indeed have detached

upon shaking.  In addition, the unrebutted evidence is that the O-rings used in the

prior art obviousness combination permit the user to detach the balloon from the

tube without too much difficulty and without tearing the balloon, which necessarily

---

[12] The district court judge relied on two paragraphs from Zuru's expert declaration
to conclude that "the O-rings that Telebrands relies on are frequently designed
specifically not to detach upon shaking." Appx37 (citing Appx3018-3019 at ¶¶ 59-
60).  But those paragraphs do not address whether Donaldson's O-ring are
designed not to detach when shaken. Appx3018-3019 at ¶¶ 59-60.  And although
they do discuss Lee's rubber band, the paragraphs narrowly address whether Lee's
rubber band is designed to be shaken off in an endoscopic surgical procedure. *Id.*
Those paragraphs do not address Telebrands' point that if Lee's rubber bands can
be pushed off with a mechanical mechanism that applies a force, that they
necessarily can be shaken off by applying the same force.  Appx2644-2648 ¶¶84-
95.

would result in O-rings of a strength that permit detachment upon shaking.

Appx3750 at ¶¶ 19-20, Appx4509-4510 at 75:14-18.

### 3.    The District Court's Finding of Secondary Considerations Was Not Based on Substantial Evidence

The sole secondary consideration cited by the district court was alleged

evidence of copying:  namely, that in 2014—*before the filing of the applications*

*that led to the '749 and '282 patents, and before the '066 patent issued*—

Telebrands allegedly copied Zuru's design in its development of Telebrands' initial

*Balloon Bonanza* product, a product that is not at issue here.  Appx23, Appx179.

The district court's reliance on copying is erroneous.  "It is simplistic to

assert that copying per se should bolster the validity of a patent."  *Cable Elec.*

*Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1028 (Fed. Cir. 1985), *overruled on*

*other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356

(Fed. Cir. 1999) (en banc).  Copying can, for example, "occur[] out of a general

lack of concern for patent property." *Id.* That  is the case here, where the alleged

copying occurred in 2014, *well before the issuance of the asserted patents.*  Then,

in 2015, before the two patents in this suit issued, Telebrands redesigned its

product. Appx2729-2730. And the magistrate judge already found, in the context

of the '066 patent, that the changes were sufficiently "significant, such that the

Battle Balloons products are more than colorably different from the Balloon

39

Bonanza products." Appx1745.

Finally, even where copying evidence is relevant, it is "only equivocal evidence" of non-obviousness, as the district court pointed to no more compelling evidence of secondary considerations. *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000).

### B.    The District Court Erred in Finding No Substantial Issue of Non-Infringement for the '749 Patent

The district court erred in finding that the Battle Balloons includes the following claim elements: (1) "plurality of holes extending through a *common face* of the housing at a *second end*"; and (2) "each hollow tube attached to the housing at a respective one of the holes at the *second end*" limitations. Appx99 at 6:36-41 (emphasis added). Appx99 at 6:36-41 (emphasis added). The court misconstrued "common face" and, when applying the claims to Battle Balloons, effectively read the limitation out of the claims. In any event, because each step of the Battle Balloons housing is a discrete surface with only a single hole, Battle Balloons cannot infringe the common face limitation under either the correct claim construction or the court's improper claim construction. Finally, the district court improperly applied a different construction of the "second end" limitation to Battle Balloons than it applied to the prior art.

### 1. The district court's construction of "common face" is legally erroneous

In Zuru I (the '066 patent action), the district court construed "common face" to mean "a shared outer surface of the housing through which a plurality of holes extend." Appx2496. Because the '749 patent is a continuation of the '066 patent and its claim uses the "common face" limitation, the district court adopted the same construction in the current case. Appx11-12. In so doing, the court rejected Telebrands' argument (1) that the surface of the common face must be planar and (2) that geometric boundaries of the accused product must be taken into account when identifying where one "common face" ends and another begins. Appx2492, Appx1683 n.3. The court's construction is inconsistent with the extrinsic and intrinsic evidence, including the file history, where the patentee repeatedly distinguished the prior art based on the "common face" language.

"Common face" is not used in the patent specification. An ordinary meaning of "face" has a planarity component. Appx1780-1781 ¶¶22-24; Appx1956 (definition 5(a)(5)). And any definition of "common face" must also permit one to determine its boundaries, which are created by geometric transitions. For example, it is widely understood that a die has six separate faces, with each face having either one, two, three, four, five, or six dots. But using the court's application of its "shared outer surface" construction, all twenty-one of the dots on the die are on a "common face," because all the dots are on the outside surface of

41

the die. This result makes no sense.

The intrinsic evidence confirms that the ordinary meaning of "common face" is the correct one.  For example, the specifications of the patents-in-suit disclose tubes extending from holes in an "array" that lies in the planar surface illustrated as "End B" in Figures 1-2.  Appx91-92 at Figs. 1-2, Appx97 at 2:43-44; Appx1702-1703 at Figs. 1-2, Appx1708 at 2:45-46.   End B has a readily discernible geometric boundary.



**'749 patent, Fig. 2 (Appx92)**
**(excerpted to exclude a balloon, and "B" highlighted in yellow)**

The prosecution histories also make clear that the proper construction of "common face" must include the "planar surface" and "geometric boundaries" concepts.  The applicant added the "plurality of holes extending through a common face of the housing at a second end" limitation to distinguish the '066 claims over the Boise prior art.  But the district court's misconstruction of "common face" now

42

causes the limitation to impermissibly read directly on Boise.

Specifically, original claim 1 of the '066 patent application recited "a housing with an opening at a first end and a plurality of holes at a second end." Appx1827. The examiner rejected the claims in light of Boise (Appx1848), finding, among other things, that Boise taught this "second end" limitation: "Boise discloses . . . a housing . . . with an opening at a first end (end with hose (9)) and a plurality of holes at a second end (end downstream of hose (9)) has holes through which conduits (2, 31) extend through housing . . . ." Appx1839. The image below depicts what the examiner described as the first end (shown in red), second end (shown in blue), and holes (shown in green):



**Boise Fig. 5 (Appx1853)**
**(highlighting added)**

In response, the applicant amended the claim to read: "a housing <u>comprising</u>

~~with~~ an opening at a first end and <u>a two-dimensional array</u> ~~a plurality~~ of holes at a second end . . . ." Appx1900 (emphasis in original), Appx1908.  But this amendment was inadequate to overcome Boise which, as depicted below, also has holes that are arranged in a two-dimensional array:



**Boise, Fig. 5 (Appx1853)**
**(highlighting added)**

Finally, the applicant authorized the examiner to delete the just-added "two-dimensional array" language (which describes the spatial arrangement of the *holes*) and substitute instead the "common face" limitation (which describes the *shape of the housing)*, so that the relevant limitation reads, "a plurality of holes extending through a common face of the housing at a second end." Appx1924-1925. With this new "common face" language, the examiner issued a notice of allowance, concluding that the patentee had finally distinguished the planar surface of the housing in the claimed invention from the rounded outer surface of the housing in

Boise. The examiner expressly stated that "[t]he 'common face' language of claim 1 distinguishes the present invention from Boise, in particular figures 4 and 5 of that reference." Appx1925. Specifically, the examiner concluded that Boise—which does not have a plurality of holes on a planar surface—did have "a plurality of holes at a second end," Appx1839, but did not have "a plurality of holes *extending through a common face* of the housing at a second end," Appx1925.

The '749 patent's prosecution history also supports Telebrands' position that "common face" must include a planarity requirement and a requirement that surfaces be separated by geometric boundaries or transitions. The examiner found that the prior art Saggio reference depicted below—which has a plurality of tubes extending through a non-planar outer surface with progressively decreasing diameters resulting in geometric transitions—does "*not* disclose that the tubes extend through a common face of the housing," whereas the flat-faced Furey prior art reference that is also depicted below *does* have tubes extending from a "common face," Appx2528-2529 (rejecting application claim 9 at Appx2516):





**Saggio, Fig. 7 (Appx2540)**
**(Highlighting added:  holes shown as**
**red circles in the green surface)**

**Furey, Fig. 1 (Appx2546)**

Despite this evidence, the court below erroneously declined to include a

planarity requirement in its construction of "common face." Instead, it construed

common face to mean "a shared outer surface of the housing through which a

plurality of holes extend."  Appx12.  The court's construction cannot be squared

with the prosecution histories. As shown in the illustration below, based on the

examiner's interpretation of "second end," the curved outer surface of Boise's

cylinder *is* a shared outer surface with a plurality of holes at a second end:

46



**Boise Fig. 5 (Appx1853)**
**(highlighting added)**

In other words, if the patentee had amended the '066 patent claims to add "shared outer surface" instead of "common face," the examiner would have maintained his rejection based on Boise. *Cf.* Appx1839.

To support its decision not to adopt the planar requirement, the district court asserted that it "potentially excludes embodiments disclosed in the specification where the shape of the housing is 'conical, cylindrical, pyramidal, etc. . .'" Appx2495. The court is clearly mistaken. First, as shown below, all three shapes identified by the court have at least one planar surface:



Planar Surfaces

Second, even assuming for the sake of argument that the court were factually correct that the planarity requirement would exclude certain embodiments, that would be "little cause for concern" where, as here, the patentee amended claims during prosecution. *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1285 (Fed. Cir. 2011). The patentee's original application claims (Appx1827, Appx1829-1830) would have undisputedly covered the conical, cylindrical, and pyramidal shapes identified by the court. *See PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166 (Fed. Cir. 2008) (courts should consider that during prosecution the applicant may have amended or cancelled claims covering alternative embodiments).

### 2.    The district court erred in finding that Battle Balloons has a "plurality of holes" in a "common face"

Regardless whether the district court's or Telebrands' proposed construction of "common face" applies, Battle Balloons does not have a "plurality of holes" in a "common face." That is because each step of the Battle Balloons housing is a discrete surface with only a single hole, not a plurality of holes. Appx4489-4491 at

54:22-56:18; Appx2338-2341 ¶¶38-49.



**Battle Balloons Side View**

If a planarity requirement is included in the definition of "common face," there is no infringement because each of the holes is in its own—discrete—planar surface.  Appx2342 ¶50.

But even if the district court's construction—"a shared outer surface"—is applied, there still is no infringement.  Appx4489-4491 at 54:22-56:18; Appx2338-2341 ¶¶38-49.  In order to define where a "face" (or a "surface") begins and ends—and to determine whether the face is a "common" face or a surface is "shared"—one must be able to identify its boundaries.  Even though the words, "geometric boundaries" (or equivalent) are not included in the district court's claim construction, they must be taken into account in identifying what is the "common face."  Indeed, the district court's opinion (correctly) suggests that geometric transitions can indeed be relevant to the "common face" analysis.  *Compare*

49

Appx34 ("Telebrands's arguments rely on an assumption that under the Magistrate Judge's construction, if a 'shared outer surface' can contain *any* geometric transitions, then *all* geometric transitions must be irrelevant to determining the boundaries of the 'shared outer surface.' However, nothing in the construction or the prosecution history of this claim demands this dichotomy.") *with* the magistrate judge's opinion at Appx12 ("[T]he Court's construction gave no such geometric distinction to the understanding of 'shared outer surface.'").  But the district court failed to identify the alleged "common face" in the Battle Balloons housing, let alone explain how the Battle Balloons housing possibly has a "common face" with a plurality of holes in it.

The reality is that the Battle Balloons housing does not have a "common face" with a plurality of holes. Consider a spiral staircase: no step shares a surface with any other step:



Like a spiral staircase, the top surface of each "step" on the Battle Balloons

housing is a discrete "shared outer surface" that is separated from the top surface of each other "step" by one or more geometric transitions—i.e. the vertical risers between each step.  Appx4489-4491 at 54:22-56:18; Appx2338-2341 ¶¶38-49.

This same reasoning compels the conclusion that each of the figures below has more than one "face," but that none has a "common face" sharing a plurality of holes:



But under the district court's contrary reasoning, each of the above figures has a single "common face" (*i.e,* a shared surface), with "a plurality of holes."  There is no support anywhere for such an illogical result, which would essentially read "common face" out of the claim.

### 3.    The district court erroneously applied the "second end" limitation to the Battle Balloons housing

The district court's application of the "second end" limitation improperly turned on whether the court was applying the limitation to the prior art or Battle Balloons.

51

- When the district court looked at prior art like Boise, it identified only Boise's linear extremes as the "second end," and excluded portions adjacent to those extremes from being part of the "second end."

- But when the district court looked at Battle Balloons, it interpreted "second end" to include *all* "outer surfaces" distinct from the first end, *including* portions adjacent to an outer limit.

Specifically, in Zuru I, Zuru proposed a broad interpretation of "second end" as "a part of the housing at *or adjacent to* a limit of the housing spaced apart from the first end." Appx2496. Zuru's expert argued that the examiner contemplated that Boise's "second end" had nine holes in it, as depicted below:



**Zuru's Expert Declaration**
**(Appx2306 (labeling by Zuru's Expert))**

Zuru's expert subsequently testified that Zuru's original proposal of "second end"—which encompassed a housing's limits as well as portions adjacent to the

limit—encompassed *all* of Battle Balloon's spiral steps, as illustrated below,

Appx4468 at 33:1-23:



**Appx4888**
**(from slide 5, used by Zuru's expert during his examination)**

In its claim construction decision in Zuru I, the district court rejected Zuru's

attempt to include the adjacent surfaces in the construction of "second end,"

finding it to be unsupported. Appx2498.[13]  The court construed "second end" to

mean "an outer *limit* of the housing distinct from the first end." Appx2499

(emphasis added). Significantly, the district court also disagreed with Zuru's

characterization of Boise as having a plurality of holes at a second end, Appx2306,

stating that:

- Boise has "a single hole at either end of the housing," Appx2494; and

- Boise "does not disclose a shared outer surface with a plurality of

  holes at a *second end*," Appx2495 (emphasis in original).

---

[13] The district court also rejected Telebrands' proposal to include "linear" in the
definition of "outer limit." Appx2498.

The magistrate judge repeated these same statements in its preliminary injunction report and recommendation below. Appx12-13.

Hence, in the context of Boise, the magistrate judge considered only the extreme limits of the housing—which are also Boise's "linear"/"lengthwise" limits—to be the "second end," and excluded from that limitation the portions of the housing that are adjacent to those linear limits:



**FIG. 5**

**Appx1853**
**(blue and red highlighting added to signify "ends")**

Consistent with this definition of "second end"—in which the court excluded surfaces "adjacent" to the outer limit—Telebrands' expert testified at the preliminary injunction hearing that, as shown in the photo below and to the right, the actual "second end" (*i.e.*, "outer limit . . . distinct from the first end") of the

Battle Balloons housing is the flat plateau at the top of

the photo because that is the outermost portion of the

housing.  Appx4492-4497; Appx2334-2338 ¶¶ 22-23,

25-37.  He further explained that, because that flat

plateau has no holes, Battle Balloons cannot infringe

because it does not have a "plurality of holes . . . at a



second end" or "each hollow tube attached to the housing at a respective one of the

holes at the second end" limitations.  Appx99 at 6:36-41.

Although Telebrands' expert's testimony regarding Battle Balloons was

completely consistent with the court's prior analysis of second end that it had

applied to distinguish Boise, the district court nevertheless rejected it.  Specifically,

although the district court continued to point to Boise's *linear extremes* as its

"ends," Appx12-13, it nevertheless criticized Telebrands for allegedly trying to

read the court's claim construction "to mean the only portion of the housing that

can be a 'second end' is the outer *linear* limit of the housing."  Appx13 (emphasis

in original); *see also* Appx34.  This criticism is not valid. Although Telebrands'

maintained its previously-rejected claim construction position and reserved its

rights for appeal, at the preliminary injunction hearing Telebrands expressly

applied the court's claim construction of "second end":  "an outer limit of the

housing distinct from the first end."  Appx4494-4495; Appx2334 ¶¶ 23; Appx4668

n.3; Appx5442.   For example, Telebrands' expert explained that the Battle Balloons housing's flat plateau is an "outer limit"—and not just a "linear" limit—because the plateau is the part of the housing that is farthest out from the center of the housing.  Appx4493-4495.  The court's criticism seems to have been based on its belief that a "linear limit" and an "outer limit" can never refer to the same part of the housing (though this is what the court does with Boise). But this is not correct; just as a square is an example of a rectangle, a linear limit is an example of an outer limit.  Indeed, the patent's preferred embodiment identifies the linear limits of the housing as the first and second ends.  (Figs. 1-2, ends A and B.)

In its preliminary injunction decision, the magistrate judge also "clarifie[d]" its construction of "second end" to now mean an "outer surface" of the housing "distinct from the first end," Appx14. Although the district court stated that this "clarification" does not broaden the court's prior construction, Appx33, it clearly does.  The "clarified" construction is now broad enough to encompass the portions of the housing that are "adjacent to the limit"—a construction that the district court previously excluded from the scope of "second end" when it applied the limitation to the Boise prior art, as being inconsistent with the intrinsic record.  Appx2498.

The court's clarified construction is irreconcilable with the district court's twice-stated conclusion that the Boise prior art has only "a *single hole* at either end of the housing," and "does *not* disclose a shared outer surface with a *plurality of*

*holes at a second end.*"  Appx2494-2495 (emphasis added); Appx12-13.  But using

the district court's latest construction of "common face" ("a shared outer surface of

the housing through which a plurality of holes extend") and clarified construction

of "second end" ("an outer surface of the housing distinct from the first end"),

Boise does indeed have *multiple* holes in its second end, Appx2337 ¶33,

Appx4495-4497:



**Boise Fig. 5 (highlighting added)**
**(Appx1853)**

The district court's clarified construction—"an outer surface of the housing

distinct from the first end," Appx14, Appx34— is also inconsistent with the patent

specification and dictionary definitions.  Neither Zuru nor the court have identified

any dictionary definition that defines "end" as broadly as any "outer surface"

distinct from another end, Appx1785-1786 ¶36.  Rather, "end" is typically defined

as "the last part, or extremity, lengthwise, of anything that is longer than it is wide or broad." Appx1960. This is consistent with the patent specification, which labels outer limits A and B as the "ends" of the housing. Appx97-98 at 2:33-35, 3:1-3, 4:28-33 (referencing Appx91-92). The district court's clarified construction would encompass the adjacent side surfaces of those housings because it now includes any "outer surface" that is "distinct from the first end."[14]



FIG. 2

Consistent with the dictionary definition and intrinsic evidence, "second end" should be construed by this Court to mean one of at least two linear (or lengthwise) limits of an object. At a minimum it should be construed in accordance with the district court's original construction, which the court used in assessing validity: an outer limit distinct from the first end. Under either construction, Battle Balloons does not infringe.

---

[14] As described above, after the injunction against Telebrands, but before the injunction against the Retailers, the court below shifted positions again. At claim construction, in response to Telebrands' argument that equating "limit" to "surface" impermissibly broadens the claims, Appx7072, the magistrate judge "again clarif[ied] its construction"—reverting to its original construction ("outer limit"), and noting that "outer limit" is now synonymous with "an 'end' of the housing as a person of ordinary skill in the art would understand the plain and ordinary meaning of that word." Appx7118. The district court judge then stated that "'surface' is *not* included in the definition of 'limit.'" Appx6838 (emphasis added).

## III.    The District Court Erred In Finding Irreparable Harm

The district court erred in finding irreparable harm. Sales data demonstrates that Zuru suffered no irreparable price erosion, and Zuru presented little credible evidence of customer confusion or strained customer relationships.

### A.    Zuru Did Not Establish Price Erosion

The district court's price erosion analysis ignored actual sales data and instead focused primarily on the court's year-old finding from a different case before the two patents-in-suit had even issued of "an apparent pattern of erosion at both the retail and direct-to-consumer levels from Telebrands' entry to market with its *Balloon Bonanza* product " (emphasis added), and the unsupported, speculation of Zuru's COO, Ms. Mowbray, that Zuru expected to reduce its wholesale price in the future  "as a result of the continued sales of Telebrands' alleged infringing Battle Balloon products to shared retailers."  Appx25.

The court inexplicably ignored Zuru's own pricing data, which showed that the retail prices for Zuru's Bunch O Balloons had not declined after Telebrands introduced Battle Balloons.  Appx2677-2681.   Indeed, Zuru's own economic expert conceded that the retail price of Zuru's Bunch O Balloons actually *increased* between July 2015 and April 2016 in at least one large retail outlet, *see* Appx4393-4395 (Tr. 41:9-43:1), despite Telebrands having offered Battle Balloons for sale at least as early as January 2016, Appx2729, Appx5924-5925, Appx5931.

The court also ignored credible evidence that rebutted Ms. Mowbray's speculation that competition from Telebrands would force Zuru to reduce its wholesale price for the 2017 selling season. For example, managers from two retailers testified that the wholesale price Zuru had quoted for Bunch O Balloons remained was unchanged. Appx4265; Appx4272 ¶3.

In any event, by relying on the alleged irreparable harm found in Tinnus I, the district court impermissibly created an ongoing presumption of irreparable harm as to any Telebrands products.

## B.    Zuru Did Not Establish That Telebrands Harmed Customer Relationships

Although Zuru initially offered the declaration of a Zuru employee claiming that Telebrands' competition allegedly caused retailers to stop carrying Zuru's Bunch O Balloons and that one retailer allegedly ordered fewer Bunch O Balloons than would have been predicted by that retailer's normal market share, the retailers themselves submitted sworn declarations that refute Zuru's unsubstantiated claims. *Compare* Appx1272-1273 ¶¶5-7 *with* Appx3837 ¶3, Appx3836 ¶5. Moreover, the parties' largest shared retailer confirmed in a sworn declaration that its purchase of Zuru's Bunch O Balloons had *exceeded* its market share and had increased year-over-year. Appx3836 ¶5.

The district court and Zuru also maintained that Walmart's decision to

60

temporarily put Zuru's business on hold demonstrates that the competition from Telebrands strained the relationship between Zuru and its customers. Appx41. But Walmart's representative indisputably stated that it put Zuru's business on hold because of the "legal issues," not because Walmart chose to buy Telebrands' products. Appx2839. Moreover, Walmart took this action only after the patent owner—Tinnus—sued Walmart and sought a preliminary injunction. *Id.* It is hardly surprising that Walmart did not view this conduct favorably.

In short, there is no credible evidence from which the court could have concluded that sales of the Battle Balloons product irreparably harmed Zuru.

## **CONCLUSION**

For the reasons set forth above, Defendants-Appellants request that the Court reverse the district court's preliminary injunction orders.

Respectfully submitted,

Dated:  May 19, 2017

Robert T. Maldonado
Elana B. Araj
COOPER & DUNHAM LLP
30 Rockefeller Plaza
New York, NY 10112
212.278.0506

*Attorneys for all Defendants-*
*Appellants*

/s/ D. Michael Underhill
D. Michael Underhill
Eric J. Maurer
Stacey K. Grigsby
BOIES, SCHILLER & FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
Telephone:  202.237.2727

*Attorneys for Defendant-Appellant*
*Telebrands Corporation*

# ADDENDUM

## Addendum Contents

| Date Entered | Docket No. | Description | Appx Pages |
|---|---|---|---|
| 7/13/2016 | 99 | Report and Recommendation of United States Magistrate Judge | Appx1-29 |
| 9/29/2016 | 142 | Order Adopting Report and Recommendation of Magistrate Judge | Appx30-42 |
| 10/31/2016 | 159 | Order on Injunction | Appx43-46 |
| | | U.S. Pat. No. 9,242,749 | Appx89-99 |
| | | U.S. Pat. No. 9,315,282 | Appx100-111 |
| 11/21/2016 | 182 | Report and Recommendation of United States Magistrate Judge | Appx6396-6404 |
| 1/3/2017 | 211 | Order Adopting Report and Recommendation of Magistrate Judge | Appx6626-6635 |
| 2/16/2017 | 229 | Memorandum Opinion and Order re Motion for Reconsideration | Appx6854-6868 |
| 2/23/2017 | 237 | Redacted Order on Injunction | Appx6950-6954 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **TINNUS ENTERPRISES, LLC, and** | § | |
| **ZURU LTD.** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **No. 6:16-cv-0033 RWS-JDL** |
| **v.** | § | |
| | § | **JURY DEMANDED** |
| **TELEBRANDS CORP.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

Before the Court is Plaintiffs Tinnus Enterprises, LLC's ("Tinnus") and ZURU Ltd.'s ("ZURU") Emergency Motion for a Preliminary Injunction. (Doc. No. 19.)    Defendant Telebrands Corp. ("Telebrands") filed a response (Doc. No. 32), to which Plaintiffs filed a reply (Doc. No. 50), and Telebrands filed a sur-reply (Doc. No. 66).  The Court held a hearing on the Motion on June 17, 2016. After considering the parties' arguments, the Court recommends that Plaintiffs' Emergency Motion for a Preliminary Injunction (Doc. No. 19) be **GRANTED**.

## BACKGROUND

On January 26, 2016, Plaintiffs filed the instant action against Telebrands, alleging infringement of U.S. Patent No. 9,242,749 ("the '749 Patent"). (Doc. No. 1.) On April 19, 2016, Plaintiffs amended their complaint to add allegations of infringement of U.S. Patent No. 9,315,282 ("the '282 Patent"). (Doc. No. 3.) Both the '749 and '282 Patents (collectively "patents-in-suit") are continuations of U.S. Patent No. 9,051,066 ("the '066 Patent"), for which the Court has already entered an injunction against Telebrands. (6:15-cv-551, Doc. No. 91.) The patents-in-suit are entitled "System and Method for Filling Containers with Fluids" and issued on

1

Appx1

January 26, 2016 and April 19, 2016, to Tinnus. '749 Patent; '282 Patent.  Tinnus is a company

based in Plano, Texas, that is founded and solely owned by the inventor of the patents-in-suit,

Josh Malone.  (6:15-cv-551, Doc. No. 9-2, Declaration of Josh Malone, at ¶ 1) ("Malone

Decl.").)  The patents-in-suit are based on Josh Malone's invention of a new toy product now

known as "Bunch O Balloons." *Id.* at ¶ 2.  The Bunch O Balloons device is a hose attachment

that is fitted with either 35 or 37 Balloons. *Id.* at ¶ 3.  When the device is attached to a hose and

the water is turned on, the balloons will fill and seal themselves upon release, allowing someone

to fill up to 100 water balloons in 60 seconds. *Id.* at ¶¶ 2-3.  After developing a successful

prototype, Mr. Malone caused Tinnus to file a patent application on February 7, 2014, which

eventually issued as the '066 Patent on June 9, 2015, and led to the patents-in-suit as

continuations. *Id.* at ¶ 4; '749 Patent; '282 Patent.

Mr. Malone began taking steps to manufacture his Bunch O Balloons product in March

2014, and the first batch of product was manufactured in June 2014. *Id.* at ¶ 5.  To raise funds to

continue the manufacture of his product, Mr. Malone launched a Kickstarter campaign on July

22, 2014. *Id.* at ¶ 6.  Within 30 days, the project funding reached nearly $1 million and the

Kickstarter video had been viewed 2.9 million views. *Id.* at ¶ 8. On the very first day the

Kickstarter campaign launched, Tinnus received a total of 598 public orders for the product,

selling out of initial production batch.  *Id.* at ¶ 11.  Also on that same day, Mr. Malone's Bunch

O Balloons invention was featured in *Sports Illustrated's* on-line magazine.  *Id.* at ¶ 9.  From

there, Mr. Malone continued to gain national attention for his invention.  Both *Time* magazine

and *People* magazine covered the Bunch O Balloons product on their respective websites, and

Mr. Malone appeared on nationally-televised broadcasts of *Good Morning America* and the

Appx2

*Today Show*. *Id.*   The Bunch O Balloons product also went viral on YouTube, with approximately 9.6 million views. *Id.* at ¶ 10.

Selling at a price of approximately $17, Tinnus shipped the first batch of Bunch O Balloons product on August 29, 2014. *Id.* at ¶ 13.  Tinnus had also begun negotiating to partner with ZURU to provide the manufacture, marketing, and sale of Bunch O Balloons. *Id.* at ¶ 14. On August 19, 2014, Tinnus and ZURU entered into an exclusive license agreement where Tinnus agreed to license ZURU any present or future patent rights owned by Tinnus related to the Bunch O Balloons product. *Id.* at ¶ 15.

In December of 2014, Mr. Malone became aware that Telebrands was advertising and offering for sale a product called "Balloon Bonanza," which appeared to be an exact replica of his invention. *Id.* at ¶ 16. Upon investigation, Mr. Malone determined that Balloon Bonanza was an unauthorized copy of his Bunch O Balloons product and Tinnus and ZURU therefore sent a cease and desist letter to Telebrands on December 16, 2014. *Id.* at ¶ 17. On the same day the '066 Patent issued, Plaintiffs filed a related action in this Court (6:15-cv-551), alleging that Telebrands Balloon Bonanza product infringes the '066 Patent. (6:15-cv-551, Doc. No. 1.) Plaintiffs filed a motion for a preliminary injunction in that action against Telebrands Balloon Bonanza products. (6:15-cv-551, Doc. No. 9.)  This Court held a hearing on the preliminary injunction and ultimately found that the preliminary injunction should be granted. (6:15-cv-551, Doc. Nos. 66, 84.)  The Court then issued an Injunctive Order pursuant to Fed.R.Civ.P. 65 on December 22, 2015. (6:15-cv-551, Doc. No. 91.)  At some point during the pendency and decision on the preliminary injunction as to the Balloon Bonanza products, Telebrands redesigned and developed a similar product called "Battle Balloons."[1] Plaintiffs filed an

---

[1] Battle Balloons products collectively refer to and include Telebrands Battle Balloons and Battle Balloons Color Combat. (Doc. No. 1, at ¶ 48.) At a prior contempt hearing held by this Court in related action 6:15-cv-551, it was

Appx3

emergency motion for contempt of court against Telebrands to enjoin the sale of the Battle

Balloons products and for monetary sanctions in the related action as to the '066 Patent. (6:15-

cv-551, Doc. No. 113.)  On February 19, 2016, the Court held a hearing on contempt, soliciting

testimony from both side's experts regarding the technical aspects of the redesigned products,

and ultimately denied contempt. (6:15-cv-551, Doc. Nos. 144, 166.) Thereafter, Plaintiffs filed

the instant motion in this action for a preliminary injunction as to the Battle Balloons products

for alleged infringement of the '749 and '282 Patents. (Doc. No. 19.)

## LEGAL STANDARD

"[B]efore the issues of fact and law have been fully explored and finally resolved, the

purpose of a preliminary injunction is merely to preserve the relative positions of the parties

until a trial on the merits can be held." *Abbott Labs v. Sandoz, Inc.*, 544 F.3d 1341, 1344–45

(Fed. Cir. 2008) (internal quotations omitted); *see Techradium, Inc. v. Blackboard Connect Inc.*,

No. 2:08-cv-214, 2009 WL 1152985, at *2 (E.D. Tex. Apr. 29, 2009).

The Court may grant an injunction to "prevent the violation of any right secured by

patent." 35 U.S.C. § 283. "The decision to grant a preliminary injunction is within the discretion

of the district court." *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359,

1363 (Fed. Cir. 2001); *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009);

*see also eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (with respect to the

closely related topic of permanent injunctions, the Supreme Court recently noted that "[t]he

decision to grant or deny permanent injunctive relief is an act of equitable discretion by the

district court, reviewable on appeal for abuse of discretion").

---

confirmed that "Battle Balloons" are the same product as "Balloon Bonanza HD." Therefore, the Court will refer
herein to the accused products as "Battle Balloons" for the sake of clarity, but the scope of this Report and
Recommendation shall apply to all Battle Balloons products (including Battle Balloons Color Combat) and Balloon
Bonanza HD, and any other Telebrands products with identical structural modifications.

4

"A district court may enter a preliminary injunction based on its consideration of four factors: (1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest." *Abbott Labs.*, 566 F.3d at 1298 (internal citations omitted) (citing *Erico Int'l Corp. v. Vutec Corp.*, 516 F.3d 1350, 1353–54 (Fed. Cir. 2008)).

To establish likelihood of success on the merits, the patentee seeking preliminary injunction must show that it will likely prove infringement, and that it will likely withstand any challenges to the validity of the patent. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009); *see Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

The test for infringement at the preliminary injunction stage is the same as the usual test set forth in *Graver Trank & Mfg. Co., Inc. et al. v. Linde Air Prod. Co.*, which requires the accused device be evaluated in light of the properly construed claim. *Graver*, 339 U.S. 605 (1950); *see Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005). However, demonstrating likelihood of success on the merits does not lead to a presumption of irreparable harm. *Robert Bosch LLC v. Pylon Mfg. Corp*, 659 F.3d 1142, 1149 (Fed. Cir. 2011) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)) ("We take this opportunity to put the question to rest and confirm that *eBay* jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief.")

With respect to validity, "if the alleged infringer raises a substantial question concerning validity, *i.e.*, asserts an invalidity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Helifix Ltd. V. Block-Lok, Ltd.*, 208 F.3d 1339,

1351 (Fed. Cir. 2000). "Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial. The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself." *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1335 (Fed. Cir. 2006); *Amazon.com Inc. v. Barnesandnoble.com*, 239 F.3d 1343, 1358 (Fed. Cir. 2001). The party seeking preliminary injunction may support validity "by showing that the patent in suit [has] successfully withstood previous validity challenges in other proceedings. Further support for such a clear case might come from a long period of industry acquiescence in the patent's validity." *Amazon.com Inc.*, 239 F.3d at 1358 (Fed. Cir. 2001).

Irreparable harm may be demonstrated by showing: (1) infringement has caused or will  cause price erosion or loss of market share; (2) deprivation of the exclusive right to the patented  invention; or (3) that the accused infringer is incapable of paying a damages award. *Bosch*, 659  F.3d at 1156. Loss of revenue and goodwill may also be "incalculable and irreparable." *Smith &  Nephew, Inc v. Arthrex, Inc.*, No. 2:07-cv-335, 2010 WL 2522428, at *2–3 (E.D. Tex. Jun. 18,  2010) (*citing i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010)).  Damage to a reputation as the "sole source" in the United States may also be irreparable harm.  *Eli Lilly & Co. v. Generix Drug Sales, Inc.*, 324 F. Supp. 715, 724 (S.D. Fla. 1972), *aff'd*, 460  F.2d 1096 (5th Cir. 1972).

The balance of hardships weighs the "magnitude of the threatened injury to the patent owner . . . in light of the strength of the showing of likelihood of success on the merits, against  the injury to the accused infringer if the preliminary decision is in error." *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987).

"Although the public interest inquiry is not necessarily or always bound to the likelihood

6

of success of the merits, in [many cases,] absent any other relevant concerns . . . the public is best served by enforcing patents that are likely valid and infringed." *Abbott Labs. Inc.*, 452 F.3d at 1348.

## DISCUSSION

### A. Likelihood of Success on the Merits

To succeed on the first prong, Plaintiffs must show that they will likely prove that the Battle Balloons products infringe the patents-in-suit; and that the infringement claim will likely withstand Telebrands' validity challenges to the '749 and '282 Patents. *Amazon.com*, 239 F.3d at 1350.

#### a. Infringement

Plaintiffs contend that it is more likely than not that Telebrands' Battle Balloons products infringe the patents-in-suit. (Doc. No. 19, at 8.)

##### i. The '282 Patent

The '282 Patent contains one independent claim, claim 1, which recites:

1. An apparatus comprising:
    a housing comprising an inlet and a plurality of outlets;
    a plurality of hollow tubes, each hollow tube attached to the housing at a respective one of the outlets;
    a plurality of containers, each container removably attached to a respective one of the hollow tubes;
    and a plurality of elastic fasteners, each elastic fastener clamping a respective one of the plurality of containers to a respective tube, and each elastic fastener configured to restrict detachment of its respective container from its respective tube and to automatically seal its respective container upon detachment of the container from its respective tube, the restriction of each elastic fastener being sufficiently limited to permit its respective container to detach from its respective tube upon one or more of (1) at least partially filling the container with fluid and (2) shaking the housing;
    wherein the apparatus is configured to fill the containers substantially simultaneously with fluid;

7

Appx7

> and wherein at least first and second ones of the plurality of
> containers are disposed sufficiently close to each other such
> that they press against each other, regardless whether the first
> and second ones of the plurality of containers are in a filled
> state or an unfilled state.

'282 Patent at 6:35–48.

Plaintiffs contend that the Battle Balloons products literally infringe claims 1–3 of the

'282 Patent. (Doc. No. 19-2, "Kudrowitz Decl." at 9–25.)  In support, Plaintiffs submitted an

expert declaration of Barry M. Kudrowitz, which provides Dr. Kudrowitz's opinions as to why

each and every limitation of the asserted claims of the '282 Patent are met by features of the

Battle Balloons products. *Id.* In addition, at the hearing on the preliminary injunction, Mr.

Kudrowitz provided testimony regarding infringement. (Doc. No. 97, Preliminary Injunction

Transcript "Tr." at 23:14–29:14.) To show that each claim limitation is met, Dr. Kudrowitz

submitted a claim chart that includes images of the Battle Balloons products from the Battle

Balloons website, actual photographs of the products, images from the product instruction

manual, and other screenshots of the website and related product videos.  Kudrowitz Decl. at 9–

25.   Plaintiffs also submitted the actual Battle Balloons products as evidence of infringement.

Dr. Kudrowitz identified each alleged infringing feature of the Battle Balloons products to each

limitation of claim of the '282 Patent. *Id.* The Court has thoroughly reviewed Dr. Kudrowitz's

report and the evidence submitted, and finds that Plaintiffs have discharged their initial burden in

showing a likelihood of infringement of the '282 Patent.

In response to Plaintiffs' showing, Telebrands argues that Plaintiffs have failed to offer

any constructions for claim terms of the '282 Patent, including a key term, "unfilled state," and

that Plaintiffs have failed to show that the Battle Balloons products ever press together in an

unfilled state.  (Doc. No. 32, at 7.) Telebrands submitted a declaration of Dr. Ken Karmin, who

states that "[i]t is my opinion that if the balloons in the Battle Balloons product were in a vacuum state, i.e. unfilled state, they would not necessarily press against each other." (Doc. No. 33-1, at ¶ 114.) Dr. Kamrin also testified at the hearing regarding non-infringement, but did not testify regarding any specific non-infringement positions as to the '282 Patent. (Doc. No. 97, Tr. at 54:22–62:22.)

The Court has reviewed the claims and specification of the '282 Patent and finds the claim terms at issue need no further construction other than their plain and ordinary meaning at this time, including the claim term "unfilled state."[2] The term "unfilled state" simply means a state at which there is no water in the containers. In Dr. Kudrowitz's declaration, he shows an image of the Battle Balloons product in an "unfilled state" where the balloons appear to be pressing against one another to show this limitation is met:

| [1j] wherein at least first and second ones of the plurality of containers are disposed sufficiently close to each other such that they press against each other, regardless whether the first and second ones of the plurality of containers are in a filled state or an unfilled state. | As can be seen in Figure O at right, the Battle Balloons containers (balloons) are disposed sufficiently close to each other such that they press against each other when the containers are not yet filled with water.<br><br>As can be seen in Figure P | Figure O: Photograph of the Battle Balloons hollow tubes and containers.<br> |

---

[2] Reinforcing this conclusion is the fact that the Court has already issued a claim construction, construing certain terms of the '066 Patent. (6:15-cv-551, Doc. No. 181.)

Indeed, it appears several of the balloons are pressed against each other in the unfilled state. Likewise, examining the actual product in its unfilled state shows at least a plurality of the balloons are pressed against each other. Dr. Kamrin's opinion is not that the Battle Balloons product *cannot* meet this limitation, but only that it does not *necessarily* meet it. This opinion does not refute Plaintiffs' showing, particularly where the evidence shows that the Battle Balloons, when removed from the box in their ordinary course, include at least a plurality of the balloons pressed up against one another in an unfilled state. While certain maneuvering may allow for some separation of the balloons, even if one were to physically force the balloons apart in their unfilled state, they would return to pressed state as a result of the position of the tubes, which are closely arranged in the finite space of the housing.

Accordingly, the Court finds that Plaintiffs are likely to show that the Battle Balloons products infringe at least claim 1 of the '282 Patent.

### ii. The '749 Patent

The '749 Patent has only one claim, which recites as follows:

1. An apparatus comprising:

a housing comprising an opening at a first end and a plurality of holes extending through a common face of the housing at a second end;

a plurality of hollow tubes, each hollow tube attached to the housing at a respective one of the holes at the second end of the housing;

a plurality of containers, each container removably attached to a respective one of the hollow tubes;

and a plurality of elastic fasteners, each elastic fastener clamping a respective one of the plurality of containers to a respective tube, and each elastic fastener configured to restrict detachment of its respective container from its respective tube and to automatically seal its respective container upon detachment of the container from its respective tube, the restriction of each elastic fastener being sufficiently limited to permit its respective container to detach from its respective tube upon one or more of (1) at least partially filling the container with a fluid and (2) shaking the housing;

wherein the apparatus is configured to fill the containers substantially simultaneously with the fluid.

Appx10

'749 Patent at 6:35–57.

Plaintiffs contend that the Battle Balloons products literally infringe claim 1 of the '749 Patent. Kudrowitz Decl. at 25–35. In support, Plaintiffs submitted an expert declaration of Barry M. Kudrowitz, which provides Dr. Kudrowitz's opinions as to why each and every limitation of claim 1 of the '749 Patent is met by features of the Battle Balloons products. *Id.* In addition, at the hearing on the preliminary injunction, Dr. Kudrowitz provided testimony regarding infringement. (Doc. No. 97, Tr. at 23:14–29:14.) To show that each claim limitation is met, Dr. Kudrowitz submitted a claim chart that includes images of the Battle Balloons products from the Battle Balloons website, actual photographs of the products, images from the product instruction manual, and other screenshots of the website and related product videos. Kudrowitz Decl. at 25–35. Plaintiffs also submitted the actual Battle Balloons products as evidence of infringement. Dr. Kudrowitz identified each alleged infringing feature of the Battle Balloons products mapped to each limitation of claim 1 of the '749 Patent. *Id.*

In response to Plaintiffs' showing, Telebrands argues that the Battle Balloons products do not infringe because they do not meet the following two limitations: (1) a plurality of holes extending through a common face of the housing at a second end; and (2) a plurality of hollow tubes, each hollow tube attached to the housing at a respective one of the holes at the second end. (Doc. No. 32, at 7–8.) The crux of this dispute hinges on the Court's construction of the claim terms "common face" and "second end." Kamrin Decl. at ¶¶ 25, 26; Doc. No. 97, Tr. at 54:22–62:22.

The Court has already construed these terms during proceedings on the '066 Patent in the related action, 6:15-cv-551. (6:15-cv-551, Doc. No. 181.) Because the '749 Patent is a

11

continuation of the '066 Patent, which shares the same specification, the Court finds its prior

constructions applicable in the instant matter.

As to "common face," the Court construed the term "common face" to mean "a shared

outer surface of the housing through which a plurality of holes extend." (6:15-cv-551, Doc. No.

181, at 9.) In doing so, the Court expressly rejected Telebrands' proposed limitation that the

"common face" be "planar." *Id.* The Court further distinguished Telebrands' argument that the

prosecution history compelled such a limitation, stating:

> The Examiner clearly recognized the full scope of the claim as he amended the
> claim as follows: "a housing comprising an opening at a first end, and a plurality
> of holes extending through a common face of the housing two dimensional array
> of holes at a second end." (Doc. No. 162-13, Prosecution History App. No.
> 14/492,487, at 2.)  Importantly, the plain language of the claim requires the
> "common face" to be at a second end of the housing.  Boise does not disclose a
> shared outer surface with a plurality of holes at a *second end.*

*Id.*

Telebrands' expert contends that the Battle Balloons products do not have a plurality of

holes extending through a "common face" because "[e]ach hole in the spiral structure of the

Battle Balloons housing is disposed of in its own, individual step," such that the "steps are on

different geometrically bounded surfaces that are separate and distinct from one another and

have clear visual dividing lines and geometric transitions…" Kamrin Decl. at ¶ 39. Telebrands

argues that because each hole is slightly stepped up and has a distinct "geometrically bounded

surface" it is not a "shared surface" under the Court's construction. However, the Court's

construction gave no such geometric distinction to the understanding of "shared outer surface."

Indeed, in discussing the prosecution history, the Court stated the following:

> Importantly, the Examiner's amendment simply requires that *a plurality of holes*
> extend through a "*common face.*" (Doc. No. 162-13, Prosecution History App.
> No. 14/492,487, at 2) (adding "plurality of holes extending through a common
> face of the housing.").) This addition is distinguishable from Figures 4 & 5 of
> Boise which show an aligned plurality of holes along the cylindrical portion of the

> housing, and a single hole at either end of the housing. (US 2008/0121309, Figs.
> 4, 5.) In other words, the Examiner did not necessarily amend the claims to
> distinguish the present invention over the prior art by requiring that the "common
> face" be "planar" (indeed the Examiner states no such requirement in amending
> the plain language of the claim) because the important distinction is also made
> that a plurality of holes extend through a "common" or shared surface of the
> housing at a second end.

(6:15-cv-551, Doc. No. 181, at 8–9.)

The Examiner never stated that Boise does not disclose a common face; instead, as discussed in the Court's opinion, the Examiner's distinction was that there be a plurality of holes extending through a "common" or shared surface of the housing at a *second end*. The claim must be read in its full context to appreciate the amendment made by the Examiner in view of Boise. There is nothing in the prosecution history, the specification, or the claims that requires such a narrow "geometrically bounded" interpretation of what it means to be a "shared outer surface." As such, the Court finds this issue is not dispositive of infringement. At this stage, Plaintiffs have shown a likelihood of success under this Court's construction of the term "common face."

As to "second end," the Court construed the term "second end" to mean "an outer limit of the housing distinct from the first end." (6:15-cv-551, Doc. No. 181, at 13.) Here again, Telebrands advances an unduly narrow interpretation of the Court's claim construction. Telebrands interprets the Court's claim construction to mean the only portion of the housing that can be a "second end" is the outer *linear* limit of the housing. But the Court's construction is not so limiting. Indeed, in its claim construction opinion, the Court rejected the requirement that the second end be a "linear limit" or "adjacent to a linear limit." (6:15-cv-551, Doc. No. 181, at 12.) Instead, the Court explained "[t]he specification consistently discloses the 'second end' as an outer limit of the housing and distinguishes the 'second end' from the 'first end.'" *Id.* at 12–13 (citing '066 Patent Fig. 1; 2:33-37.) Because there is an apparent dispute among the experts as to

13

the meaning of the Court's construction of "outer limit," the Court clarifies its claim construction herein. The meaning of "outer limit" as used in the Court's construction is simply that of an "outer surface."[3] The distinguishing marker of the "second end," as was set forth in the Court's claim construction, is that the "second end" be *distinct* from the "first end." Under the Court's construction, Plaintiffs have made a prima facie showing that the limitations "plurality of holes extending through a common face of the housing at a second end," and "plurality of hollow tubes, each hollow tube attached to the housing at a respective one of the holes at the second end of the housing" are met by the Battle Balloons products.

Accordingly, the Court finds that Plaintiffs are likely to show that the Battle Balloons products infringe at least claim 1 of the '749 Patent.

### b. Invalidity

"A patent shall be presumed valid." 35 U.S.C. § 282; *see also Research Corp. Technologies v. Microsoft Corp.*, 627 F.3d 859, 870 (Fed. Cir. 2010) ("A patent is presumed valid and the party asserting invalidity has the burden of persuasion to show the contrary by clear and convincing evidence."). Plaintiffs contend the patents-in-suit are valid and Dr. Kudrowitz offered opinions as to their validity as well as testimony discussing why the patents were not invalid over certain prior art references. (Doc. No. 97, Tr. at 29:15–30:20.)  However, Telebrands contends that both the '282 and '749 Patents are invalid as obvious under 35 U.S.C. § 103, and as indefinite under 35 U.S.C. § 112, and contends that the '282 Patent is invalid under 35 U.S.C. § 112 for failing to meet the written description requirement.

---

[3] Indeed, at the hearing, Telebrands' expert, Dr. Kamrin, testified that in his interpretation the "outer limit" is the outer most portions of the housing. Tr. at 58:10–18 ("So the outer limit would be the outermost portions…"). In distinguishing the Court's claim construction, Dr. Kamrin also testified that an outer limit is more general than a linear limit. (Tr. at 59:3–12) Thus, even under Telebrands' expert's interpretation, the construction is not dispositive of infringement as Telebrands suggests.

### i. The '282 Patent

As to obviousness, Telebrands contends that claim 1 of the '282 Patent is obvious over Weir and Donaldson. (Doc. No. 32, at 3.) Dr. Kamrin submitted a chart mapping the alleged disclosures of Weir and Donaldson to claim 1. (Doc. No. 33-1, at ¶ 119.) However, neither Weir nor Donaldson teaches a method for filling a container with fluid and corresponding detachment thereof by partially filling or shaking.  Weir relates to filling a bouquet of balloons in a vase. (Doc. No. 33-1, Ex. U., Fig. 1.) Donaldson teaches mechanically sealing a balloon that is not filled with water by using the pressurized gas in the balloon, a firing mechanism, and an O ring, to detach from the disclosed sealing device. (Doc. No. 33-1, Ex. Q, Fig. 5.) Dr. Kamrin concedes these references do not disclose "water balloons," but contends that "[i]t was well-known to those skilled in the art that rubber balloons can be filled with any fluid, including air or water." *Id.* at ¶ 125. However, Dr. Kamrin does not explain how it would have been obvious to apply the teachings of Weir and Donaldson to balloons filled with water, and instead cites to another reference, Ramere, to generally contend that it was known in the art that balloons can be filled with either water or air.

As noted above, the sealing disclosure in Donaldson discloses a mechanical release that includes a firing pin and pressurized gas:



FIG. 5

(Doc. No. 33-1, Ex. Q, Fig. 5; 4:43–52 ("The pressurized gas escapes into the volume 48 and fills that volume. The spring 66 moves the spring pin back into the cocked position with the gasket 70 seated against the inner container bottom adjacent to the hole in that bottom to seal the volume except for the orifices 46. The pressurized gas fills the volume 48 and moves through the orifices 46 into the balloon as indicated in FIG. 4 by the arrows 71'. The O-ring seals the balloon against the escape of this pressurized gas so the balloon inflates…").) Not only is it unclear how it would be obvious to use such a mechanism to release a plurality of containers filled with water by partially filling and/or shaking, it appears actually counterintuitive to such a teaching. Instead, the mechanical action for release disclosed in Donaldson is actually distinguishable from the present invention, as Donaldson does not teach removing the container by partially filling or shaking. For these reasons, the Court cannot find that Telebrands has raised a substantial question as to obviousness of claim 1 of the '282 Patent based on the combination of these references.

Telebrands next argues that the '282 Patent is invalid for lack of written description. (Doc. No. 32, at 4.) Specifically, Telebrands contends that the specification does not disclose sufficient support for the claim phrase "wherein at least first and second ones of the plurality of

16

containers are disposed sufficiently close to each other such that they press against each other, regardless whether the first and second ones of the plurality of containers are in a filled state or an unfilled state." *Id.* at 5. Telebrands argues that the specification does not disclose pressing in an unfilled state, or any state between filled and unfilled. *Id.* In support, Dr. Kamrin points to the portion of the specification that indicates containers "may push together" as they are filled with fluid and expand. (Doc. No. 33-1, at ¶¶ 106–16, citing '282 Patent at 4:26–27.) Telebrands argues that this disclosure further only suggests that the containers may push together, not that they will push together. (Doc. No. 32, at 5.) While this disclosure does indicate that containers may push together while they expand, it does not foreclose the possibility that the balloons may press against each other in an unfilled state. In fact, it suggests the containers must, at a minimum, be sufficiently close in an unfilled state such that they would be capable of pushing together as they expand. Moreover, the patent figures provide sufficient disclosure to suggest that the containers press against one another in an unfilled state. For example, Figure 1 is set forth below:



('282 Patent, Fig. 1; 4:48–50 ("…a number of containers 18 that are desired to be filled…").)

17

Figure 1 shows the containers pressed against each other in an unfilled state. Telebrands cites to *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*[4] to suggest that it is improper to rely on drawings to support claim proportions where the specification is silent. (Doc. No. 32, at 5.) However, *Hockerson-Halberstadt* merely upholds the principle that patent figures should not be relied on to define precise proportions or particular sizes if the specification is silent. *Id.* at 956. Here, the exact size or proportion of the containers is not in question. The question is whether the specification discloses containers pressed together in an unfilled state, and "drawings alone may be sufficient to provide the 'written description of the invention' required by § 112, first paragraph." *Vas-Cath, Inc et al. v. Mahurkar*, 935 F.2d 1555, 1564 (Fed. Cir. 1991). Telebrands and its expert maintain that Figure 1 is a perspective drawing that shows multiple containers at different depths of field. (Doc. No. 32, at 5; Doc. No. 33-1, at ¶ 111.) While Figure 1 is a perspective drawing, nothing in the intrinsic record suggests that the containers are not pressing against each other as drawn.  Even assuming varying depths for each container, varying depths does not foreclose Figure 1 showing the pressing together of the containers as set forth in Figure 1. The Court finds that Figure 1, in conjunction with the specification's disclosure that the containers "may push against each other" as they fill with fluid, is sufficient to satisfy the written description requirement.  Thus, Telebrands has not raised a substantial question concerning the validity of the '282 Patent for lack of written description.

Finally, Telebrands contends that the limitation that the restriction of each elastic fastener is "sufficiently limited to permit its respective container to detach from its respective tube upon one or more of (1) at least partially filling the container with fluid and (2) shaking the housing" is indefinite because it fails to provide objective bounds to the claim. (Doc. No. 32, at

---

[4] 222 F.3d 951, 956 (Fed. Cir. 2000).

6.) Telebrands contends this limitation is indefinite because it suggests that "sufficiently limited" is met if the container has any amount of fluid in it, and because "shaking" of the housing does not allow a skilled artisan to determine how much shaking is necessary to detach the containers. (Doc. No. 32, at 6–7.) The Court disagrees. The "partially filing" language is sufficiently bounded, just as Telebrands concedes—an amount of fluid between filled and unfilled. (Doc. No. 32, at 6.) Similarly, "shaking the housing" is not indefinite. As the Court has already defined "shaking" to mean "applying an acceleration," it has clear meaning in the context of the claims. (Doc. No. 181, at 22–23.) As the claim plainly states, the restriction of each fastener is "sufficiently limited" to permit detachment "upon one or more of (1) at least partially filling the container with fluid and (2) shaking the housing." '282 Patent at 6:50–51. Thus, the containers may detach when they are partially filled, or the housing is shaken, or a combination of both.

Telebrands also argues that '282 Patent does not provide any objective basis for determining when the containers are in a "filled" or "unfilled" state as claimed. (Doc. No. 32, at 7.) Telebrands maintains the containers are only "filled" when they have reached a desired size or volume. *Id.* As this Court previously explained in discussing the claim term "substantially filled" in the '066 Patent, "[w]hile the amount of water used to fill the containers may be subjective, it is not objectively boundless." (Doc. No. 182, at 9.) Here, the claim simply recites that "containers are disposed sufficiently close to each other such that they press against each other, regardless whether the first and second ones of the plurality of containers are in a filled state or an unfilled state." '282 Patent at 6:55–58. Because the claim recites that the containers press against each other "regardless" of whether they are in a "filled or unfilled state," the relative "filled" status of the containers is not imperative to the practice of the claim. Moreover,

19

taking the plain language of the claim, it is understood that the containers are pressed against each other when any amount of fluid is in the containers. Thus, Telebrands has not raised a substantial question concerning the validity of the '282 Patent based on the claim terms being indefinite.

### ii. The '749 Patent

First, with regard to indefiniteness of the '749 Patent, Telebrands makes the same arguments with respect to the '282 Patent. For the reasons explained, above, such arguments do not raise a substantial question as to the validity of the '749 Patent. *Supra* Part A(b)(i).

Second, as to obviousness, Telebrands argues that Claim 1 of the '749 Patent is obvious over (1) The Air Force Inflator in view of Donaldson or Lee, or (2) Cooper in view of Saggio and Lee or Donaldson. (Doc. No. 32, at 3; Doc. No. 33-1, at ¶¶ 66–81.) The Air Force Inflator is a device that Telebrands corroborates with web pages, which shows the ability to fill four balloons with air at a single time. However, the Air Force Inflator does not disclose any elastic fasteners or any sealing mechanism for the balloons, and instead shows them being removed by hands. (Doc. No. 33-1, Ex. P.) To combat this shortcoming, Telebrands again points to Donaldson.  But, as was the case with Weir, neither Donaldson nor the Air Force Inflator discloses a mechanism for filling containers with a fluid such as water. As discussed above with respect to the '282 Patent, Donaldson discloses a release mechanism that includes a firing pin and pressurized gas. (Doc. No. 33-1, Ex. Q, Fig. 5; 4:43–52 ("The pressurized gas escapes into the volume 48 and fills that volume. The spring 66 moves the spring pin back into the cocked position with the gasket 70 seated against the inner container bottom adjacent to the hole in that bottom to seal the volume except for the orifices 46. The pressurized gas fills the volume 48 and moves through the orifices 46 into the balloon as indicated in FIG. 4 by the arrows 71'. The

20

O-ring seals the balloon against the escape of this pressurized gas so the balloon inflates…").)

Again, Telebrands has not plausibly connected these teachings to containers filled with fluid.

Moreover, neither Donaldson nor the Air Force Inflator teach detachment of the containers by

partially filling and/or shaking.

As to the combination of the Air Force Inflator with U.S. Patent Application No.

2005/0004430 ("Lee"), Telebrands contends that Lee discloses the "elastic fastener" element of

claim 1 because Lee discloses a rubber band attached to a guide tube that seals and releases the

balloon from the guide pipe. (Doc. No. 33-1, at ¶ 74, citing Lee at [0033].)  Lee discloses that

the balloon is removed by pushing the guide pipe. Lee at [0033] ("[i]n this state, when the

pushing handle 8 of the rear portion of the guide pipe 4 is pushed in the direction of the front

end, the rubber band is moved in the direction of the front end of the inner guide pipe by a front

end of the outer guide pipe and is escaped from the guide pipe.")  Lee does not disclose "the

restriction of each elastic fastener being sufficiently limited to permit its respective container to

detach from its respective tube upon one or more of (1) at least partially filling the container

with fluid and (2) shaking the housing…" as required by the claim. Moreover, the invention

disclosed in Lee relates to a treatment for obesity and the motivation to combine Lee and the

Air Force Inflator is unclear. Lee at [0002].   Thus, neither the Air Force Inflator nor Lee

discloses an "elastic fastener" as claimed in claim 1 of the '749 Patent.   For at least these

reasons, the Court cannot find that Telebrands has raised a substantial question as to

obviousness of claim 1 of the '282 Patent based on the combination of these references.

Finally, Telebrands contends that claim 1 of the '749 Patent is obvious over U.S. Patent

No. 5,826,803 ("Cooper") in view of U.S. Patent Application US 2013/0118640 ("Saggio") or

Lee. (Doc. No. 33-1, at ¶¶ 79–81.)  As the Court previously found with respect to the '066

Patent, the Court cannot find that Telebrands has raised a substantial question as to the validity of claim 1 of the '749 Patent as obvious over Cooper in view of Saggio. Particularly, neither Cooper nor Saggio appear to disclose the "elastic fasteners" as claimed in the '749 Patent. Telebrands contends that Saggio discloses this limitation because it discloses an "inner membrane" and "seal" that internally closes off the balloon through a "closure member" when the balloon is compressed or rotated. Saggio at [0019]. Saggio does not, however, disclose any external elastic fastener. Like the '066 Patent, the '749 Patent recites each "elastic fastener clamping a respective one of the plurality of containers to a corresponding hollow tube." '749 Patent at 6:45–47. It is not clear how the inner membrane of Saggio would indeed work to clamp the balloons to the tubes of Cooper and provide the claimed "restriction of each elastic fastener," particularly when the inner membrane of Saggio extends along nearly the entire inner perimeter of the whole balloon body, as shown below in Figure 2:



Saggio Fig. 2.

22

As discussed above with respect to Lee, Lee does not disclose "the restriction of each elastic fastener being sufficiently limited to permit its respective container to detach from its respective tube upon one or more of (1) at least partially filling the container with fluid and (2) shaking the housing…" as required by the claim.  Finally, Telebrands does not sufficiently describe how a person of ordinary skill in the art would have been motivated to combine Lee with Cooper, which relates to lawn and garden sprinklers, or Saggio, which relates to a water balloon system. Cooper at 1:8-11; Saggio at [0002]. Accordingly, the Court cannot find that Telebrands has raised a substantial question as to obviousness of claim 1 of the '749 Patent based on the combination of these references.

Moreover, even if Telebrands is able to make a prima facie showing of obviousness, the Court finds that secondary considerations will be relevant here where Plaintiffs have set forth evidence of copying by Telebrands.  For example, Planitiffs have submitted Telebrands' emails that discuss the development of Telebrands' balloon products, and  state, for example: "[t]his is only the first proto so assume this will have 37 filler rods and balloons ( or more or less) *like theirs and work exactly like the original 'Bunch of Balloons.'"* (Doc. No. 19-1, at 6 (emphasis added).)   In light of these relevant secondary considerations, and the shortcomings in Telebrands' obviousness combinations, the Court finds that Telebrands has failed to raise a substantial question concerning the validity of the '282 and '749 Patents as obvious.

Because Plaintiffs will likely be able to show that the '282 and '749 Patents are valid and infringed, Plaintiffs are likely to succeed on the merits.  Thus, the likelihood of success on the merits factor favors granting a preliminary injunction.

### B. Irreparable Harm

Plaintiffs assert that Telebrands is causing severe and irreparable harm to Plaintiffs by "interfering with ZURU's exclusive patent rights, confusing consumers, interfering with plaintiffs' market position and rightful ability to gain mindshare, causing price erosion, harming plaintiffs' reputation, injuring plaintiffs' business relationships with retailers, and causing loss of good will." (Doc. No. 19, at 9.)  Telebrands contends that Plaintiffs are not entitled to a preliminary injunction because Plaintiffs delayed in bringing their motion for a preliminary injunction and have not met their burden of showing they are entitled to one. (Doc. No. 32, at 10–11.)  Here, ZURU and Telebrands directly compete with each other and are alleged to be the only two competitors in the mass water balloon maker market. Plaintiffs have submitted evidence of several types of harm that have arisen as a result of Telebrands' alleged infringing Battle Balloons products being on the market.

Plaintiffs contend that irreparable harm is likely in the absence of an injunction because Telebrands and ZURU are direct competitors in the water balloon market, and Telebrands' actions in selling the alleged infringing Battle Balloons products has interfered with ZURU's ability to establish market position and mindshare. (Doc. No. 19, at 10.) The evidence shows that Telebrands and ZURU are the two main competitors in this market. (6:15-cv-551, Doc. No. 66, at 15–17.) To the extent other players have come to market with similar products, that market share has not been established in the preliminary injunction proceedings. Instead, the evidence demonstrates that Telebrands and ZURU share many of the same retail customers and occupy the same consumer markets. For example, at least one major shared retailer is Wal-Mart, over whom the parties dispute the cause of the recent severance of the 2017 retail relationship with ZURU. (Doc. No. 96, Sealed Tr. at 10:6–11:5; 14:8–19.)

As the Court previously noted, the Federal Circuit has repeatedly held that "[d]irect competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude." *Presidio Components, Inc., v. American Technical Ceramics Corp*., 702 F.3d 1351, 1363 (Fed. Cir. 2012)*; Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703 (Fed. Cir. 2008); *see also Douglas Dynamics v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Circ. 2013) ("[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions.") On this basis alone, Plaintiffs have shown a likelihood of irreparable harm absent an injunction.

Much of the parties' dispute relates to whether ZURU has or will experience price erosion. As the Court previously found, there was an apparent pattern of erosion at both the retail and direct-to-consumer levels from Telebrands' entry to market with its Balloon Bonanza product. (6:15-cv-551, Doc. No. 66, at 15–17.)[5]

At the hearing, Ms. Mowbray, ZURU's Chief Financial Officer and Chief Operations Officer, testified that negotiations for the 2017 selling season are underway currently and generally testified to the competitive nature of online pricing between ZURU and Telebrands, as well as the price competition being driven by shared retailers. (Doc. No. 96, Sealed Tr. at 10:13–11:3; 13:5–14:7.) Ms. Mowbray's testimony reinforces the direct competition between ZURU and Telebrands in this market. It is therefore foreseeable that ZURU could be required to reduce its wholesale prices for 2017 as a result of the continued sales of Telebrands' alleged infringing Battle Balloon products to shared retailers.  Because these negotiations are currently

---

[5] At the hearing, Telebrands objected to Plaintiffs' presentation of evidence of wholesale price erosion contained in a summarized chart showing wholesale price data for each retailer from 2016 to 2017. (Doc. No. 96, Sealed Tr. at 11:4–13:4; Doc. No. 83, at 1–2.) The Court sustains the objection and does not rely on that information herein.

underway, and the water balloons are seasonal summer products, there is a likelihood of irreparable harm in the absence of an immediate injunction.

The Court also finds that Plaintiffs have presented additional evidence of consumer confusion and loss of goodwill. As discussed above, Wal-Mart has indisputably put all retail relationships with ZURU on hold for 2017. (Doc. No. 96, Sealed Tr. at 14:8–19.) ZURU maintains that the severance of this relationship, and others, is as a result of the sale of Telebrands' alleged infringing products. (Doc. No. 19, at 13.) Telebrands maintains that ZURU has lost its retail customers as a result of its conduct in these litigations. (Doc. No. 32, at 15.) Of course, without the sale of Telebrands' alleged infringing products, ZURU would never have had to bring any litigation or enforce its patent rights. Importantly, the harm here is that ZURU was deprived of the ability to come to the market with its monopoly right, and deprived of the opportunity to build new and gainful relationships with retailers absent Telebrands' presence in the market.

Similarly, Plaintiffs presented evidence that consumers are confusing the Bunch O Balloons and Battle Balloons products. Plaintiffs provided emails to ZURU that discuss dissatisfaction with "color" in the balloons staining clothing and skin, as well as Amazon reviews that the dye in the balloons burns eyes. (Doc. No. 96, Sealed Tr. at 16:20–18:3.) Because ZURU does not make any product with colored dye in the water balloons, it maintains that all of these customers are confusing ZURU's Bunch O Balloons product with Telebrands' Battle Balloons Color Combat, which do contain colored dye in the water balloons. At a minimum, this evidence suggests that consumers may continue to confuse the patented invention and its commercial embodiment, ZURU's Bunch O Balloons, with Telebrands' alleged infringing Battle Balloons products.

The Court finds that the harms identified herein cannot be undone or compensated with monetary damages.  Indeed, Plaintiffs will not have a second chance to come to the market and establish a market share, gain consumer mindshare, and build retailer relationships based solely on the sales and success of their commercial embodiment.

Finally, Telebrands' argument that Plaintiffs delayed filing this motion fails.  As discussed above, Plaintiffs filed this action the same day the '749 Patent issued, and amended the complaint the same day the '282 Patent issued.  Plaintiffs then filed this motion for a preliminary injunction based on its claims of patent infringement shortly thereafter.

For the reasons discussed herein, the Court finds that Plaintiffs will likely suffer irreparable harm in the absence of a preliminary injunction. Therefore, this factor also favors granting a preliminary injunction.

### C.  Balance of Hardships

Plaintiffs contend that the balance of hardships favors granting a preliminary injunction for several reasons: (1) Telebrands is a large company with many products so any harm from the injunction will be minimized; (2) Telebrands took a calculated risk in selling Battle Balloons when it knew of Plaintiffs' patented inventions; and (3) Mr. Malone and his family rely on the sale of Bunch O Balloons as their primary source of income. (Doc. No. 19, at 15.) Telebrands contends that balance of hardships weighs in favor of Telebrands because an injunction would cause damage to its retailer relationships and loss of revenue and sales for Summer 2016. (Doc. No. 32, at 15.)

Here, as discussed above, Plaintiffs have shown a likelihood of success on the merits and irreparable harm. Further, Telebrands was indisputably aware of Plaintiffs' patent rights and went ahead and made the calculated risk to sell the Battle Balloon products.   Indeed, this

27

invention and the Bunch O Balloons product is the livelihood of Mr. Malone and his company

Tinnus.  Malone Decl. at ¶ 15.  Telebrands has numerous "As Seen on TV" products in addition

to Battle Balloons.  At the hearing, Mr. Iyer, Executive Vice President and Chief Operating

Officer of Telebrands, testified that over the past 30 years, Telebrands has sold several hundred

products. (Doc. No. 97, Tr. at 53:16–19.) On balance, the irreparable harm that Tinnus and

ZURU will suffer in the absence of a preliminary injunction outweighs the harm Telebrands

would incur. Accordingly, this factor weighs in favor of granting a preliminary injunction.

### D.  Public Interest

Plaintiffs contend there is a strong public interest that favors the enforcement of patents.

(Doc. No. 19, at 15.)  Telebrands contends that this factor does not weigh in favor of granting a

preliminary injunction because Plaintiffs have not demonstrated they are likely to succeed on the

merits. (Doc. No. 32, at 15.)  Here, as discussed above, Plaintiffs have shown a likelihood of

success on the merits. *Abbott Labs. Inc.*, 452 F.3d at 1348 ("[a]lthough the public interest inquiry

is not necessarily or always bound to the likelihood of success of the merits, in this case absent

any other relevant concerns, . . . the public is best served by enforcing patents that are likely

valid and infringed."). Therefore, the Court finds that this factor also weighs in favor of granting

a preliminary injunction.

### CONCLUSION

Having found that all four factors favor granting a preliminary injunction, it is

**RECOMMENDED** that Plaintiffs' Motion for Preliminary Injunction (Doc. No. 19) be

**GRANTED**.

Within fourteen (14) days after receipt of the magistrate judge's report, any party may

serve and file written objections to the findings and recommendations contained in this Report. A

Appx28

Party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen (14) days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusion, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); *see Douglass v. United States Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

**So ORDERED and SIGNED this 12th day of July, 2016.**

JOHN D. LOVE

UNITED STATES MAGISTRATE JUDGE

29

Appx29

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **TINNUS ENTERPRISES, LLC** | § | |
| **ET AL.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CAUSE NO. 6:16-CV-33-RWS-JDL** |
| **vs.** | § | **[LEAD CASE]** |
| | § | |
| **TELEBRANDS CORP.,** | § | |
| | § | |
| **Defendant.** | § | |

## ORDER ADOPTING REPORT AND RECOMMENDATION
## OF MAGISTRATE JUDGE

The above entitled and numbered civil action was referred to United States Magistrate Judge John D. Love pursuant to 28 U.S.C. § 636.  The Report and Recommendation of the Magistrate Judge ("R&R"), which contains his proposed findings of fact and recommendation, has been presented for consideration.    Docket No. 99.[1]    Defendant Telebrands Corp. ("Telebrands") filed objections to the Report and Recommendation.  Docket No. 102.  The Court held a hearing on August 23, 2016 to consider Telebrands's objections.  Having considered Telebrands's objections, the Court **ADOPTS** the Report and Recommendation of the Magistrate Judge as the findings and conclusions of the Court.  All objections are overruled.  Plaintiffs Tinnus Enterprises ("Tinnus") and ZURU Ltd.'s ("ZURU") (collectively "Plaintiffs") Motion for a Preliminary Injunction (Docket No. 19) is **GRANTED**.

### BACKGROUND

In the R&R, the Magistrate Judge recommends granting Plaintiffs' Motion for a Preliminary Injunction.  Telebrands objects to the Magistrate Judge's conclusions that Plaintiffs

---

[1] Unless otherwise indicated, the docket entries cited to in this order refer to Cause No. 6:16-cv-33

are likely to succeed on the merits and that Plaintiffs will suffer irreparable harm if a preliminary injunction is not granted.[2]  Docket No. 102 at 1.  Telebrands argues that the finding of likely infringement is based on incorrect claim constructions.  *Id*. at 1.  Telebrands further claims that the asserted patents (U.S. Patent Nos. 9,232,749 ("the '749 Patent") and 9,315,282 ("the '282 Patent")) are obvious and indefinite and that the '282 Patent contains a written description defect.  *Id*. at 1.  Finally, Telebrands argues that the Magistrate Judge's finding of irreparable harm is based on outdated and incorrect evidence.  *Id*. at 9.

## LEGAL STANDARD

The Court reviews *de novo* the portions of the Magistrate Judge's findings to which the Defendant has raised objections.  28 U.S.C. § 636 (b)(1).

"The decision to grant a preliminary injunction is within the discretion of the district court."  *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001).  "A district court may enter a preliminary injunction based on its consideration of four factors: (1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest."  *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009) (internal citations omitted).

To establish likelihood of success on the merits, the patentee seeking a preliminary injunction must show that it will likely prove infringement, and that it will likely withstand any challenges to the validity of the patent.  *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009); *see Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).  The test for infringement in the context of a preliminary injunction is the same

---

[2] In its objections, Telebrands states that the Magistrate Judge's finding regarding balance of the hardships was erroneous, but offers no support for the assertion.  Docket No. 102 at 9.

as the test for infringement on the merits, which requires that the accused device be evaluated in light of the properly construed claim. *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005). With respect to validity, "if the alleged infringer raises a substantial question concerning validity, *i.e.*, asserts an invalidity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Helifix Ltd. v. Block-Lok, Ltd.*, 208 F.3d 1339, 1351 (Fed. Cir. 2000).

Irreparable harm may be demonstrated by showing that: (1) infringement has caused or will cause price erosion or loss of market share; (2) deprivation of the exclusive right to the patented invention; or (3) the accused infringer is incapable of paying a damages award. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011). A patent owner may also suffer irreparable harm from loss of revenue or damage to customer goodwill, as these harms "may frequently defy attempts at valuation." *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010).

## DISCUSSION

### I. Likelihood of Success on the Merits

The Magistrate Judge properly found that Plaintiffs are likely to succeed on the merits, as Plaintiffs have shown that they are likely to prove infringement and as Telebrands has not raised a substantial question as to the validity of the asserted patents.

#### A. Infringement

First, both the '282 and '749 Patents are likely to be infringed. Telebrands raises no objections to the R&R's finding of likely infringement of the '282 Patent. For the '749 Patent, Telebrands contends that the Magistrate Judge misconstrued the terms "second end" and "common face" of Claim 1. Docket No. 102 at 6–9. The Magistrate Judge previously construed these terms during proceedings on U.S. Patent No. 9,051,066 ("the '066 Patent") in a related

Appx32

action, Cause No. 6:15-cv-551, Docket No. 181 at 12; the '749 Patent is a continuation of the '066 Patent and shares the same specification.  Docket No. 99 at 11–12.  The term "second end" was construed in Cause No. 6:15-cv-551 to mean "an outer limit of the housing distinct from the first end," and the term "common face" was construed to mean "a shared outer surface of the housing through which a plurality of holes extend."  *Id.*  In the R&R, the Magistrate Judge adopted these prior constructions, but clarified that the meaning of the "outer limit" term in the construction of "second end" is synonymous with "outer surface."  *Id*. at 11–14.

1.  **"second end"**

Telebrands asserts that the R&R did not clarify the term "second end," but broadened it, and argues that this broadening led to an incorrect finding of likely infringement of the '749 Patent.  Docket No. 102 at 6.  Telebrands states that an "outer surface" is clearly broader than an "outer limit," and claims that the scope of the term "second end" now includes at least surfaces adjacent to an outer limit.  *Id.*  Telebrands then argues that because the Magistrate Judge had previously refused to include "adjacent surfaces" in the construction of "outer limit," the Magistrate Judge's clarification is now inconsistent.  *Id*. at 7–8.

Telebrands is incorrect that the Magistrate Judge's clarification improperly broadens the term to include all portions of a housing that are between the first and second ends and all surfaces that are adjacent to the second end.  The term is not broadened here.  The Magistrate Judge clarified his prior construction of the term because the parties' experts disputed the meaning of the construction.  Docket No. 99 at 13–14.

Telebrands previously argued that "outer limit" should mean only the outer ***linear*** limit, and the Court rejected the argument.  Cause No. 6:15-cv-551, Docket No. 181 at 13.  In its objections here, Telebrands claims that it is not again arguing for this limitation, Docket No. 102

at 7 n.3, but then states that anything that is not the outer linear limit is an "adjacent surface." *Id.* at 7. By labeling everything that is not the outer linear limit an "adjacent surface," Telebrands is again arguing that the term should be limited to only the outer linear limit, a limitation that the Magistrate Judge was correct to reject. Because "outer limit" always included more than the outer linear limit, the Magistrate Judge's clarification is consistent with his prior ruling and did not broaden the term.

### 2. "common face"[3]

Telebrands's objection to the R&R's finding that its accused product meets the "common face" limitation is similarly unconvincing. Telebrands argues that a "common face" must be planar, and because each of the holes in its product is contained on its own geometrically bounded step, the holes do not extend through a "common face." *See* Docket No. 99 at 12. Telebrands also states that the R&R found that geometric transitions such as edges "are irrelevant to determining the boundaries of the 'common face.' " Docket No. 102 at 8.

In the R&R, the Magistrate Judge states that Telebrands's interpretation of the Court's construction of "common face" was too narrow because the proposed limitation that the "common face" be "planar" was previously rejected. Docket No. 99 at 12. Telebrands's arguments rely on an assumption that under the Magistrate Judge's construction, if a "shared outer surface" can contain *any* geometric transitions, then *all* geometric transitions must be irrelevant to determining the boundaries of the "shared outer surface." However, nothing in the construction or the prosecution history of this claim demands this dichotomy. Telebrands's claim construction arguments are thus without merit, and the Magistrate Judge correctly found that Plaintiffs have shown a likelihood of success of infringement of the '749 Patent.

---

[3] Telebrands's objections to the R&R's irreparable harm analysis and infringement analysis for "common face" were filed in excess of the page limit. Telebrands filed a Motion for Leave to File Excess Pages (Docket No. 103) concurrent with its objections. The Court fully considered all of Telebrands's objections.

### B.  Invalidity

#### 1.  '282 Patent

Telebrands objects to the R&R's finding that the '282 Patent is likely valid and argues that it can prove invalidity at trial on grounds of obviousness, written description and indefiniteness.  Docket No. 102 at 1.

#### a. Obviousness

Telebrands raises seven objections to the R&R's finding that the asserted patents are likely nonobvious, but each of these objections lacks merit.  First, Telebrands claims that the R&R discards certain prior art teachings because they do not teach filling balloons with "fluids such as water," but only with air, which the parties previously agreed is a fluid.  *Id*. 102 at 1–2.  Second, Telebrands claims that the R&R improperly assumes that gravity alone must cause the balloons to detach and that this caused the Magistrate Judge to conclude that Telebrands's prior art references did not teach the limitation that the connecting force of the O-ring be "sufficiently limited to permit" detachment upon shaking, partial filling or both.  *Id*.  Third, Telebrands argues that its prior art references teach detachment upon shaking because O-rings are inherently capable of detaching when they are sufficiently shaken.  *Id*. at 3.  Fourth, Telebrands argues that the '282 Patent is obvious in light of the Zorbz reference in combination with other prior art references.  *Id*. at 3–4.  Fifth, Telebrands claims that the R&R imposed a restriction that the "elastic fastener" be external to the balloon, which it argues is not found in the claims.  *Id*. at 4.  Sixth, Telebrands claims that the R&R ignored that the U.S. Patent and Trademark Office ("Patent Office") initiated a Post-Grant Review ("PGR") proceeding on the '066 Patent.  *Id*.  Finally, Telebrands claims that the R&R erred in finding that secondary considerations were

relevant to Telebrands's obviousness challenge.  *Id.*

Telebrands's first objection—that the R&R discarded certain prior art teachings because they did not teach filling balloons with "fluids such as water," but only with air—misreads the R&R's reasoning.  The Magistrate Judge's finding of no motivation to combine the prior art references was not based on including or excluding air in the category of fluids, but on the prior art not disclosing a method for filling a container with fluid and detaching it by shaking or partially filling the container.  Docket No. 99 at 15–16, 20.  As the Magistrate Judge correctly found, none of Telebrands's cited references teaches removal by shaking or partially filling.

Second, Telebrands objects to the R&R's finding that the asserted prior art references do not teach the limitation that the connecting force of the O-ring be "sufficiently limited to permit its respective container to detach from its respective tube upon one or more of (1) at least partially filling the container with fluid and (2) shaking the housing."  Docket No. 102 at 2.  Telebrands argues this finding is premised on an inappropriate assumption that gravity alone must cause the balloons to detach.  *Id.* at 2.  Telebrands argues that its prior art references teach the "sufficiently limited to permit" limitation because they allow a partially filled container to detach by pulling the container off of the tube or by using a firing pin and pressurized gas to release the container.  *Id.* at 2–3.  But its references do not teach detachment upon partially filling, shaking or both as the claims here require.  Further, the R&R never mentions gravity and correctly analyzes the claim language in its full context.

In its third objection, Telebrands argues that its prior art references teach detachment upon shaking because O-rings are inherently capable of detaching when they are sufficiently shaken.  *Id.* at 3.  However, for inherency to be considered in the obviousness analysis, the limitation must be necessarily present or be the natural result of combining elements explicitly

disclosed in the prior art. *See PAR Pharm., Inc. v. TWI Phar., Inc.*, 773 F.3d 1186, 1196 (Fed. Cir. 2014). Here, the limitation at issue—that the connecting force of the fastener be "sufficiently limited to permit" the container to detach upon partially filling, shaking or both—is not necessarily present or the natural result of combining the prior art references, as the O-rings that Telebrands relies on are frequently designed specifically not to detach upon shaking. *See* Docket No. 51-1 at ¶¶ 59–60. Telebrands has not met the high standard required for inherency.

Fourth, Telebrands argues that the '282 Patent is obvious in light of the Zorbz reference in combination with several other references. Docket No. 102 at 3. The '282 Patent claims priority to a provisional application. *See* Docket No. 32 at 4. The Zorbz reference became public after the priority date of the provisional application, but before the filing of the non-provisional application, which eventually became the '282 Patent. *See id.* Telebrands claims that Plaintiffs cannot claim priority to the provisional application because the '282 Patent has a different figure than the provisional application, and because the provisional application does not support the "pressing" limitation of the '282 Patent. Docket No. 102 at 3–4. However, the figure in the '282 Patent is nearly identical to the figure in the provisional application, and both figures show the balloons configured in an arrangement in which they are pressed against each other. *See* Docket No. 33-7 at 3; Docket No. 99 at 17. The Magistrate Judge was therefore correct in not considering the Zorbz reference as prior art.

Telebrands's fifth objection states that the R&R imposed a restriction that the "elastic fastener" be external to the balloon, which Telebrands argues is not found in the claims. Docket No. 102 at 4. However, the R&R imposed no such restriction. The Magistrate Judge correctly concluded that Telebrands's prior art references did not appear to disclose the "elastic fasteners" as claimed in the asserted patents after analyzing the combination of the references in their full

context. *See* Docket No. 99 at 22.

Sixth, Telebrands claims that the R&R ignored that the Patent Office initiated a PGR proceeding on the '066 Patent, which Telebrands states is similar to but narrower than the patents here. Docket No. 102 at 4. The '066 Patent is different from the patents at issue in this case, though, and Telebrands's unsupported assertion that the '066 Patent is narrower than the patents at issue here is not persuasive. Further, Telebrands made no argument as to why these proceedings are relevant for this case.

Finally, Telebrands argues that the R&R erred in finding that secondary considerations were relevant to Telebrands's obviousness challenge. *Id.* Telebrands claims that there is no nexus between Telebrands's copying of Plaintiffs' product and the nonobviousness of the invention because the copied product is different than the product that is the subject of this litigation. *Id.* However, there is evidence in the record that the Plaintiffs' product is coextensive with the claims of the patents at issue. *See* Docket No. 51-1 at ¶103. Plaintiffs have also shown a nexus between the nonobviousness of their product and Telebrands's copying of it, as Telebrands copied the product after one of its employees sent a link of an article praising Plaintiffs' Bunch O Balloons product to Telebrands's CEO. Docket No 19 at 7. The fact that Telebrands's copying relates to its former product, Balloon Bonanza, and not to its Battle Balloons product that is the subject of this case, is irrelevant. Telebrands copied a product that is coextensive with the claims of the patents in this case. That copying is relevant here as evidence of nonobviousness.

### b.    Written Description

Telebrands objects to the R&R's finding that the claims of the '282 Patent meet the written description requirement. It believes that the specification does not support the

requirement that at least two containers press together, whether or not they are unfilled or filled, and that nothing can be determined from the figure in the specification because the figure shows only a depth perspective.  Docket No. 102 at 4.  The specification of the '282 patent includes language that the containers "may push together" when they are filled and a figure that shows the balloons touching in an unfilled state.  '282 Patent at 4:26–27, Fig 1.  This sufficiently "conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010)(en banc). Telebrands's argument that nothing can be determined from the figure about whether the balloons are touching because it shows only a depth perspective is unpersuasive, as the figure appears to show the balloons touching.  *See* '282 Patent at 4:26–27, Fig 1.

### 1. **Indefiniteness**

Telebrands objects to the R&R's finding that the "sufficiently limited to permit" limitation, present in the claims of both the '282 Patent and the '749 Patent, meets the definiteness requirement of 35 U.S.C. § 122.  Docket No. 102 at 5.  In its objections, Telebrands belatedly attempts to inject uncertainty into the claim term "shaking."  Docket No 102 at 6.  A claim is invalid as indefinite when its language, read in light of the specification and prosecution history "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).  Telebrands's arguments, largely based on the alleged indefiniteness of the term "shaking," are not persuasive because one skilled in the art would likely be reasonably certain as to the meaning and scope of the term.  The Magistrate Judge correctly determined that the patents were not likely to be found invalid for indefiniteness.

### c. The '749 Patent

Telebrands objects to the R&R's finding of likely validity for the '749 Patent based upon the alleged obviousness and indefiniteness of the asserted claims.   Docket No. 102 at 1. Telebrands's objections with regard to obviousness and indefiniteness of the '749 Patent are the same as its objections with regard to the '282 Patent.   *See* Docket No. 102 at 1, 5.   The objections for the '749 Patent are not persuasive for the same reasons as stated for the '282 Patent.

**C.   Irreparable Harm**

The Magistrate Judge properly found that Plaintiffs will likely suffer irreparable harm absent an injunction. The Magistrate Judge found that Telebrands and ZURU are direct competitors in the water balloon market and share many of the same retail customers.   Docket No. 99 at 24.   Telebrands claims this finding is unsupported by any evidence that the parties compete in a two-player market.   Docket No. 102 at 10.   However, Plaintiffs do not need to prove that ZURU and Telebrands are the only two companies in the entire market to show the existence of likely irreparable harm.   *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011).   Further, at the hearing, Telebrands admitted that ZURU and Telebrands are the two biggest players in the market.   Docket No. 96 (Aug. 23, 2016 Hr'g Tr.) at 12:12–25.   The Magistrate Judge was correct to find that ZURU and Telebrands were direct competitors and that their status as such made it likely that Plaintiffs would suffer irreparable harm.

Telebrands's other objections to the R&R's finding of likely irreparable harm are equally unpersuasive. Telebrands points to the R&R's citation of findings for price erosion from the prior case between these parties and claims that there is no evidence of price erosion in this case. Docket No. 102 at 10.   Telebrands also objects to the R&R's finding of consumer confusion, arguing that there is no evidence that it is the only manufacturer of colored water balloons.   *Id*. at 10.   Finally, Telebrands argues that the R&R misattributed the strained nature of Plaintiffs'

relationships with its retailers to Telebrands, claiming that Plaintiffs caused those relationships to become strained. *Id.* at 10.

The R&R did not rely on the evidence from the earlier case to find a likelihood of price erosion in this case. Plaintiffs have provided ample evidence to support the Magistrate Judge's finding that price erosion is likely during the pendency of this litigation. Docket No. 99 at 25–26. Plaintiffs have also presented evidence that customers were complaining about stains from dyed water balloons, a product that Telebrands sells but Plaintiffs do not. *See id.* at 26. Plaintiffs do not need to disprove the existence of any other manufacturer of colored water balloons for that evidence to support a finding of consumer confusion, especially when it is admitted that Telebrands and ZURU are the two biggest participants in the market. And as to Telebrands's claim that Plaintiffs caused the strained nature of their relationships with their retailers, the Magistrate Judge properly concluded that Plaintiffs' relationships with their retailers were affected by Telebrands because Plaintiffs would not be in court against their retailers if not for Telebrands's actions.

## CONCLUSION

Having considered each of Telebrands's objections, the Court **ADOPTS** the Report and Recommendation of the Magistrate Judge (Docket No. 99) as the findings of this Court. All objections are **OVERRULED**, and Plaintiffs' Motion for a Preliminary Injunction (Docket No. 19) is **GRANTED**.

The parties are further **ORDERED** to meet and confer within seven (7) days of the issuance of this Order and submit to the Court a proposed bond amount and injunctive order pursuant to Federal Rule of Civil Procedure 65. To the extent the parties cannot agree on an appropriate bond amount or injunctive order, the parties may submit their disputes to the Court

within seven (7) days of the issuance of this Order.

**SIGNED this 29th day of September, 2016.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

Appx42

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **TINNUS ENTERPRISES, LLC, and** | § | |
| **ZURU LTD.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **No. 6:16-cv-0033 RWS-JDL** |
| **v.** | § | |
| | § | **JURY DEMANDED** |
| **TELEBRANDS CORP.,** | § | |
| | § | |
| **Defendant.** | § | |

## ORDER ON INJUNCTION

Before the Court is the parties' Joint Motion for Bond Amount and Injunctive Order (Docket No. 147). On July 12, 2016, the Magistrate Judge issued his Report and Recommendation ("R&R") recommending that Plaintiffs' motion for a preliminary injunction be granted. Docket No. 99. On September 29, 2016, the Court issued an order adopting the findings of the Magistrate Judge and overruling all objections ("Order Adopting"), and ordered the parties to meet and confer regarding the appropriate amount for bond and the injunctive order. Docket No. 142. The parties filed the instant motion on October 6, 2016, setting forth their disputes with regard to bond amount and the scope of the injunction. Upon consideration of the arguments, the Court resolves those disputes and sets forth the terms of the injunction herein.

The parties present two main disputes with respect to the issuance of the injunctive order: (1) whether the order applies with equal force to the retailer defendants in the consolidated action (6:16-cv-34); and (2) whether bond should be set at $50,000 or $8,800,000.

This Order sets forth the contents and scope of the injunction against Telebrands pursuant to Federal Rule of Civil Procedure 65. Regarding the applicability of this Order with respect to the retailer defendants, the Court clarifies that this Order is not in equal force with respect to

retailer defendants in the consolidated action.  Indeed, both the Magistrate Judge's R&R and the

Court's Order Adopting considered only the preliminary injunction with respect to Defendant

Telebrands.  Docket Nos. 99, 142.  A separate motion is pending with respect to the retailer

defendants (6:16-cv-34, Docket No. 26), and the Court will rule on that motion in turn.

With respect to the bond amount, Telebrands requests the bond be set at $8,800,000,

which Telebrands estimates covers the financial losses it would suffer if later found to be

improperly enjoined.  Docket No. 147 at 16.  Plaintiffs assert that a bond of $50,000 would be

appropriate.  *Id.* at 8.  Telebrands bears the burden of showing the extent of its injury resulting

from an injunction prohibiting the sale, or offering for sale, of its Battle Balloon products.  *See*

*Oakley, Inc. v. Sunglass Hot Inter.*, No. SA CV 01-1065 AHS, 2001 WL 1683252, at *12 (C.D.

Cal. Dec. 7, 2001), *aff'd on other grounds*, 316 F.3d 1331 (Fed. Cir. 2003) ("A successful

movant for a TRO or preliminary injunction must post security 'for the payment of such costs

and damages as may be incurred or suffered by any party who is found to have been wrongfully

enjoined or restrained.'  It is Defendants' burden to reasonably estimate the extent to which they

would be damaged if this preliminary injunction were improvidently granted." (quoting FED. R.

CIV. P. 65(c)).  "The amount of a bond is a determination that rests within the sound discretion of

a trial court."  *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1386 (Fed. Cir. 2006).

Here, Telebrands has submitted a declaration of its Executive Vice President and COO,

Bala Iyer, in support of its proposed $8.8 million bond.  Docket No. 146-1.  Telebrands points to

approximately $4 million in losses that would result from retail customers destroying or

returning inventory of the products in question, which Telebrands maintains will be a loss

regardless of whether the retailer defendants are enjoined by this Order.  *Id.* at ¶¶ 11–12.

Telebrands also contends it will have to pay an 8% restocking fee to each customer.  *Id.* at 13.

Finally, Telebrands estimates it will lose $4.8 million in profits if improperly enjoined.  *Id.* at ¶ 15.  In support of this contention, Telebrands further submits a declaration of its damages expert, Dr. Hatch, who states that he has reviewed sales data for Telebrands's U.S. sales from January 2016 to July 2016 and that net profits during that time frame were $4.8 million.  Docket No. 146-2 at ¶ 2.

As to the alleged potential losses from inventory destruction or returns, the Court has already stated that this Order does not apply in equal force to the retailer defendants; therefore, the Court finds such amounts unnecessary to secure any potential loss from improper enjoinment. As to the remainder of the evidence, the Court finds Telebrands's expert's submission as to an expected loss of $4.8 million in net profits based on the prior sales from January 2016 through July 2016 to support a proper bond amount in this instance. Plaintiffs do not contest this specific amount of net profits for the time period stated, or provide any argument as to why a bond in this amount based on known sales data would be improper.  Accordingly, the Court finds a bond of $4.8 million to be appropriate in this instance.

For the reasons set forth in Docket Nos. 99 and 142, it is hereby **ORDERED** as follows:

- The Court **FINDS** that Plaintiffs have carried their burden of showing (a) that Plaintiffs will likely succeed on the merits of their patent infringement claim by showing that U.S. Patent Nos. 9,242,749 ("'749 Patent") and 9,315,282 ("'282 Patent") are valid and enforceable and that Telebrands has infringed the '749 and '282 Patents, (b) that Plaintiffs have suffered and will continue to suffer irreparable harm if a preliminary injunction is not granted, (c) that the balance of hardships between Plaintiffs and Telebrands favors the Plaintiffs and (d) that the public interest would be

Appx45

served by issuing a preliminary injunction in the present case.  Docket Nos. 99, 142.

- Pursuant to Federal Rule of Civil Procedure 65, 35 U.S.C. § 271, 35 U.S.C. § 283, and the inherent equitable powers of the Court, the Court hereby preliminarily **RESTRAINS AND ENJOINS** Telebrands, its officers, agents, servants, employees, attorneys and all other persons who are in active concert or participation with Telebrands who receive actual notice of this Order by personal service or otherwise from making, using, importing, marketing, advertising, offering to sell or selling in the United States the Battle Balloons products or any colorable imitation of the same that infringes the '749 and/or the '282 Patent.  *See* FED. R. CIV. P. 65(d).

- This preliminary injunction shall remain in effect until further order of this Court.

- Plaintiffs are directed to file proof of bond in the amount of four million and eight hundred thousand dollars ($4,800,000) within seven business days of this Order.  *See* FED. R. CIV. P. 65(c).  The bond shall serve as security for all claims with respect to this preliminary injunction.

Pursuant to this Order, the Clerk of Court is directed to terminate the parties' joint motion (Docket No. 147).

**SIGNED this 31st day of October, 2016.**

*Robert W. Schroeder III*
ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

Appx46



US009242749B2

(12) **United States Patent**
    Malone

(10) Patent No.: **US 9,242,749 B2**
(45) Date of Patent: ***Jan. 26, 2016**

(54) **SYSTEM AND METHOD FOR FILLING CONTAINERS WITH FLUIDS**

(71) Applicant: **TINNUS ENTERPRISES, LLC**, Plano, TX (US)

(72) Inventor: **Joshua Malone**, Plano, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/723,953**

(22) Filed: **May 28, 2015**

(65) **Prior Publication Data**

US 2015/0259085 A1      Sep. 17, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 14/492,487, filed on Sep. 22, 2014, now Pat. No. 9,051,066.

(60) Provisional application No. 61/942,193, filed on Feb. 20, 2014, provisional application No. 61/937,083, filed on Feb. 7, 2014.

(51) **Int. Cl.**
    ***B65B 3/17*** (2006.01)
    ***B65B 3/04*** (2006.01)
    ***B65B 3/28*** (2006.01)
    ***A61B 10/00*** (2006.01)
    (Continued)

(52) **U.S. Cl.**
    CPC ............... ***B65B 3/17*** (2013.01); ***A61B 10/0045*** (2013.01); ***A63H 27/10*** (2013.01); ***B65B 3/04*** (2013.01); ***B65B 3/28*** (2013.01); ***B65B 7/025*** (2013.01); ***A63H 2027/1033*** (2013.01); ***A63H 2027/1041*** (2013.01)

(58) **Field of Classification Search**
    CPC ............ A63H 27/10; A63H 2027/105; A63H 2027/1033; A63H 2027/1041; B65B 3/04; B65B 3/28
    USPC .................. 141/10, 114, 234–248; 383/3, 71; 446/220–226
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,656,669 A    10/1953    Avansino
3,105,613 A    10/1963    Barton et al.
                (Continued)

FOREIGN PATENT DOCUMENTS

AU    PCT/IB2015/051747 A1    8/2015
FR    2911512 A1 *    7/2008

OTHER PUBLICATIONS

Search and Examination Report from the United Kingdom Patent Office, United Kingdom patent application 1504038.9.
                (Continued)

*Primary Examiner* — Kevin P Shaver
*Assistant Examiner* — Andrew StClair

(57) **ABSTRACT**

An example embodiment of an apparatus includes a housing with an opening at a first end and a plurality of holes at a second end, a plurality of hollow tubes attached to the plurality of holes, a plurality of containers removably attached to the hollow tubes, and a plurality of elastic fasteners, each elastic fastener clamping each container to a corresponding hollow tube, such that when the containers are filled with fluid and detached from the corresponding hollow tubes, each elastic fastener seals each container with the fluid inside.

**1 Claim, 6 Drawing Sheets**



**US 9,242,749 B2**

Page 2

(51) **Int. Cl.**
       ***B65B 7/02***          (2006.01)
       *A63H 27/10*          (2006.01)

(56)            **References Cited**

         U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,580,303 A | | 5/1971 | Roberge |
| 4,741,448 A | * | 5/1988 | Alley et al. ................. 215/266 |
| 5,014,757 A | | 5/1991 | Donaldson et al. |
| 5,444,962 A | * | 8/1995 | Bonnet ........................ 53/417 |
| 5,826,803 A | * | 10/1998 | Cooper ..................... 239/556 |
| 6,007,403 A | * | 12/1999 | Urspringer et al. .......... 446/222 |
| 6,488,557 B1 | | 12/2002 | Elliott et al. |
| 7,445,533 B2 | | 11/2008 | Norton et al. |
| 7,479,130 B2 | | 1/2009 | Trickett |
| 8,479,776 B2 | * | 7/2013 | Berardi ................. F16L 11/00 138/109 |
| 9,051,066 B1 | * | 6/2015 | Malone ................................ 1/1 |
| 2005/0004430 A1 | * | 1/2005 | Lee et al. ..................... 600/116 |

| | | | |
|---|---|---|---|
| 2008/0121309 A1 | * | 5/2008 | Boise et al. .................. 141/313 |
| 2010/0326212 A1 | * | 12/2010 | Furey et al. ................ 73/863.31 |
| 2011/0253256 A1 | * | 10/2011 | Finley ............................ 141/98 |
| 2013/0118640 A1 | * | 5/2013 | Saggio ........................ 141/313 |
| 2013/0226219 A1 | | 8/2013 | Brister et al. |
| 2014/0030452 A1 | * | 1/2014 | Warner et al. ............... 428/34.1 |
| 2014/0212074 A1 | * | 7/2014 | Durst ............................ 383/44 |

OTHER PUBLICATIONS

Bunch O Balloons Kickstarter page, available at https://www.
kickstarter.com/projects/bunchoballoons/bunch-o-balloons-100-
water-balloons-in-less-than-1, last visited Oct. 7, 2015.
Bunch O Balloons . . . make 100 water balloons in less than a minute!
<URL:https://www.youtube.com/watch?v=S1DaXYT6O2A>
[According to the International Search Report for PCT/IB2015/
051747: "Viewed on internet on Aug. 20, 2015 . . . Published on Aug.
5, 2014"].

* cited by examiner



FIG. 1



FIG. 2

Case: 17-1175    Document: 49    Page: 130    Filed: 05/19/2017



FIG. 3



FIG. 4

Appx93



FIG. 5



FIG. 6



16A

20A

40

18A

44

42

44

**FIG. 7**



50

| 52 | ATTACH HOUSING TO FLUID SOURCE |
| 54 | SUPPLY FLUID FROM FLUID SOURCE TO HOUSING |
| 56 | FILL PLURALITY OF CONTAINERS WITH FLUID |
| 58 | DETACH CONTAINERS FROM TUBES |

**FIG. 8**

US 9,242,749 B2

| 1 | 2 |

**SYSTEM AND METHOD FOR FILLING CONTAINERS WITH FLUIDS**

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of and claims the benefit under 35 U.S.C. §120 from U.S. patent application Ser. No. 14/492, 487 entitled "SYSTEM AND METHOD FOR FILLING INFLATABLE CONTAINERS WITH LIQUID," filed Sep. 22, 2014, which claims the benefit under 35 U.S.C. §119(e) from U.S. Provisional Application Ser. Nos. 61/937,083 and 61/942,193, filed Feb. 7, 2014 and Feb. 20, 2014, respectively, which applications are all incorporated herein by reference in their entireties.

## TECHNICAL FIELD

The present disclosure relates generally to fluid inflatable systems and more particularly, to a system and method for filling containers with fluids.

## BACKGROUND

Inflatable containers such as balloons can be filled with a variety of fluids, such as air, helium, water, medicines, etc. In some cases, a lot of inflatable containers may need to be filled with fluids. For example, balloons used as props in conventions, large parties, etc. may number in the hundreds and may require substantial human effort to fill them all in a timely manner. In another example, water balloons used as kids' toys may need to be filled in large numbers to aid in various games. Various methods may be employed to fill such inflatable containers. For example, an individual may blow up and tie the each balloon by hand or use a tank of compressed air or helium to inflate the balloon, which then has to be tied. In another example, an individual may fill water balloons with water by hand one at a time, and then tie the balloons, which can all be quite time-consuming. Moreover, the inflatable containers may be damaged or filled to different volumes.

## BRIEF DESCRIPTION OF THE DRAWINGS

To provide a more complete understanding of the present disclosure and features and advantages thereof, reference is made to the following description, taken in conjunction with the accompanying figures, wherein like reference numerals represent like parts, in which:

FIG. **1** is a simplified perspective view illustrating an example configuration of an embodiment of a system for filling containers with fluids;

FIG. **2** is a simplified diagram illustrating a cross-sectional view of example details of an embodiment of the system;

FIG. **3** is a simplified diagram illustrating other example details of an embodiment of the system;

FIG. **4** is a simplified diagram illustrating yet other example details of an embodiment of the system;

FIG. **5** is a simplified diagram illustrating yet other example details of an embodiment of the system;

FIG. **6** is a simplified diagram illustrating yet other example details of an embodiment of the system;

FIG. **7** is a simplified diagram illustrating yet other example details of an embodiment of the system; and

FIG. **8** is a simplified flow diagram illustrating example operations that may be associated with an embodiment of the system.

## DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

### Overview

An example embodiment of an apparatus includes a housing (e.g., casing, covering, etc. with a cavity inside) with an opening at a first end and a plurality of holes at a second end, a plurality of hollow tubes attached to the plurality of holes, a plurality of containers (e.g., receptacles, vessels, ampules, test-tubes, balloons, etc.) removably attached to the hollow tubes, and a plurality of elastic fasteners, each elastic fastener clamping each container to a corresponding hollow tube, such that when the containers are filled with fluid and detached from the corresponding hollow tubes, each elastic fastener seals each container with the fluid inside.

### Example Embodiments

It is to be understood that the following disclosure describes several example embodiments for implementing different features, structures, or functions of the system. Example embodiments of components, arrangements, and configurations are described herein to simplify the present disclosure. However, these example embodiments are provided merely as examples and are not intended to limit the scope of the invention.

The present disclosure may repeat reference numerals and/ or letters in the various exemplary embodiments and across the Figures provided herein. This repetitions is for the purpose of simplicity and clarity and does not in itself indicate a relationship between the various exemplary embodiments and/or configurations discussed in the various Figures.

FIG. **1** is a simplified diagram illustrating an example embodiment of a system **10** for filling containers with fluids. System **10** includes a housing **12** removably attached to a hose **14** (e.g., tube, pipe, etc.) on a first end A and to a plurality of hollow tubes **16** on a second end B. As used herein, the term "housing" encompasses a hollow space enclosed by a rigid or semi-rigid casing (e.g., covering, skin, sleeve, sheath, etc.). In some embodiments, end A may include a threaded opening configured to mate with corresponding threads on hose **14**. In some embodiments, end A may be smaller in circumference or area than end B. Hose **14** may be connected to a fluid source, such as a water tank, gas tank, water supply line, etc. on end A. End B may include a plurality of holes (e.g., configured in an array), configured to fit tubes **16**. In some embodiments, tubes **16** may be permanently attached (e.g., welded, brazed, stuck with adhesives, press-fitted, etc.) to housing **12**. In other embodiments, tubes **16** may be removably attached (e.g., with threads, pressure, etc.) to housing **12**.

A plurality of containers **18** may be clamped (e.g., attached, fastened, held, clinched, secured, etc.) to plurality of tubes **16** using elastic valves **20**. As used herein, the term "container" refers to an object that can hold something, such as fluids. The term "valve" refers to an object that regulates, directs, or controls the flow of fluids, by opening, closing, or partially obstructing passageways of fluid flow. In an example embodiment, elastic valves **20** comprise elastic fasteners, such as O-rings. In another example embodiments, elastic valves **20** comprise corrugations, smocking, elastic fibers, etc. fabricated into the necks of containers **18** such that force is required to pull open the necks of containers **18**, and removal of the force causes the necks to constrict and close. In yet another example embodiment, elastic valves comprise internal or external plugs affixed to the necks of containers **18**, through which tubes **16** may be pushed through to clamp containers **18** thereto.

Note that each of containers **18** have an opening to facilitate clamping to tubes **16** and a cavity for containing fluid. For

US 9,242,749 B2

3

example, one end of an example tube 16A may be fitted through a hole in end B of housing 12, and the other end of tube 16A may be inserted into an example container 18A. An example elastic valve 20A (e.g., O-ring, comprising a mechanical gasket typically in a toroid shape; elastic ring, such as a rubber-band) of sufficient size to expand and clamp around tube 16A may be dispose around (e.g., placed over) a neck (e.g., portion just below opening) of container 18A, clamping and sealing container 18A to tube 16A. Thus, elastic valve 20A may be in an open configuration when container 18A is attached to tube 16A; in elastic valve 20A's open configuration, the neck of container 18A is open, allowing container 18A to fill with fluid. After container 18A is filled with fluid, it may be removed from tube 16A, whereupon elastic valve 20A closes, thereby closing the neck of container 18A and sealing the fluid inside.

In one example embodiment, containers 18 may comprise inflatable balloons that may be filled with fluids such as water, air or helium. In another example embodiment, containers 18 may comprise flexible (e.g., stretchy, springy, etc.) elastic containers that may be filled with gaseous or liquid medications. As used herein, the term "elastic" is meant to refer to a property of a material that allows the material to resume its normal shape spontaneously after contraction, dilation, or distortion. In an example, an elastic material may be stretched to 200% of its original length, and the material may return to its original length when the stretching force is removed.

In yet another example embodiment, containers 18 may comprise flexible containers that may be filled with body fluids (e.g., urine, blood) for example, to collect multiple samples simultaneously for testing. Virtually any type and kind of fluid may be used within the broad scope of the embodiments. Note that in some embodiments, containers 18 need not be inflatable or flexible in their entireties. For example, a bottom portion of containers 18 may be inelastic (e.g., plastic, metal, etc., of fixed shape and size), and a top portion may be flexible enough to be inserted around tubes 16 and clamped thereon.

When the fluid source is turned on, fluid may flow through housing 12, tubes 16 and fill containers 18. In some embodiments, when housing 12 is connected to a stream of liquid, containers 18 may be filled with the liquid. In some embodiments, the fluid may be supplied at high pressure. Virtually any mechanism that facilitates fluid flow through tubes 16 at sufficient pressure to fill containers 18 may be used within the broad scope of the embodiments. After containers 18 have reached a desired size or volume, they may be detached from tubes 16. In one example embodiment, filled containers 18 may be detached by pulling them away from tubes 16.

In another example embodiment, the connecting force holding filled containers 18 to tubes 16 may be overcome by an upward acceleration on tubes 16, for example, when they are shaken. Thus, filled containers 18 may be detached by shaking housing 12 (or tubes 16) sufficiently vigorously to cause containers 18 to fall off from tubes 16. In some embodiments, the connecting force holding filled container to its corresponding tube is not less than the weight of the filled container; in a specific embodiment, the connecting force holding each container to its corresponding tube is exactly equal to the weight of the filled container. The connecting force may be provided by a combination of constricting forces and friction forces from elastic valves 20.

In yet other embodiments, containers 18 may fall off under gravity; for example, when filled containers 18 reach a threshold weight, they may slip off tubes 16 due to gravity. The threshold weight may be based upon the tightness of elastic valves 20, friction between tubes 16 and containers 18, and force from

4

the weight of containers 18 (among other parameters). In various embodiments, containers 14 may slide off tubes 16 and elastic valves 20 may constrict the necks of containers 18, sealing them. In some embodiments, containers 18 may be marked with volumetric measurements, and fluid flow may be turned off when the fluid has filled containers 18 to a desired volume.

In some embodiments, hollow tubes 16 may be made of a rigid material (e.g., steel, glass); in other embodiments, tubes 16 may be made of a flexible material (e.g., thin plastic). In some embodiments, tubes 16 may be thick, short and rigid; in other embodiments, tubes 16 may be slender, long and flexible. Thus, hollow tubes 16 may be flexible, semi-rigid, or rigid, based on its material of construction, design, or a combination thereof. Note that tubes 16 may be of different lengths, for example, to prevent crowding and to accommodate a larger number of containers 18 than would be possible if tubes 16 were of the same length. Thus, at least some of hollow tubes 16 may be of different lengths than the others.

Also, tubes 16 may be flexible to enable containers 18 to expand. Thus, as containers 18 fill with fluid and expand, they may push against each other, flexing tubes 16. The outermost tubes 16 may be flexed more than the innermost tubes 16 (outer and inner being in reference to a center-point of housing 12, with the inner tubes 16 being closer to the center-point, and the outer tubes 16 being farther from the center-point).

Turning to FIG. 2, FIG. 2 is a simplified cross-sectional view of a portion of an embodiment of system 10. Housing 12 comprises a threaded opening 22 at end A, an internal cavity 24, and an array of holes 26 at end B. Internal cavity 24 facilitates distributing the fluid entering at threaded opening 22 to array of holes 26 at end B. In some embodiments, threaded opening 22 may be configured for attaching to a fluid supply hose 14 (e.g., garden hose, plastic tube, etc.). In other embodiments, threaded opening 22 may be attached to corresponding threads in a valve. Array of holes 26 may be configured for connecting first ends 28 of tubes 16 by any suitable means. In some embodiments, first ends 28 of tubes 16 may be connected to corresponding holes 26 by compressing or gluing. In some embodiments, a number of holes 26 in housing 12 and a number of tubes 16 can correspond to a number of containers 18 that are desired to be filled and sealed substantially simultaneously.

To clarify further, only one example tube 16A is shown in the figure. A first end 28A of tube 16A is fitted through a corresponding hole 26A in housing 12. A second end 29A of tube 16A is inserted into container 18A. Elastic valve 20A may be placed around the neck of container 18A clamping the neck to tube 16A. An internal volume 30A of container 18A may be filled with fluid appropriately.

To fill and seal containers 18, housing 12 may be attached to a fluid supply hose (e.g., garden hose) and the fluid supply may be turned on. The fluid enters housing 12, is distributed to holes 26, travels down tubes 16, and fills containers 18. Containers 18 may be filled and may expand substantially simultaneously. When containers 18 have reached a desired size and/or they are filled with the desired volume of fluid, they may be removed from tubes 16. They can be removed by falling off, by shaking them off, by pulling them off by hand, etc. As each container 18A is removed from corresponding tube 16A, respective elastic valve 20A may constrict and close the neck of container 18A, sealing it with the fluid inside.

Turning to FIG. 3, FIG. 3 is a simplified diagram illustrating example details of a valve 31 that may be attached between hose 14 and housing 12 according to an embodiment

US 9,242,749 B2

5

of system **10**. One end of valve **31** may be attached to hose **14** and the other end may be attached to threaded opening **22** of housing **12** (e.g., using threads). A lever **32** may be turned from one side (of valve **31**) to another (e.g., as indicated by arrow C) to turn on and turn off fluid flow to housing **12**. For example, to turn on the fluid flow, lever **32** may be turned to a first position; lever **32** may be turned to a second position (e.g., different from the first position) to turn off fluid flow.

Turning to FIG. **4**, FIG. **4** is a simplified diagram illustrating example details of an embodiment of system **10**. Housing **12** may be attached to a spigot **33** (e.g., nozzle, faucet, outlet, etc.) that connects to the fluid source. Spigot **33** may be turned on or turned off to start or stop fluid flow to housing **12**.

Turning to FIG. **5**, FIG. **5** is a simplified diagram illustrating example details of an application of an embodiment of system **10**. Embodiments of system **10** may be used in a variety of applications, such as for collecting numerous blood samples substantially simultaneously. Blood **34** may be drawn from a human (or animal) and blood **34** may collect substantially simultaneously in plurality of containers **18**. The substantial simultaneous collection of blood in such manner can ease patient pain, speed up sampling time, and enable taking multiple samples substantially simultaneously without cross-contamination from one container to another or messy transfers between containers.

Turning to FIG. **6**, FIG. **6** is a simplified diagram illustrating example details of an application of an embodiment of system **10**. Embodiments of system **10** may be used in a variety of applications, such as for collecting numerous urine samples substantially simultaneously. Urine **36** may be drawn from a human (or animal) through a suitable catheter **38**, and may collect substantially simultaneously in plurality of containers **18**.

Turning to FIG. **7**, FIG. **7** is a simplified diagram illustrating example details of an embodiment of system **10**. Example container **18**A may comprise a flexible portion **40** and an inflexible portion **42**. Flexible portion **40** may be clamped on to example tube **16**A using example elastic valve **20**A. In some embodiments, container **18**A may comprise volumetric measurement markings **44**. When fluid fills container **18**A to a desired volume, for example, as indicated by volumetric measurement marking **44**, container **18**A may be detached from tube **16**A, whereupon elastic valve **20**A may close container **18**A, sealing the fluid inside.

Turning to FIG. **8**, FIG. **8** is a simplified flow diagram **50** illustrating example operations that may be associated with an embodiment of system **10**. At **52**, housing **12** may be attached to a fluid source (e.g., through hose **14**, spigot **33**, etc.) At **54**, fluid may be supplied from the fluid source to housing **12**. At **56**, plurality of containers **18** may be filled with the fluid. At **58**, containers **18** may be detached from corresponding tubes **16**.

Note that in this Specification, references to various features (e.g., elements, structures, modules, components, steps, operations, characteristics, etc.) included in "one embodiment", "example embodiment", "an embodiment", "another embodiment", "some embodiments", "various embodiments", "other embodiments", "alternative embodiment",

6

and the like are intended to mean that any such features are included in one or more embodiments of the present disclosure, but may or may not necessarily be combined in the same embodiments.

The elements described herein may be made of any suitable materials, including metal (e.g., stainless steel, copper, brass, bronze, aluminum, etc.), plastic, glass, elastomers, or any suitable combination thereof. Each element may also be made of a combination of different materials (e.g., housing and tubes may be made of plastic and containers may be made of elastic rubber; housing and tubes may be made of stainless steel and containers may be made of a combination of glass and flexible plastic; etc.). Any suitable material or combination of materials may be used for the components described herein without departing from the broad scope of the present disclosure.

In addition, the shapes shown and illustrated in the various FIGURES are for example purposes only. Various other shapes may be used herein without changing the scope of the present disclosure. For example, housing **12** may be conical, cylindrical, pyramidal, etc., without departing from the broad scope of the embodiments. Likewise, tubes **16** may be rigid, or flexible **18** without departing from the scope of the broad embodiments.

While the disclosure references several particular embodiments, those skilled in the art will be able to make various modifications to the described embodiments without departing from the true spirit and scope of the disclosure. It is intended that all elements or steps which are insubstantially different from those recited in the claims but perform substantially the same functions, respectively, in substantially the same way to achieve the same result as what is claimed are within the scope of the disclosure.

What is claimed is:

**1**. An apparatus comprising:

a housing comprising an opening at a first end and a plurality of holes extending through a common face of the housing at a second end;

a plurality of hollow tubes, each hollow tube attached to the housing at a respective one of the holes at the second end of the housing;

a plurality of containers, each container removably attached to a respective one of the hollow tubes; and

a plurality of elastic fasteners, each elastic fastener clamping a respective one of the plurality of containers to a respective tube, and each elastic fastener configured to restrict detachment of its respective container from its respective tube and to automatically seal its respective container upon detachment of the container from its respective tube, the restriction of each elastic fastener being sufficiently limited to permit its respective container to detach from its respective tube upon one or more of (1) at least partially filling the container with a fluid and (2) shaking the housing;

wherein the apparatus is configured to fill the containers substantially simultaneously with the fluid.

\* \* \* \* \*



US009315282B2

(12) **United States Patent**

Malone

(10) Patent No.: **US 9,315,282 B2**

(45) Date of Patent: **\*Apr. 19, 2016**

(54) **SYSTEM AND METHOD FOR FILLING CONTAINERS WITH FLUIDS**

(71) Applicant: **TINNUS ENTERPRISES, LLC**, Plano, TX (US)

(72) Inventor: **Joshua Malone**, Plano, TX (US)

(73) Assignee: **TINNUS ENTERPRISES, LLC**, Plano, TX (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/921,212**

(22) Filed: **Oct. 23, 2015**

(65) **Prior Publication Data**

US 2016/0039547 A1      Feb. 11, 2016

**Related U.S. Application Data**

(63) Continuation of application No. 14/723,953, filed on May 28, 2015, now Pat. No. 9,242,749, which is a continuation of application No. 14/492,487, filed on Sep. 22, 2014, now Pat. No. 9,051,066.

(60) Provisional application No. 61/942,193, filed on Feb. 20, 2014, provisional application No. 61/937,083, filed on Feb. 7, 2014.

(51) **Int. Cl.**
B65B 3/17      (2006.01)
B65B 3/04      (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ................ **B65B 3/17** (2013.01); **A61B 5/1427** (2013.01); **A61B 5/15** (2013.01); **A61B 5/15003** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ............ A63H 27/10; A63H 2027/105; A63H 2027/1033; A63H 2027/1041; B65B 3/04; B65B 3/28
USPC ................. 141/10, 114, 234–248; 383/3, 71; 446/220–226
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 262,517 | A | 8/1882 | Unz |
| 1,098,286 | A | 5/1914 | Herbert |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2015201240 | 3/2015 |
| AU | 2015101248 | 10/2015 |

(Continued)

OTHER PUBLICATIONS

Examination Report from the Australian Patent Office, Patent App. No. 2015101248.

(Continued)

*Primary Examiner* — Mark A Laurenzi
*Assistant Examiner* — Andrew Stclair

(57)      **ABSTRACT**

An example embodiment of an apparatus includes a housing with an opening at a first end and a plurality of holes at a second end, a plurality of hollow tubes attached to the plurality of holes, a plurality of containers removably attached to the hollow tubes, and a plurality of elastic fasteners, each elastic fastener clamping each container to a corresponding hollow tube, such that when the containers are filled with fluid and detached from the corresponding hollow tubes, each elastic fastener seals each container with the fluid inside.

**3 Claims, 6 Drawing Sheets**



Appx100

**US 9,315,282 B2**

Page 2

(51) **Int. Cl.**

| | |
|---|---|
| *B65B 3/28* | (2006.01) |
| *A61B 10/00* | (2006.01) |
| *B65B 7/02* | (2006.01) |
| *B65B 3/00* | (2006.01) |
| *B65B 51/04* | (2006.01) |
| *A61B 5/155* | (2006.01) |
| *A61B 5/15* | (2006.01) |
| *B65B 3/26* | (2006.01) |
| *A63H 27/10* | (2006.01) |
| *A61M 25/10* | (2013.01) |
| *A61M 27/00* | (2006.01) |

(52) **U.S. Cl.**

CPC ........... *A61B 5/155* (2013.01); *A61B 5/150221* (2013.01); *A61B 5/150366* (2013.01); *A61B 5/150992* (2013.01); *A61B 10/007* (2013.01); *A61B 10/0045* (2013.01); *A63H 27/10* (2013.01); *B65B 3/003* (2013.01); *B65B 3/04* (2013.01); *B65B 3/26* (2013.01); *B65B 3/28* (2013.01); *B65B 7/02* (2013.01); *B65B 7/025* (2013.01); *B65B 51/04* (2013.01); *A61M 25/1018* (2013.01); *A61M 27/00* (2013.01); *A63H 2027/1033* (2013.01); *A63H 2027/1041* (2013.01); *A63H 2027/1083* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 116,669 | A | 1/1916 | Miller |
| 1,236,865 | A | 8/1917 | Pittenger |
| 1,350,935 | A | 8/1920 | Pastor |
| 1,478,757 | A | 12/1923 | O'Connor |
| 1,484,575 | A | 2/1924 | Shulin |
| 1,703,463 | A | 2/1929 | Weigel |
| 2,027,225 | A | 7/1936 | Gill |
| 2,161,274 | A | 6/1939 | Behrend |
| 2,553,941 | A | 5/1951 | Raab |
| 2,617,624 | A | 11/1952 | Annis |
| 2,656,669 | A | 10/1953 | Avansino |
| 2,757,960 | A | 7/1956 | Hendrie et al. |
| 2,922,252 | A | 1/1960 | Dam et al. |
| 2,924,041 | A | 9/1960 | Jackson |
| 3,105,613 | A | 10/1963 | Barton et al. |
| 3,108,396 | A | 10/1963 | Dorman |
| 3,118,672 | A | 1/1964 | Dorn |
| 3,154,050 | A | 10/1964 | Hanson |
| 3,161,998 | A | 12/1964 | Lennox |
| 3,301,490 | A | 1/1967 | Hruby, Jr. |
| 3,368,302 | A | 2/1968 | Martino |
| 3,580,303 | A | 5/1971 | Roberge |
| 3,820,200 | A | 6/1974 | Myers |
| 3,978,555 | A | 9/1976 | Weisenthal |
| 4,212,460 | A | 7/1980 | Kraft |
| 4,416,038 | A | 11/1983 | Morrone, III |
| 4,428,149 | A | 1/1984 | Brown |
| 4,684,137 | A | 8/1987 | Armer, Jr. |
| 4,687,458 | A | 8/1987 | Handa |
| 4,741,448 | A | 5/1988 | Alley et al. |
| 4,892,500 | A | 1/1990 | Lau |
| 4,911,379 | A | 3/1990 | Kopelman |
| 4,944,709 | A | 7/1990 | Lovik |
| 5,004,633 | A | 4/1991 | Lovik |
| 5,014,757 | A | 5/1991 | Donaldson et al. |
| 5,029,851 | A | 7/1991 | Hagen |
| 5,036,985 | A | 8/1991 | Lovik |
| 5,119,281 | A | 6/1992 | Akman |
| 5,127,867 | A | 7/1992 | Lau |
| 5,135,222 | A | 8/1992 | Spector |
| D335,901 | S | 5/1993 | Gill |
| 5,234,726 | A | 8/1993 | Dahan |
| 5,240,450 | A | 8/1993 | Graham |
| 5,293,707 | A | 3/1994 | Shaeffer |
| 5,301,392 | A | 4/1994 | Richman |

| | | | | |
|---|---|---|---|---|
| 5,370,161 | A | 12/1994 | Shafer | |
| 5,381,964 | A | 1/1995 | Reyna | |
| 5,439,199 | A | 8/1995 | Briggs et al. | |
| 5,444,962 | A | 8/1995 | Bonnet | |
| 5,496,203 | A | 3/1996 | Murray | |
| 5,509,540 | A | 4/1996 | Pomerantz | |
| 5,531,626 | A | 7/1996 | Deal | |
| 5,538,456 | A | 7/1996 | Liu et al. | |
| 5,588,896 | A | 12/1996 | Goodman | |
| 5,628,091 | A | 5/1997 | Mueller | |
| 5,639,526 | A | 6/1997 | Kotsiopoulos et al. | |
| 5,732,530 | A | 3/1998 | Pfaff | |
| 5,755,419 | A | 5/1998 | Gearhart | |
| 5,826,803 | A | 10/1998 | Cooper | |
| 5,944,576 | A | 8/1999 | Nelson | |
| 5,964,636 | A | 10/1999 | Carrera | |
| 5,975,983 | A | 11/1999 | Panec | |
| 6,007,403 | A | 12/1999 | Urspringer | |
| 6,024,251 | A | 2/2000 | Mayer et al. | |
| 6,047,866 | A | 4/2000 | Brown | |
| 6,053,816 | A * | 4/2000 | Immel ...................... F16F 3/12 | |
| | | | | 267/33 |
| 6,106,135 | A | 8/2000 | Zingale | |
| 6,149,488 | A | 11/2000 | Stark | |
| 6,158,619 | A | 12/2000 | D'andrade | |
| 6,176,758 | B1 | 1/2001 | Wu | |
| 6,179,823 | B1 | 1/2001 | Niedospial | |
| 6,386,938 | B1 | 5/2002 | Novak | |
| 6,419,825 | B1 | 7/2002 | Hahmann | |
| 6,478,057 | B1 | 11/2002 | Bearss | |
| 6,478,651 | B1 | 11/2002 | Weir | |
| 6,488,557 | B1 | 12/2002 | Elliott et al. | |
| 6,527,615 | B1 | 3/2003 | Boehler | |
| 6,558,223 | B1 | 5/2003 | Matthews | |
| 6,598,807 | B1 | 7/2003 | Anzalone | |
| 6,716,083 | B1 | 4/2004 | Castro | |
| 6,793,094 | B2 | 9/2004 | Turnbough | |
| 7,444,938 | B2 | 11/2008 | Tippmann | |
| 7,445,533 | B2 | 11/2008 | Norton et al. | |
| 7,479,130 | B2 | 1/2009 | Trickett | |
| 7,762,214 | B2 | 7/2010 | Ritchey | |
| 8,037,906 | B1 | 10/2011 | Grillo | |
| 8,141,326 | B2 | 3/2012 | Wang | |
| 8,251,111 | B2 | 8/2012 | Nelson et al. | |
| 8,479,776 | B2 | 7/2013 | Berardi | |
| 8,733,675 | B2 | 5/2014 | Leber | |
| 8,789,565 | B1 | 7/2014 | Wicken | |
| 9,051,066 | B1 | 6/2015 | Malone | |
| 2001/0003505 | A1 | 6/2001 | Bertrand | |
| 2004/0127311 | A1 | 7/2004 | Brock | |
| 2004/0159968 | A1* | 8/2004 | Lee ...................... B29C 37/0067 | |
| | | | | 264/130 |
| 2004/0174718 | A1 | 9/2004 | Ohlund | |
| 2005/0004430 | A1* | 1/2005 | Lee ...................... A61F 5/0036 | |
| | | | | 600/116 |
| 2005/0138862 | A1 | 6/2005 | O'connor | |
| 2005/0176339 | A1 | 8/2005 | Cuisinier | |
| 2006/0291217 | A1 | 12/2006 | Vanderschuit | |
| 2007/0167107 | A1 | 7/2007 | Petell et al. | |
| 2008/0121309 | A1 | 5/2008 | Boise | |
| 2008/0166943 | A1 | 7/2008 | Hou | |
| 2010/0326212 | A1 | 12/2010 | Furey et al. | |
| 2011/0151744 | A1 | 6/2011 | Archer | |
| 2011/0253256 | A1 | 10/2011 | Finley | |
| 2013/0118640 | A1 | 5/2013 | Saggio | |
| 2013/0226219 | A1 | 8/2013 | Brister et al. | |
| 2014/0030452 | A1 | 1/2014 | Warner | |
| 2014/0076454 | A1 | 3/2014 | Kjar | |
| 2014/0212074 | A1 | 7/2014 | Durst | |
| 2014/0316207 | A1 | 10/2014 | Hain | |
| 2015/0020480 | A1 | 1/2015 | Harris | |
| 2015/0056887 | A1 | 2/2015 | Harter et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 102015206176 | 4/2015 |
| EP | 1548420 | 12/2008 |
| FR | 2911512 | 7/2008 |
| FR | 3017381 | 4/2015 |

(56)            **References Cited**

FOREIGN PATENT DOCUMENTS

| GB | 294273 | 7/1928 |
| GB | 1277377 | 6/1972 |
| NO | WO9408849 | 4/1994 |
| WO | WO2015027187 | 2/2015 |
| WO | WO2015118518 | 8/2015 |
| WO | WO2015119516 | 8/2015 |

OTHER PUBLICATIONS

International Search Report issued by the New Zealand Patent Office, PCT/NZ2015/050025.

Search Report of Hungarian Intellectual Property Office, P1500153.

Balloon Powered Boat, May 17, 2011, http://alittlelearningfortwo.blogspot.com/.

"Hundreds of water balloons in minutes! ZORBZ Replicator™ System coming to retailers 2015," available at https://www.youtube.com/watch?v=wCajj0KPV7c, accessed Apr. 7, 2015, allegedly published Aug. 19, 2014.

Bunch O Balloons Kickstarter page, available at https://www.kickstarter.com/projects/bunchoballoons/bunch-oballoons-100-water-balloons-in-less-than-1, last visited Oct. 7, 2015.

Bunch O Balloons . . . make 100 water balloons in less than a minute! <URL:https://www.youtube.com/watch?v=S1DaXYT6O2A>

[According to the International Search Report for PCT/IB2015/051747: "Viewed on internet on Aug. 20, 2015 . . . Published on Aug. 5, 2014"].

https://www.youtube.com/watch?v=-HIZjZII2O8o, accessed Apr. 7, 2015, allegedly published May 12, 2014.

Search and Examination Report from the United Kingdom Patent Office, United Kingdom patent application 1504038.9.

www.conwinonline.com/shop/air-force4/, accessed Mar. 19, 2015, published Jun. 11, 2013.

YouTube video of the ZORBZ Replicator, allegedly published Aug. 19, 2014, https://www.youtube.com/watch?v=wCajj0KPV7c.

* cited by examiner



FIG. 1



FIG. 2

Case: 17-1175    Document: 49    Page: 142    Filed: 05/19/2017



**FIG. 3**



**FIG. 4**



FIG. 5



FIG. 6



**FIG. 7**



**FIG. 8**

US 9,315,282 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**SYSTEM AND METHOD FOR FILLING CONTAINERS WITH FLUIDS**

CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of and claims the benefit under 35 U.S.C. §120 from U.S. patent application Ser. No. 14/723, 953 entitled "SYSTEM AND METHOD FOR FILLING INFLATABLE CONTAINERS WITH LIQUID," which is a continuation of and claims the benefit under 35 U.S.C. §120 from U.S. patent application Ser. No. 14/492,487, filed Sep. 22, 2014, which claims the benefit under 35 U.S.C. §119(e) from U.S. Provisional Application Ser. Nos. 61/937,083 and 61/942,193, filed Feb. 7, 2014 and Feb. 20, 2014, respectively, which applications are all incorporated herein by reference in their entireties.

TECHNICAL FIELD

The present disclosure relates generally to fluid inflatable systems and more particularly, to a system and method for filling containers with fluids.

BACKGROUND

Inflatable containers such as balloons can be filled with a variety of fluids, such as air, helium, water, medicines, etc. In some cases, a lot of inflatable containers may need to be filled with fluids. For example, balloons used as props in conventions, large parties, etc. may number in the hundreds and may require substantial human effort to fill them all in a timely manner. In another example, water balloons used as kids' toys may need to be filled in large numbers to aid in various games. Various methods may be employed to fill such inflatable containers. For example, an individual may blow up and tie each balloon by hand or use a tank of compressed air or helium to inflate the balloon, which then has to be tied. In another example, an individual may fill water balloons with water by hand one at a time, and then tie the balloons, which can all be quite time-consuming. Moreover, the inflatable containers may be damaged or filled to different volumes.

BRIEF DESCRIPTION OF THE DRAWINGS

To provide a more complete understanding of the present disclosure and features and advantages thereof, reference is made to the following description, taken in conjunction with the accompanying figures, wherein like reference numerals represent like parts, in which:

FIG. **1** is a simplified perspective view illustrating an example configuration of an embodiment of a system for filling containers with fluids;

FIG. **2** is a simplified diagram illustrating a cross-sectional view of example details of an embodiment of the system;

FIG. **3** is a simplified diagram illustrating other example details of an embodiment of the system;

FIG. **4** is a simplified diagram illustrating yet other example details of an embodiment of the system;

FIG. **5** is a simplified diagram illustrating yet other example details of an embodiment of the system;

FIG. **6** is a simplified diagram illustrating yet other example details of an embodiment of the system;

FIG. **7** is a simplified diagram illustrating yet other example details of an embodiment of the system; and

FIG. **8** is a simplified flow diagram illustrating example operations that may be associated with an embodiment of the system.

DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

Overview

An example embodiment of an apparatus includes a housing (e.g., casing, covering, etc. with a cavity inside) with an opening at a first end and a plurality of holes at a second end, a plurality of hollow tubes attached to the plurality of holes, a plurality of containers (e.g., receptacles, vessels, ampules, test-tubes, balloons, etc.) removably attached to the hollow tubes, and a plurality of elastic fasteners, each elastic fastener clamping each container to a corresponding hollow tube, such that when the containers are filled with fluid and detached from the corresponding hollow tubes, each elastic fastener seals each container with the fluid inside.

Example Embodiments

It is to be understood that the following disclosure describes several example embodiments for implementing different features, structures, or functions of the system. Example embodiments of components, arrangements, and configurations are described herein to simplify the present disclosure. However, these example embodiments are provided merely as examples and are not intended to limit the scope of the invention.

The present disclosure may repeat reference numerals and/ or letters in the various exemplary embodiments and across the Figures provided herein. This repetitions is for the purpose of simplicity and clarity and does not in itself indicate a relationship between the various exemplary embodiments and/or configurations discussed in the various Figures.

FIG. **1** is a simplified diagram illustrating an example embodiment of a system **10** for filling containers with fluids. System **10** includes a housing **12** removably attached to a hose **14** (e.g., tube, pipe, etc.) on a first end A and to a plurality of hollow tubes **16** on a second end B. As used herein, the term "housing" encompasses a hollow space enclosed by a rigid or semi-rigid casing (e.g., covering, skin, sleeve, sheath, etc.). In some embodiments, end A may include a threaded opening configured to mate with corresponding threads on hose **14**. In some embodiments, end A may be smaller in circumference or area than end B. Hose **14** may be connected to a fluid source, such as a water tank, gas tank, water supply line, etc. on end A. End B may include a plurality of holes (e.g., configured in an array), configured to fit tubes **16**. In some embodiments, tubes **16** may be permanently attached (e.g., welded, brazed, stuck with adhesives, press-fitted, etc.) to housing **12**. In other embodiments, tubes **16** may be removably attached (e.g., with threads, pressure, etc.) to housing **12**.

A plurality of containers **18** may be clamped (e.g., attached, fastened, held, clinched, secured, etc.) to plurality of tubes **16** using elastic valves **20**. As used herein, the term "container" refers to an object that can hold something, such as fluids. The term "valve" refers to an object that regulates, directs, or controls the flow of fluids, by opening, closing, or partially obstructing passageways of fluid flow. In an example embodiment, elastic valves **20** comprise elastic fasteners, such as O-rings. In another example embodiments, elastic valves **20** comprise corrugations, smocking, elastic fibers, etc. fabricated into the necks of containers **18** such that force is required to pull open the necks of containers **18**, and removal of the force causes the necks to constrict and close. In yet another example embodiment, elastic valves comprise

US 9,315,282 B2

3

internal or external plugs affixed to the necks of containers 18, through which tubes 16 may be pushed through to clamp containers 18 thereto.

Note that each of containers 18 have an opening to facilitate clamping to tubes 16 and a cavity for containing fluid. For example, one end of an example tube 16A may be fitted through a hole in end B of housing 12, and the other end of tube 16A may be inserted into an example container 18A. An example elastic valve 20A (e.g., O-ring, comprising a mechanical gasket typically in a toroid shape; elastic ring, such as a rubber-band) of sufficient size to expand and clamp around tube 16A may be dispose around (e.g., placed over) a neck (e.g., portion just below opening) of container 18A, clamping and sealing container 18A to tube 16A. Thus, elastic valve 20A may be in an open configuration when container 18A is attached to tube 16A; in elastic valve 20A's open configuration, the neck of container 18A is open, allowing container 18A to fill with fluid. After container 18A is filled with fluid, it may be removed from tube 16A, whereupon elastic valve 20A closes, thereby closing the neck of container 18A and sealing the fluid inside.

In one example embodiment, containers 18 may comprise inflatable balloons that may be filled with fluids such as water, air or helium. In another example embodiment, containers 18 may comprise flexible (e.g., stretchy, springy, etc.) elastic containers that may be filled with gaseous or liquid medications. As used herein, the term "elastic" is meant to refer to a property of a material that allows the material to resume its normal shape spontaneously after contraction, dilation, or distortion. In an example, an elastic material may be stretched to 200% of its original length, and the material may return to its original length when the stretching force is removed.

In yet another example embodiment, containers 18 may comprise flexible containers that may be filled with body fluids (e.g., urine, blood) for example, to collect multiple samples simultaneously for testing. Virtually any type and kind of fluid may be used within the broad scope of the embodiments. Note that in some embodiments, containers 18 need not be inflatable or flexible in their entireties. For example, a bottom portion of containers 18 may be inelastic (e.g., glass, plastic, metal, etc., of fixed shape and size), and a top portion may be flexible enough to be inserted around tubes 16 and clamped thereon.

When the fluid source is turned on, fluid may flow through housing 12, and fill containers 18. In some embodiments, when housing 12 is connected to a stream of liquid, containers 18 may be filled with the liquid. In some embodiments, the fluid may be supplied at high pressure. Virtually any mechanism that facilitates fluid flow through tubes 16 at sufficient pressure to fill containers 18 may be used within the broad scope of the embodiments. After containers 18 have reached a desired size or volume, they may be detached from tubes 16. In one example embodiment, filled containers 18 may be detached by pulling them away from tubes 16.

In another example embodiment, the connecting force holding filled containers 18 to tubes 16 may be overcome by an upward acceleration on tubes 16, for example, when they are shaken. Thus, filled containers 18 may be detached by shaking housing 12 (or tubes 16) sufficiently vigorously to cause containers 18 to fall off from tubes 16. In some embodiments, the connecting force holding filled container to its corresponding tube is not less than the weight of the filled container; in a specific embodiment, the connecting force holding each container to its corresponding tube is exactly equal to the weight of the filled container. The connecting force may be provided by a combination of constricting forces and friction forces from elastic valves 20.

4

In yet other embodiments, containers 18 may fall off under gravity; for example, when filled containers 18 reach a threshold weight, they slip off tubes 16 due to gravity. The threshold weight may be based upon the tightness of elastic valves 20, friction between tubes 16 and containers 18, and force from the weight of containers 18 (among other parameters). In various embodiments, containers 14 may slide off tubes 16 and elastic valves 20 may constrict the necks of containers 18, sealing them. In some embodiments, containers 18 may be marked with volumetric measurements, and fluid flow may be turned off when the fluid has filled containers 18 to a desired volume.

In some embodiments, hollow tubes 16 may be made of a rigid material (e.g., steel, glass); in other embodiments, tubes 16 may be made of a flexible material (e.g., thin plastic). In some embodiments, tubes 16 may be thick, short and rigid; in other embodiments, tubes 16 may be slender, long and flexible. Thus, hollow tubes 16 may be flexible, semi-rigid, or rigid, based on its material of construction, design, or a combination thereof. Note that tubes 16 may be of different lengths, for example, to prevent crowding and to accommodate a larger number of containers 18 than would be possible if tubes 16 were of the same length. Thus, at least some of hollow tubes 16 may be of different lengths than the others.

Also, tubes 16 may be flexible to enable containers 18 to expand. Thus, as containers 18 fill with fluid and expand, they may push against each other, flexing tubes 16. The outermost tubes 16 may be flexed more than the innermost tubes 16 (outer and inner being in reference to a center-point of housing 12, with the inner tubes 16 being closer to the center-point, and the outer tubes 16 being farther from the center-point).

Turning to FIG. 2, FIG. 2 is a simplified cross-sectional view of a portion of an embodiment of system 10. Housing 12 comprises a threaded opening 22 at end A, an internal cavity 24, and an array of holes 26 at end B. Internal cavity 24 facilitates distributing the fluid entering at threaded opening 22 to array of holes 26 at end B. In some embodiments, threaded opening 22 may be configured for attaching to a fluid supply hose 14 (e.g., garden hose, plastic tube, etc.). In other embodiments, threaded opening 22 may be attached to corresponding threads in a valve. Array of holes 26 may be configured for connecting first ends 28 of tubes 16 by any suitable means. In some embodiments, first ends 28 of tubes 16 may be connected to corresponding holes 26 by compressing or gluing. In some embodiments, a number of holes 26 in housing 12 and a number of tubes 16 can correspond to a number of containers 18 that are desired to be filled and sealed substantially simultaneously.

To clarify further, only one example tube 16A is shown in the figure. A first end 28A of tube 16A is fitted through a corresponding hole 26A in housing 12. A second end 29A of tube 16A is inserted into container 18A. Elastic valve 20A may be placed around the neck of container 18A clamping the neck to tube 16A. An internal volume 30A of container 18A may be filled with fluid appropriately.

To fill and seal containers 18, housing 12 may be attached to a fluid supply tube (e.g., garden hose) and the fluid supply may be turned on. The fluid enters housing 12, is distributed to holes 26, travels down tubes 16, and fills containers 18. Containers 18 may be filled and may expand substantially simultaneously. When containers 18 have reached a desired size and/or they are filled with the desired volume of fluid, they may be removed from tubes 16. They can be removed by falling off, by shaking them off, by pulling them off by hand, etc. As each container 18A is removed from corresponding

Appx110

US 9,315,282 B2

5

tube **16**A, respective elastic valve **20**A may constrict and close the neck of container **18**A, sealing it with the fluid inside.

Turning to FIG. **3**, FIG. **3** is a simplified diagram illustrating example details of a valve **31** that may be attached between hose **14** and housing **12** according to an embodiment of system **10**. One end of valve **31** may be attached to hose **14** and the other end may be attached to threaded opening **22** of housing **12** (e.g., using threads). A lever **32** may be turned from one side (of valve **31**) to another (e.g., as indicated by arrow C) to turn on and turn off fluid flow to housing **12**. For example, to turn on the fluid flow, lever **32** may be turned to a first position; lever **32** may be turned to a second position (e.g., different from the first position) to turn off fluid flow.

Turning to FIG. **4**, FIG. **4** is a simplified diagram illustrating example details of an embodiment of system **10**. Housing **12** may be attached to a spigot **33** (e.g., nozzle, faucet, outlet, etc.) that connects to the fluid source. Spigot **33** may be turned on or turned off to start or stop fluid flow to housing **12**.

Turning to FIG. **5**, FIG. **5** is a simplified diagram illustrating example details of an application of an embodiment of system **10**. Embodiments of system **10** may be used in a variety of applications, such as for collecting numerous blood samples substantially simultaneously. Blood **34** may be drawn from a human (or animal) and blood **34** may collect substantially simultaneously in plurality of containers **18**. The substantial simultaneous collection of blood in such manner can ease patient pain, speed up sampling time, and enable taking multiple samples substantially simultaneously without cross-contamination from one container to another or messy transfers between containers.

Turning to FIG. **6**, FIG. **6** is a simplified diagram illustrating example details of an application of an embodiment of system **10**. Embodiments of system **10** may be used in a variety of applications, such as for collecting numerous urine samples substantially simultaneously. Urine **36** may be drawn from a human (or animal) through a suitable catheter **38**, and may collect substantially simultaneously in plurality of containers **18**.

Turning to FIG. **7**, FIG. **7** is a simplified diagram illustrating example details of an embodiment of system **10**. Example container **18**A may comprise a flexible portion **40** and an inflexible portion **42**. Flexible portion **40** may be clamped on to example tube **16**A using example elastic valve **20**A. In some embodiments, container **18**A may comprise volumetric measurement markings **44**. When fluid fills container **18**A to a desired volume, for example, as indicated by volumetric measurement marking **44**, container **18**A may be detached from tube **16**A, whereupon elastic valve **20**A may close container **18**A, sealing the fluid inside.

Turning to FIG. **8**, FIG. **8** is a simplified flow diagram **50** illustrating example operations that may be associated with an embodiment of system **10**. At **52**, housing **12** may be attached to a fluid source (e.g., through hose **14**, spigot **33**, etc.) At **54**, fluid may be supplied from the fluid source to housing **12**. At **56**, plurality of containers **18** may be filled with the fluid. At **58**, containers **18** may be detached from corresponding tubes **16**.

Note that in this Specification, references to various features (e.g., elements, structures, modules, components, steps, operations, characteristics, etc.) included in "one embodiment", "example embodiment", "an embodiment", "another embodiment", "some embodiments", "various embodiments", "other embodiments", "alternative embodiment",

6

and the like are intended to mean that any such features are included in one or more embodiments of the present disclosure, but may or may not necessarily be combined in the same embodiments.

The elements described herein may be made of any suitable materials, including metal (e.g., stainless steel, copper, brass, bronze, aluminum, etc.), plastic, glass, elastomers, or any suitable combination thereof. Each element may also be made of a combination of different materials (e.g., housing and tubes may be made of plastic and containers may be made of elastic rubber; housing and tubes may be made of stainless steel and containers may be made of a combination of glass and flexible plastic; etc.). Any suitable material or combination of materials may be used for the components described herein without departing from the broad scope of the present disclosure.

In addition, the shapes shown and illustrated in the various FIGURES are for example purposes only. Various other shapes may be used herein without changing the scope of the present disclosure. For example, housing **12** may be conical, cylindrical, pyramidal, etc., without departing from the broad scope of the embodiments. Likewise, tubes **16** may be rigid, or flexible **18** without departing from the scope of the broad embodiments.

While the disclosure references several particular embodiments, those skilled in the art will be able to make various modifications to the described embodiments without departing from the true spirit and scope of the disclosure. It is intended that all elements or steps which are insubstantially different from those recited in the claims but perform substantially the same functions, respectively, in substantially the same way to achieve the same result as what is claimed are within the scope of the disclosure.

What is claimed is:

**1**. An apparatus comprising:

a housing comprising an inlet and a plurality of outlets;

a plurality of hollow tubes, each hollow tube attached to the housing at a respective one of the outlets;

a plurality of containers, each container removably attached to a respective one of the hollow tubes; and

a plurality of elastic fasteners, each elastic fastener clamping a respective one of the plurality of containers to a respective tube, and each elastic fastener configured to restrict detachment of its respective container from its respective tube and to automatically seal its respective container upon detachment of the container from its respective tube, the restriction of each elastic fastener being sufficiently limited to permit its respective container to detach from its respective tube upon one or more of (1) at least partially filling the container with fluid and (2) shaking the housing;

wherein the apparatus is configured to fill the containers substantially simultaneously with fluid; and

wherein at least first and second ones of the plurality of containers are disposed sufficiently close to each other such that they press against each other, regardless whether the first and second ones of the plurality of containers are in a filled state or an unfilled state.

**2**. The apparatus of claim **1**, wherein the apparatus is sufficiently compact to be operated while being held by hand of a single operator.

**3**. The apparatus of claim **1**, wherein each container is a water balloon.

* * * * *

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **TINNUS ENTERPRISES, LLC, and ZURU LTD.** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **No. 6:16-cv-0033 RWS-JDL** |
| **v.** | § | |
| | § | **JURY DEMANDED** |
| **TELEBRANDS CORP.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

On May 13, 2016, Plaintiff Tinnus Enterprises, LLC filed an Emergency Motion for a Preliminary Injunction against Defendants Bed Bath & Beyond Inc, Fry's Electronics, Kohl's Department Stores Inc, Sears Holding Corporation, The Kroger Company, Toys "R" Us-Delaware, Inc., Wal-Mart Stores Inc.,[1] and Walgreens Boots Alliance, Inc. (collectively the "Retailers") (Doc. No. 26). On June 16, 2016, the Court consolidated this action with case number 6:16-cv-33, which also had a pending motion for preliminary injunction as to the same products and two of the same patents against Defendant Telebrands Corporation ("Telebrands"). On June 17, 2016, this Court held a hearing on both motions and allocated additional hearing time to the presentation of retailer-specific issues. Neither the briefing nor argument at the hearing presented any retailer-specific injunctive issues.  Therefore, the Court proceeded with an injunction analysis as to Defendant Telebrands in the related action (6:16-cv-33).

On October 31, 2016, an injunction issued against Defendant Telebrands in the lead action. (6:16-cv-33, Doc. No. 159.) While the parties indicated they would likely be able to reach

---

[1] Wal-Mart Store Inc. has since been dismissed.

1

agreement as to the implications of the injunction with respect to the Retailers, they have not.

Accordingly, on November 1, 2016, the Court requested supplemental expedited briefing on the

issue of whether an injunction should issue with respect to the remaining stocked inventory of

the Retailers. (Doc. No. 163.) Plaintiffs filed their brief in support of an injunction on November

10, 2016 (Doc. No. 171), and Defendants filed a responsive brief on November 17, 2016 (Doc.

No. 179). The Court held a hearing on November 21, 2016. Upon consideration of the parties'

arguments, the Court **RECOMMENDS** that the Retailers be enjoined from the continued sale of

currently stocked inventory.

## LEGAL STANDARD

"[B]efore the issues of fact and law have been fully explored and finally resolved, the

purpose of a preliminary injunction is merely to preserve the relative positions of the parties

until a trial on the merits can be held." *Abbott Labs v. Sandoz, Inc.*, 544 F.3d 1341, 1344–45

(Fed. Cir. 2008) (internal quotations omitted); *see Techradium, Inc. v. Blackboard Connect Inc.*,

No. 2:08-cv-214, 2009 WL 1152985, at *2 (E.D. Tex. Apr. 29, 2009).

The Court may grant an injunction to "prevent the violation of any right secured by

patent." 35 U.S.C. § 283. "The decision to grant a preliminary injunction is within the discretion

of the district court." *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359,

1363 (Fed. Cir. 2001); *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009);

*see also eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (with respect to the

closely related topic of permanent injunctions, the Supreme Court recently noted that "[t]he

decision to grant or deny permanent injunctive relief is an act of equitable discretion by the

district court, reviewable on appeal for abuse of discretion").

Appx6397

"A district court may enter a preliminary injunction based on its consideration of four factors: (1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest." *Abbott Labs.*, 566 F.3d at 1298 (internal citations omitted) (citing *Erico Int'l Corp. v. Vutec Corp.*, 516 F.3d 1350, 1353–54 (Fed. Cir. 2008)).

To establish likelihood of success on the merits, the patentee seeking preliminary injunction must show that it will likely prove infringement, and that it will likely withstand any challenges to the validity of the patent. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009); *see Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

The test for infringement at the preliminary injunction stage is the same as the usual test set forth in *Graver Trank & Mfg. Co., Inc. et al. v. Linde Air Prod. Co.*, which requires the accused device be evaluated in light of the properly construed claim. *Graver*, 339 U.S. 605 (1950); *see Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005). However, demonstrating likelihood of success on the merits does not lead to a presumption of irreparable harm. *Robert Bosch LLC v. Pylon Mfg. Corp*, 659 F.3d 1142, 1149 (Fed. Cir. 2011) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)) ("We take this opportunity to put the question to rest and confirm that *eBay* jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief.")

With respect to validity, "if the alleged infringer raises a substantial question concerning validity, *i.e.*, asserts an invalidity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Helifix Ltd. V. Block-Lok, Ltd.*, 208 F.3d 1339,

1351 (Fed. Cir. 2000). "Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial. The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself." *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1335 (Fed. Cir. 2006); *Amazon.com Inc. v. Barnesandnoble.com*, 239 F.3d 1343, 1358 (Fed. Cir. 2001). The party seeking preliminary injunction may support validity "by showing that the patent in suit [has] successfully withstood previous validity challenges in other proceedings. Further support for such a clear case might come from a long period of industry acquiescence in the patent's validity." *Amazon.com Inc.*, 239 F.3d at 1358 (Fed. Cir. 2001).

Irreparable harm may be demonstrated by showing: (1) infringement has caused or will  cause price erosion or loss of market share; (2) deprivation of the exclusive right to the patented  invention; or (3) that the accused infringer is incapable of paying a damages award. *Bosch*, 659  F.3d at 1156. Loss of revenue and goodwill may also be "incalculable and irreparable." *Smith &  Nephew, Inc v. Arthrex, Inc.*, No. 2:07-cv-335, 2010 WL 2522428, at *2–3 (E.D. Tex. Jun. 18,  2010) (*citing i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010)).  Damage to a reputation as the "sole source" in the United States may also be irreparable harm.  *Eli Lilly & Co. v. Generix Drug Sales, Inc.*, 324 F. Supp. 715, 724 (S.D. Fla. 1972), *aff'd*, 460  F.2d 1096 (5th Cir. 1972).

The  balance  of  hardships  weighs  the  "magnitude  of  the  threatened  injury  to  the patent  owner . . . in light of the strength of the showing of likelihood of success on the merits, against  the injury to the accused infringer if the preliminary decision is in error." *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987).

"Although the public interest inquiry is not necessarily or always bound to the likelihood

4

of success of the merits, in [many cases,] absent any other relevant concerns . . . the public is best  served by enforcing patents that are likely valid and infringed." *Abbott Labs. Inc.*, 452 F.3d at 1348.

## DISCUSSION

### A.  Likelihood of Success on the Merits

Because the analysis of this factor is identical with respect to the Retailers as it was for Telebrands, the Court will not reconsider this factor at this time, and finds that this factor weighs in favor of granting a preliminary injunction for all the reasons set forth in its injunction against Telebrands. *See* Doc. Nos. 99, 142, 159.

### B.  Irreparable Harm

Plaintiffs assert that the Retailers continued sell off of currently stocked inventory is causing price erosion. (Doc. No. 171, at 5.)  Plaintiffs further argue that the inferior quality of the accused products is harming their reputation and that the Retailers are directly causing a loss of consumer mindshare because they are selling the Plaintiffs' products right next to the accused products. *Id.* at 6. Finally, Plaintiffs argue that the Retailers continuous sale is causing a secondary market where consumers are buying in bulk and reselling in market places like Amazon and eBay. *Id.* at 7.

Defendants contend that Plaintiffs are not entitled to a preliminary injunction because Plaintiffs delayed in bringing their motion for a preliminary injunction and have not met their burden of showing they are entitled to one. (Doc. No. 179, at 6–7.)  Specifically, Defendants argue that the evidence of price erosion is speculative and that price markdowns happen during the holiday season. *Id.* at 7. Defendants also argue that there is no harm to Tinnus because they do not make or sell the Bunch O Balloons products, and that there can be no significant

5

Appx6400

confusion from the small sale of remaining items to either Tinnus or Zuru. *Id.* at 8–9.  Finally,

Defendants argue that the alleged secondary market cannot and would not be stopped by an

injunction against the Retailers because they have no control over that market. *Id.* at 9–10.

First, as to price erosion, Plaintiffs argue that at least two retailers have already

drastically reduced prices of the accused products to $4.29 and $6.49. (Doc. No. 171-3.)

Defendants argue that this price reduction is normal seasonal reduction, only affects a small

number of products, and can't affect wholesale prices that have already been set in the future.

Regardless of whether wholesale prices will ultimately be eroded in the future, the evidence

cited shows that at present retail prices are significantly dropping as a result of the Retailers'

rapid fire sale of the products. While in part this may be seasonally-driven, it is also undisputed

that the Retailers are in a position that they must clear their shelves of this inventory due to the

injunction against Telebrands. Ultimately, the fact that the Retailers are currently engaging in a

fire sale of the accused products incentivizes not only significant price cuts to the accused

products while Plaintiffs products are still being sold side by side, it also incentives continued

sales through alternative markets. In addition, the side by side placement of the accused

products to Plaintiffs' products by the Retailers has appeared to continue the consumer

confusion cited in the record. Therefore, the Court finds that Plaintiffs will likely continue to

suffer irreparable harm in the absence of a preliminary injunction against the Retailers as to the

remaining inventory. Accordingly, this factor also favors granting a preliminary injunction.

### C. Balance of Hardships

Plaintiffs contend that the balance of hardships favors granting a preliminary injunction

for several reasons: (1) the Retailers are large companies selling thousands of products so any

harm from the injunction will be minimized; (2) Telebrands will accept the return of the

6

Retailers' unsold inventory; and (3) the Retailers have been aware of Plaintiffs' allegations of patent infringement and have continued to take calculated risks in selling the accused products. (Doc. No. 171, at 7–9.) Defendants contend that removing the inventory from their shelves at the height of the holiday season would cause sever disruption, that other key retailers such as Walmart would not be enjoined, and that Telebrands could lose as much as $2.8 million if inventories were returned. (Doc. No. 179, at 10–12.)

Defendants argue that it would require great hardship and Herculean efforts to remove the remainder of the inventory off the Retailers' shelves. Plaintiffs argue that these are huge retailers who remove products from shelves all the time for various reasons such as recalls and injunctions. At the hearing it was estimated that approximately 200,000 units remained stocked for sale with the Retailers across thousands of stores. Here, on the one hand, the Retailers argue that the remaining inventory is so insignificant in numbers it cannot irreparably harm Plaintiffs, but on the other hand argue that removing that inventory would be so burdensome to the Retailers that it weighs against an injunction. These arguments cannot be reconciled. The Court agrees that while there will be some burden to the Retailers to remove this inventory, that burden alone does not weigh against the grant of injunction where a small identifiable number of units remain with retailers who have the experience and ability to remove these products from their shelves. Moreover, any harm to Telebrands is irrelevant here, and the Court finds this factor ultimately still weighs in favor of an injunction.

### D. Public Interest

As this Court previously found, Plaintiffs have shown a likelihood of success on the merits. *Abbott Labs. Inc.*, 452 F.3d at 1348 ("[a]lthough the public interest inquiry is not necessarily or always bound to the likelihood of success of the merits, in this case absent any

other relevant concerns, . . . the public is best served by enforcing patents that are likely valid and infringed."). Therefore, for the same reasons discussed previously, the Court finds that this factor also weights in favor of granting a preliminary injunction. *See* Doc. Nos. 99, 142, 159.

## CONCLUSION

Ultimately, in weighing the factors, the Court finds that the factors weigh in favor of enjoining the continued sales of the Retailers' stocked inventory. For this reason, the Court **RECOMMENDS** that the Retailers be enjoined from the sale of Telebrands' Battle Balloon products currently in inventory and that the Retailers should remove all currently stocked product from their shelves as soon as possible, but in any event no later than **December 8, 2016**. The Court can assess the issue of additional bond upon issuance of the injunctive order, if necessary.

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in this Report. A Party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen (14) days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusion, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); *see Douglass v. United States Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

Appx6403

**So ORDERED and SIGNED this 21st day of November, 2016.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

Appx6404

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **TINNUS ENTERPRISES, LLC, and ZURU LTD.** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **No. 6:16-cv-0033 RWS-JDL** |
| **v.** | § | |
| | § | **JURY DEMANDED** |
| **TELEBRANDS CORP.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## ORDER ADOPTING REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

The above entitled and numbered civil action was referred to United States Magistrate Judge John D. Love pursuant to 28 U.S.C. § 636(b)(3). On November 21, 2016, the Magistrate Judge issued a Report and Recommendation containing his proposed findings and recommending that the Retailers be enjoined from the sale of Telebrands' Battle Balloon products currently in inventory. (Doc. No. 182.) The Retailers[1] filed an objection to the Report and Recommendation (Doc. No. 195) to which Plaintiffs Tinnus Enterprises ("Tinnus") and ZURU Ltd.'s ("ZURU") (collectively "Plaintiffs") filed a response (Doc. No. 203). Having considered the Retailers' objections, the Court **ADOPTS** the Report and Recommendation of the Magistrate Judge as the findings and conclusions of the Court. All objections are overruled.

## BACKGROUND

On October 31, 2016, the Court issued an injunction against Defendant Telebrands in the lead action as to U.S. Patent Nos. 9,232,749 ("the '749 Patent") and 9,315,282 ("the '282 Patent"). (6:16-cv-33, Doc. No. 159.) During the injunction proceedings, the Retailers were

---

[1] The Retailers are Bed Bath & Beyond Inc, Fry's Electronics, Kohl's Department Stores Inc, Sears Holding Corporation, The Kroger Company, Toys "R" Us-Delaware, Inc., and Walgreens Boots Alliance, Inc.

Appx6626

present and heard on all issues pertaining to the related emergency motion pending against the Retailers. (6:16-cv-34, Doc. No. 26.) Because the issues before the Court focused on Telebrands and the Retailers had not raised any Retailer-specific issues during the proceedings, the Court first proceeded with the injunction on the motion against Telebrands. (6:16-cv-34, Doc. No. 80.)

Upon issuance of the injunction, the parties continued to dispute technicalities on the applicability of the injunction as it pertains to the Retailers. Because the prior briefing was nearly identical to the briefing submitted by Telebrands and not helpful to resolving the parties' then-presented dispute, the Magistrate Judge denied that motion and requested supplemental briefing on the issues that remained pertaining to the Retailers. (6:16-cv-34, Doc. No. 80.) Specifically, on November 1, 2016, the Court requested supplemental expedited briefing on the issue of whether an injunction should issue with respect to the remaining stocked inventory of the Retailers. (Doc. No. 163.) Plaintiffs filed their brief in support of an injunction on November 10, 2016 (Doc. No. 171), and Defendants filed a responsive brief on November 17, 2016 (Doc. No. 179). The Magistrate Judge held a hearing on November 21, 2016 and that same day issued his recommendation that the Retailers be enjoined from the sale of Telebrands' Battle Balloon products currently in inventory. (Doc. No. 182.) The Retailers have now filed objections to the Magistrate Judge's Report and Recommendation.

## LEGAL STANDARD

The Court reviews *de novo* the portions of the Magistrate Judge's findings to which the Defendant has raised objections. 28 U.S.C. § 636 (b)(1).

"The decision to grant a preliminary injunction is within the discretion of the district court." *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001). "A district court may enter a preliminary injunction based on its consideration of four

2

factors: (1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009) (internal citations omitted).

To establish likelihood of success on the merits, the patentee seeking a preliminary injunction must show that it will likely prove infringement, and that it will likely withstand any challenges to the validity of the patent. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009); *see Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997). The test for infringement in the context of a preliminary injunction is the same as the test for infringement on the merits, which requires that the accused device be evaluated in light of the properly construed claim. *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005). With respect to validity, "if the alleged infringer raises a substantial question concerning validity, *i.e.*, asserts an invalidity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Helifix Ltd. v. Block-Lok, Ltd.*, 208 F.3d 1339, 1351 (Fed. Cir. 2000).

Irreparable harm may be demonstrated by showing that: (1) infringement has caused or will cause price erosion or loss of market share; (2) deprivation of the exclusive right to the patented invention; or (3) the accused infringer is incapable of paying a damages award. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011). A patent owner may also suffer irreparable harm from loss of revenue or damage to customer goodwill, as these harms "may frequently defy attempts at valuation." *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010).

## DISCUSSION

As to the Retailers' initial objection that the Magistrate Judge lacked jurisdiction to make his recommendation, that objection is overruled. As explained above, the Retailers were heard on the motion and the issues were resolved by the Magistrate Judge and the Court as it pertained to both Telebrands and the Retailers. This approach was taken in an effort to help the Court manage its docket where the Retailers presented no different circumstances in briefing or at the injunction hearing. The Court's injunction expressly enjoined the sale of Telebrands's Battle Balloon products by Telebrands and its agents and "all other persons who are in active concert or participation with Telebrands who receive actual notice of this Order by personal service or otherwise." (Doc. No. 159, at 4.) Because the Retailers raised a dispute over this language regarding whether the sale of stocked inventory was enjoined—the only issue specifically presented as unique to the Retailers—the Magistrate Judge then ordered additional briefing and held a hearing on the matter. (6:16-cv-34, Doc. No. 80.) The Report and Recommendation does not modify the prior injunction against Telebrands, but specifically recommends enjoining the sale of the Retailers' currently stocked inventory. For this reason, the Retailers' jurisdictional objection lacks merit.

### a.  Likelihood of Success

The Retailers first object to the Report and Recommendation's incorporation of the likelihood of success considerations from the initial Report and Recommendation and Order Adopting because the '066 Patent was not included in those orders. (Doc. No. 195, at 2.) As to that point, the Retailers' objection is moot. The Report and Recommendation in question only recommends an injunction as to the Retailers on the '282 and '749 Patents.

4

The Retailers next object that the Court did not construe "sufficiently limited to permit its respective containers to detach…" and explain why Donaldson and Lee do not allegedly teach it. (Doc. No. 195, at 2.) First, the Magistrate Judge has since explained the meaning of this phrase is consistent with the understanding and application of the phrase in the Magistrate Judge's original Report and Recommendation (Doc. No. 99). (Doc. No. 200, at 7–8.) Therein, the Magistrate Judge explained why neither Donaldson nor Lee teach this limitation:

> Not only is it unclear how it would be obvious to use [a mechanical release that includes a firing pin and pressurized gas] to release a plurality of containers filled with water by partially filling and/or shaking, it appears actually counterintuitive to such a teaching. Instead, the mechanical action for release disclosed in Donaldson is actually distinguishable from the present invention, as Donaldson does not teach removing the container by partially filling or shaking.

> Lee discloses that the balloon is removed by pushing the guide pipe. Lee at [0033] ("[i]n this state, when the pushing handle 8 of the rear portion of the guide pipe 4 is pushed in the direction of the front end, the rubber band is moved in the direction of the front end of the inner guide pipe by a front end of the outer guide pipe and is escaped from the guide pipe.") Lee does not disclose "the restriction of each elastic fastener being sufficiently limited to permit its respective container to detach from its respective tube upon one or more of (1) at least partially filling the container with fluid and (2) shaking the housing…" as required by the claim.

(Doc. No. 99, at 15–16, 21); see also Doc. No. 142, at 7 ("As the Magistrate Judge correctly found, none of Telebrands's cited references teaches removal by shaking or partially filling.")

The Magistrate Judge's reasoning as to why these prior art references do not disclose this limitation was and remains clear. Accordingly, this objection to the Report and Recommendation is without merit.

Finally, the Retailers argue that the Magistrate Judge erred by failing to consider the impact of a terminal disclaimer of the '749 Patent and an argument that the containers pressing together in the '282 Patent is an unpatentable duplication of elements that does not qualify as an unexpected result. (Doc. No. 195, at 2.) As to the terminal disclaimer objection, the Retailers'

Appx6630

argument presented to the Court is that claim 1 of the '749 Patent is invalid for all of the same reasons as claim 1 of the '066 Patent. (6:16-cv-34, Doc. No. 44, at 8.) Despite contending that the Retailers are not impacted by the injunction on the '066 Patent, the Retailers raise and incorporate only those arguments previously raised by Telebrands with respect to the '066 Patent. The Court has already extensively considered these arguments in issuing an injunction (6:15-cv-551, Doc. Nos. 66, 84), and finds that these arguments do not change the determination on the likelihood of success. As to the '282 Patent, the Retailers point only to a single statement that "[e]ven if there was no motivation to make this change, the limitation still is not patentably significant, because '[t]he duplication of elements is not patentable unless a new or unexpected result is produced.'" (6:16-cv-34, Doc. No. 44, at 4.) While this exact statement was not considered verbatim, it does not impact the Court's analysis on the likelihood of success. The Court found that Defendants had not raised a substantial question as to invalidity of the '282 Patent based on the combinations of references presented, and the Court did not consider the fact that the balloons press together as a point of novelty in rendering its analysis. (Doc. No. 142, at 6–9.) Thus, considering this argument now does not change the outcome of this analysis. Therefore, the Court agrees with the Magistrate Judge regarding the likelihood of success and overrules the Retailers' objections.

### b. Irreparable Harm

Regarding irreparable harm, the Retailers first object that the Magistrate Judge failed to identify any irreparable harm as to Tinnus when Tinnus was the sole original movant. (Doc. No. 195, at 3.) But the Court has joined ZURU as a plaintiff in this action as a necessary party. (6:16-cv-34, Doc. No. 71.) Moreover, ZURU joined in the briefing on irreparable harm that was

6

considered by the Magistrate Judge in issuing his Report and Recommendation. (Doc. No. 171.)

Therefore, the Magistrate Judge was not incorrect to consider irreparable harm to ZURU.

Next, the Retailers list a litany of considerations for which the Retailers contend there was no evidence in the record. (Doc. No. 195, at 4.) However, these items were either not conclusions made in the Magistrate Judge's Report and Recommendation (and therefore there is no basis upon which to object) or are mischaracterized by the Retailers. For example, the Retailers first cite an alleged conclusion on "the inferior quality of the accused products." (Doc. No. 195, at 4.) However, the record reveals there is no discussion of, or conclusion made on, the inferiority of the accused products in the Magistrate Judge's Report and Recommendation. (Doc. No. 182.) Next, the Retailers provide a quote as if from the Magistrate Judge's findings in the Report and Recommendation that "consumers are buying in bulk and reselling in market places like Amazon and eBay." (Doc. No. 194, at 4.) As the record again reveals, this is not a conclusion drawn by the Magistrate Judge in his Report and Recommendation, but a characterization of the Plaintiffs' arguments during the discussion of the parties' contentions. (Doc. No. 182, at 5.)

Next, the Retailers object to the statement that "the Retailers are in a position that they must clear their shelves of this inventory due to the injunction against Telebrands." (Doc. No. 195, at 4.) Here, it is undisputed that there is an injunction in place against Telebrands and its agents. (Doc. No. 159.) Therefore, the Magistrate Judge accurately described the present circumstances in this consideration.

The Retailers also object to the Magistrate Judge's consideration of the side-by-side placement of the accused products and Plaintiffs' products by the Retailers. (Doc. No. 195, at 4.) In the briefing, Plaintiffs included evidence of the Plaintiffs' products being sold side-by-side the

accused products at a Walmart store—a company that was a defendant in this action. (Doc. No. 171, at 5.) In their response, the Retailers did not dispute that this photo was accurate or that Walmart was not placing the products side-by-side. To the extent the Retailers wanted to challenge the competency of this evidence as it pertains to the side-by-side placement, that should have been raised in their response and not for the first time in their objections. Instead, the Retailers objected to this evidence on the grounds that it was not accurate evidence of price erosion. (Doc. No. 179, at 7.) The Magistrate Judge, however, did not rely on this photo as evidence of price erosion in his Report and Recommendation. Rather, the Magistrate Judge stated that side-by-side placement, as was presented in the record, was likely to continue the consumer confusion that was previously cited in the record upon issuance of the injunction against Telebrands. (Doc. No. 182, at 6.) Although Walmart has since been dismissed from this action, the Magistrate Judge did not err in drawing this inference from the record. Moreover, as to irreparable harm, the Magistrate Judge ultimately concluded that "the fact that the Retailers are currently engaging in a fire sale of the accused products incentivizes not only significant price cuts to the accused products while Plaintiffs products are still being sold side by side, it also incentives continued sales through alternative markets." (Doc. No. 182, at 6.) The Retailers do not provide a meritorious objection to this conclusion and the Court agrees with the Magistrate Judge's findings on this point.

Finally, the Retailers object to the Report and Recommendation's reliance on *Robert Bosch LLC v. Pylon Mfg. Corp.* and that the Magistrate Judge did not consider the delay with respect to the '066 Patent. (Doc. No. 195, at 4–5, 7.) As to the objection regarding *Robert Bosch LLC v. Pylon Mfg. Corp.,* the Magistrate Judge did not rely on this case to support the idea that price erosion may constitute irreparable harm as the Retailers' claim. Rather, the Report and

8

Recommendation cites this case in its legal section in support of the statement that "demonstrating likelihood of success on the merits does not lead to a presumption of irreparable harm." (Doc. No. 182, at 3.) The Court sees no error in this citation and finds that the Retailers' objection mischaracterizes the Magistrate Judge's use of the case citation in question. Finally, with regard to the '066 Patent, the record is clear that there has been no injunction analysis on the '066 Patent as it pertains to the Retailers. Therefore, the Magistrate Judge did not error in declining to consider the time from the issuance of the '066 Patent to the filing of Plaintiffs' emergency motion for an injunction.

### c.   Remaining Factors

As to the remaining factors, the Retailers again incorrectly characterize the Magistrate Judge's discussions of the parties' arguments as a foregone conclusion drawn by the Magistrate Judge in their objections.  (Doc. No. 195, at 7.) Contrary to the Retailers' contentions, the Magistrate Judge did not conclude that the Retailers "remove product from their shelves all the time." Instead, the Magistrate Judge clearly concluded that "while there will be some burden to the Retailers to remove this inventory, that burden alone does not weigh against the grant of injunction where a small identifiable number of units remain with retailers who have the experience and ability to remove these products from their shelves." (Doc. No. 182, at 7.) The Court agrees with this finding. Finally, as to the public interest factor, the Retailers object that the Report and Recommendation impermissibly relies on a presumption that this factor is always satisfied. (Doc. No. 195, at 8.) The Court disagrees that the Magistrate Judge relied on an unsupported presumption. The record reveals that the Magistrate Judge concluded that because the patents are likely infringed and valid, and there were no other relevant concerns raised, this factor weighed in favor of an injunction. (Doc. No. 182, at 7–8.) The Court finds the remainder

9

of objections constitute reargument of arguments already raised and properly considered by the

Magistrate Judge.

**CONCLUSION**

Having considered each of the Retailers' objections, the Court **ADOPTS** the Report and

Recommendation of the Magistrate Judge (Doc. No. 182) as the findings of this Court.   All

objections are **OVERRULED**.

The parties are further **ORDERED** to meet and confer within seven (7) days of the

issuance of this Order and submit to the Court a proposed bond amount and injunctive order

pursuant to Federal Rule of Civil Procedure 65.   To the extent the parties cannot agree on an

appropriate bond amount or injunctive order, the parties may submit their disputes to the Court

within seven (7) days of the issuance of this Order.

**So ORDERED and SIGNED this 3rd day of January, 2017.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

Appx6635

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **TINNUS ENTERPRISES, LLC, ZURU LTD.,** | § § § | |
| | § | **CIVIL ACTION NO.  6:16-CV-00033-RWS** |
| **Plaintiffs,** | § § § | |
| | § | |
| **v.** | § § | |
| | § | |
| **TELEBRANDS CORPORATION,** | § § | |
| | § | |
| **Defendant.** | | |

### MEMORANDUM OPINION AND ORDER

Before the Court is Telebrands Corp.'s ("Telebrands") Motion for Reconsideration (Docket No. 153) of the Court's Order Adopting the Report and Recommendation of the Magistrate Judge (Docket No. 142).  Plaintiffs Tinnus Enterprises, LLC and ZURU Ltd. ("Plaintiffs") have filed a response (Docket No. 169), to which Telebrands has filed a reply (Docket No. 181), and Plaintiffs have filed a sur-reply (Docket No. 191).  For the reasons stated herein, Telebrands's Motion for Reconsideration (Docket No. 153) is **DENIED**.

Also before the Court is Telebrands's Motion to Stay Pending the Preliminary Injunction. Docket No. 168.  Plaintiffs have filed a response (Docket No. 189), to which Telebrands has filed a reply (Docket No. 197), and Plaintiffs have filed a sur-reply (Docket No. 202).  For the reasons stated herein, Telebrands's Motion to Stay (Docket No. 168) is **DENIED**.

### BACKGROUND

On January 26, 2016, Plaintiffs filed the instant action against Telebrands, alleging infringement of U.S. Patent No. 9,242,749 ("the '749 Patent").  Docket No. 1.  On April 19, 2016, Plaintiffs amended their complaint to add allegations of infringement of U.S. Patent No. 9,315,282

("the '282 Patent").  Docket No. 3.  Both the '749 and '282 Patents (collectively "patents-in-suit")

are continuations of U.S. Patent No. 9,051,066 ("the '066 Patent"), for which this Court has already

entered an injunction against Telebrands.  Docket No. 91 in Case No. 6:15-cv-551.[1]  On June 17,

2016, this Court held a hearing on Plaintiffs' emergency motion for a preliminary injunction, and

on July 12, 2016, the Magistrate Judge issued a Report and Recommendation, recommending that

Plaintiffs' emergency motion for a preliminary injunction be granted (Docket No. 99).  Thereafter,

objections were filed, the Court held a hearing on the objections on August 23, 2016 and issued an

Order Adopting the Report and Recommendation of the Magistrate Judge on September 29, 2016

(Docket No. 142).  Telebrands filed the instant Motion for Reconsideration on October 23, 2016.

The injunction against Telebrands issued on October 31, 2016.  Docket No. 159.

Immediately thereafter, on November 2, 2016, Telebrands filed a notice of appeal of the injunction

to the Federal Circuit.  Docket No. 164.  At the time the notice of appeal was filed, Telebrands's

Motion for Reconsideration was not yet fully briefed.  The appeal to the Federal Circuit is currently

pending.

## LEGAL STANDARD

### *Motions for Reconsideration*

The Federal Rules of Civil Procedure do not specifically provide for motions for

reconsideration.  *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004).  Motions to

reconsider are considered rare and filed only for the limited purpose: "to permit a party to correct

manifest errors of law or fact, or to present newly discovered evidence."  *Krim v. pcOrder.com,*

*Inc.*, 212 F.R.D. 329, 331 (W.D. Tex. 2002) (citations omitted).  Mere disagreement with an order

---

[1] On January 24, 2017, the Federal Circuit affirmed the Court's injunction on the '066 Patent. *See Tinnus Enterprises, LLC v. Telebrands Corp.*, No. 16-1410 2017 WL 344324 (Fed. Cir. Jan. 24, 2017).

Appx6855

of the Court does not warrant reconsideration of that order.  *Id.* at 332.  A party should not restate,

recycle, or rehash arguments that were previously made.  *Id.*

### *Motions to Stay Pending Appeal*

Pursuant to Federal Rule of Civil Procedure 62(c), "the court may suspend, modify, restore,

or grant an injunction" while an appeal is pending.  Fed. R. Civ. P. 62(c).  Courts consider several

factors in determining whether to issue a stay pending appeal, including "(1) whether the stay

applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the

applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

substantially injure the other parties interested in the proceeding; and (4) where the public interest

lies."  *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987); *Nken v. Holder*, 556 U.S. 418, 434 (2009).

Each factor need not be given equal weight, and no one factor is dispositive.  *Id.* at 777.  Instead,

courts should take a flexible approach in analyzing the factors, weighing the equities as they affect

the parties and the public.  *See, e.g., Hybritech Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451

(Fed. Cir. 1988) (the "factors, taken individually, are not dispositive; rather, the district court must

weigh and measure each factor against the other factors and against the form and magnitude of the

relief requested."); *H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 390 (Fed. Cir.

1987) ("[t]he magnitude of the threatened injury to the patent owner is weighed, in light of the

strength of the showing of likelihood of success on the merits, against the injury to the accused

infringer if the preliminary decision is in error . . . . No one element controls the result.")

### DISCUSSION

### A.  Reconsideration

As an initial matter, the Court notes that Telebrands has chosen to simultaneously ask this

Court to reconsider the injunction and appeal that injunction to the Federal Circuit. Thus, the Court

must first determine whether it has jurisdiction to decide the Rule 60(b) motion while the appeal is pending.  Fed. R. Civ. P. 60(b).

The issue of whether the district court has "jurisdiction to entertain [a] Rule 60(b) motion . . . involves construction of the Federal Rules of Civil Procedure in a matter not unique to patent law."  *Concept Design Elecs. & Mfg., Inc. v. Duplitronics, Inc.*, 104 F.3d 376 (Fed. Cir. 1996).  Thus, the governing law is the law of the regional circuit in which the district court sits.  *Id.*  The Fifth Circuit has allowed district courts to consider Rule 60(b) motions on their merits, despite a pending appeal.  *See Silva v. Harris Cty.*, 5 F.3d 1496 (5th Cir. 1993) (citing *Lairsey v. Advance Abrasives Co.*, 542 F.2d 928 (5th Cir. 1976); *Ferrell v. Trailmobile, Inc.*, 223 F.2d 697 (5th Cir. 1955)).  Further, the Fifth Circuit has found that denying a Rule 60(b) motion without first considering that motion on the merits constitutes an abuse of discretion.  *U.S. ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 613 F. App'x 445, 447 (5th Cir. 2015) ("[t]he district court does not have the option simply to deny the motion, without considering it on its merits.") (internal quotations omitted).  Accordingly, the Court turns to the merits of Telebrands's Motion for Reconsideration.

Telebrands asks the Court to reconsider the Court's Order Adopting (Docket No. 142) based on deposition testimony of Plaintiffs' technical expert, Dr. Kudrowitz, that occurred on October 13 and 14, 2016.  Docket No. 153 at 1.  Specifically, Telebrands argues that Dr. Kudrowitz provided new testimony that proves Telebrands was correct that the claims are obvious in view of Donaldson and Lee, that the claims of the patents-in-suit are indefinite, and that Dr. Kudrowitz modified the Court's constructions of "shaking" and "common face."  Docket No. 153 at 2–5.  Plaintiffs argue that nothing Dr. Kudrowitz has said in recent depositions contradicts his own conclusions or the Court's conclusions with respect to the Battle Balloon products or the asserted patents.  Docket No. 169.

As to obviousness, Telebrands primarily claims that Dr. Kudrowitz no longer advanced the argument that the patents require containers to detach due to gravity. Docket No. 153 at 3. But as Telebrands's Motion points out, the Court never relied on Plaintiffs' contention that gravity was required to cause the balloons to fall off due to "partially filling." *Id.* Accordingly, this argument provides no grounds for the Court to reconsider its Order.

As to the specific testimony, Telebrands contends that Dr. Kudrowitz admitted that Donaldson's elastic fastener seals a balloon after the automatic detachment of the balloon, and that automatic attachment occurs after Donaldson's balloon is filled with fluid. Docket No. 153 at 3 (citing Docket No. 153-3 at 295:3–12; 295:19–25; 300:10–25). Even if this testimony provided the admissions claimed by Telebrands, which it does not appear to, the purported admissions of Plaintiffs' technical expert do not impact the Court's analysis. In the Magistrate Judge's Report and Recommendation, which was adopted by the Court, the Magistrate Judge explained that "the mechanical action for release disclosed in Donaldson is actually distinguishable from the present invention, as Donaldson does not teach removing the container by partially filling or shaking." Docket No. 99 at 16. Thus, whether Donaldson covers sealing after automatic detachment of a balloon does not impact this analysis. As such, this testimony does not warrant reconsideration.

Next, Telebrands argues that Dr. Kudrowitz's testimony confirms the patents-in-suit are indefinite because Dr. Kudrowitz admitted that he would need to make a separate infringement determination for every possible type of shaking, every possible fluid, and every possible fill level. Docket No. 153 at 5. As an initial matter, the Court has reviewed the deposition testimony cited by Telebrands and cannot find these alleged admissions in that testimony. Regardless, even if this testimony existed as Telebrands suggests it does, it has no bearing on the Court's indefiniteness analysis. The focus of this analysis is on whether the claims "inform those skilled in the art about

the scope of the invention with reasonable certainty," not on how many possible configurations could be said to infringe the claims. *Nautilus v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014). Therefore, this testimony does not provide a basis for reconsideration.

Finally, Telebrands argues that Dr. Kudrowitz used modified constructions of the terms "shaking" and "common face." Docket No. 153 at 5. While Telebrands raises this testimony as contradictory and undisclosed, Telebrands fails to explain how it impacts the Court's analysis such that the Court should grant Telebrands's Rule 60(b) Motion. The Court fails to see how this testimony constitutes new evidence that warrants reconsideration.

In sum, the Court finds that none of Dr. Kudrowitz's testimony cited by Telebrands as new evidence warrants a reconsideration of the Court's Order (Docket No. 142). Accordingly, the Court **DENIES** Telebrands's Motion for Reconsideration (Docket No. 153).

## B.  Stay

The determination of whether the injunction should be stayed pending appeal is permissive under Fed. R. Civ. P. 62(c), and the Court must analyze each of the relevant factors in turn, weighing the equities based on the facts presented. *Id.*; *Nken*, 556 U.S. at 434; *Hybritech Inc.,* 849 F.2d at 1451.

### a.  *Likelihood of Success on the Merits*

Because Telebrands filed an appeal seeking review of whether this Court erred in granting Plaintiffs' motion for a preliminary injunction, Telebrands will succeed on appeal if it can show the Court abused its discretion in issuing the preliminary injunction. *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.,* 77 F.3d 1364, 1367 (Fed. Cir. 1996). "An abuse of discretion may be established by showing that the court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings." *Id.*

Appx6859

Here, Telebrands's Motion to Stay focuses almost entirely on why Telebrands is likely to succeed on appeal by disagreeing with the Court's reasoning in issuing an injunction. Docket No. 168 at 2–12. While Telebrands utilized ten pages of its brief to reargue its positions to the Court and explain why it disagrees with the Court's decision, Telebrands has not identified any finding which amounted to an abuse of the Court's discretion.

### i. Non-infringement

Telebrands first argues that is likely to succeed on appeal because the Court's clarification regarding "second end" improperly broadened the claim term. Docket No. 168 at 3. This Court has explained in resolving objections and during subsequent claim construction proceedings that the Court did not broaden the claim construction and was instead resolving a dispute between the experts based on testimony provided at the preliminary injunction hearing. Docket No. 142 at 5; Docket No. 200 at 12–13; Docket No. 225, at 3–4. The Court has not broadened the construction of this term but instead rejected Telebrands's expert's position that the "outer limit" be a "linear limit." *Id.* Due to the continued dispute over the meaning of the Court's construction, the Court has since clarified that "outer limit" is synonymous with "end." Docket No. 200 at 13. This clarification does not impact the Court's analysis on the preliminary injunction—as that analysis remains unchanged. The Court's interpretation of the term "second end" has been consistent. Telebrands has continued to morph the construction of that term to a position favorable to Telebrands where it clearly disagrees with the Court's construction. Docket No. 99 at 13–14.

Telebrands has failed to demonstrate how the Court has abused its discretion in construing this term and resolving the dispute among the experts and in rejecting the position that the "second end" must be the linear limit of the housing opposite the first end. As the Court has repeatedly explained, there is no support for such a limiting construction, and therefore Telebrands does not

have a viable non-infringement argument by arguing that the "second end" is limited to a linear end of the housing.  Docket No. 99 at 13–14.

Along these lines, Telebrands faults the Court for not identifying the exact boundaries of the "second end" in the Battle Balloons products.  Docket No. 168 at 4.  But, as the Court explained, Plaintiffs had discharged their initial burden of showing a likelihood of success on infringement.  *See, e.g.*, Docket No. 99 at 8.  The Court relied on Plaintiffs' evidence, including claim charts from Plaintiffs' expert, which had identified a portion of the Battle Balloons product as containing a "second end," as well as the actual physical products.  *Id.*; Docket No. 19-2 at 24. In its prior injunction, the Court relied on this same evidence and the Federal Circuit agreed that the Court did not commit plain error in such reliance.  *See Tinnus Enterprises, LLC v. Telebrands Corp.*, No. 16-1410 2017 WL 344324 at *6–7 (Fed. Cir. Jan. 24, 2017).

Finally, these arguments regarding the "second end" pertain only to one of the patents-in-suit, the '749 Patent.  The injunction also issued as to the '282 Patent, which does not claim a "second end."  Accordingly, even if the Court had abused its discretion with respect to its interpretation and application of "second end," the injunction as to the '282 Patent remains unchallenged on this point.

Telebrands next argues that the Court erred by failing to consider how the Court's application of "common face" can be reconciled with the PTO's characterization of the prior art, by misinterpreting Telebrands's "common face" arguments as requiring planarity, and by failing to specifically identify where the "common face" on the Battle Balloons products is located. Docket No. 168 at 4–5.  First, the Court carefully considered Telebrands's arguments in light of the prosecution history.  Docket No. 99 at 12–13.  This discussion rejected Telebrands's suggestion that the "common face" must be planar.  *Id.*  But this argument has been and continues to be

Appx6861

Telebrands's contention, as set forth in its motion.  Docket No. 168 at 5.  The Court has further

explained that "Telebrands's arguments rely on an assumption that under the [Court's]

construction, if a 'shared outer surface' can contain any geometric transitions, then all geometric

transitions must be irrelevant to determining the boundaries of the 'shared outer surface,'" but that

"nothing in the construction or the prosecution history of this claim demands this dichotomy."

Docket No. 142 at 5.  The Court has continued to understand and assess the moving interpretations

of Telebrands's proposal for the term "common face."  Second, the Court has since specifically

considered the references in the '749 file history cited by Telebrands in its Motion and found they

do not warrant modified construction, explaining the differences in the prior art.  Docket No. 200

at 11–12; Docket No. 225, at 4.  This further analysis is consistent with the findings pertaining to

the injunction.  Telebrands's argument again presents a disagreement with the Court but does not

clearly showcase an abuse of discretion.

Finally, the term "common face" is not found in the asserted claims of the '282 Patent, and

therefore, even if the Court had abused its discretion in interpreting and applying the claim term

"common face," the injunction as to the '282 Patent is not challenged on this point.

### ii.  Obviousness

Telebrands next re-raises its objections to the Court's obviousness considerations, the

majority of which were raised and discussed above with respect to Telebrands's Motion for

Reconsideration.  Docket No. 168 at 6–8.  None of Telebrands's arguments regarding the

consideration of Donaldson or Plaintiffs' expert's new testimony discussed above point out a clear

legal or factual error in the Court's analysis.  Again, the Court did not consider Plaintiffs' "gravity"

argument and the newly cited testimony is not persuasive, as discussed above.

Similarly, the Court did not fail to explain how it is construing the term "sufficiently limited," as Telebrands contends. Docket No. 168 at 6. The Court explicitly explained that it was interpreting the term "sufficiently limited" consistent with the plain and ordinary language of the claim: "[a]s the claim plainly states, the restriction of each fastener is 'sufficiently limited' to permit detachment 'upon one or more of (1) at least partially filling the container with fluid and (2) shaking the housing.'" (Docket No. 99 at 19, citing '282 Patent at 6:50–51. It was with this understanding that the Court evaluated the references relied on by Telebrands.

Telebrands next argues that the Court rejected some references as "irrelevant." Docket No. 168 at 8. However, the Court did not reject any references as irrelevant. Rather, the Court considered the references and the testimony provided, and analyzed each reference and combination, as well as any evidence of a motivation to combine. *See, e.g.,* Docket No. 99 at 15–20; Docket No. 142 at 6–9.

Finally, as Telebrands points out, the Court considered evidence of copying that was presented in the record. Docket No. 99 at 23. The Court did not rely on this evidence to "bolster validity," but instead noted that it contributed to Telebrands's shortcomings in raising a substantial question concerning the validity of the '282 and '749 Patents as obvious. *Id.* Accordingly, Telebrands's arguments regarding obviousness do point to any clear legal or factual error that would weigh in favor of a stay on this factor.

### iii.  Indefiniteness

Regarding indefiniteness, Telebrands argues that the Court fails to address the indefiniteness issue raised by Telebrands that it is impossible to determine how the elastic fastener is "sufficiently limited" to permit releasing when "shaking" and/or "at least partially filling" occurs. Docket No. 168 at 9. However, the Court did consider the indefiniteness arguments raised

Appx6863

by Telebrands on these terms.  Docket No. 99 at 18–19; Docket No. 142 at 10.  Moreover, consistent with the findings at the preliminary injunction stage, the Court has since further explained why the term "sufficiently limited" and the claimed restriction on the elastic fasteners does not render the claim indefinite.  Docket No. 201 at 7–9; Docket No. 226, at 1–3.  Thus, Telebrands's argument does not suggest the Court clearly erred in its consideration of indefiniteness such that a stay would be warranted.

### iv.  Written Description

Telebrands next argues that the Court erred in its finding regarding the written description of the '282 Patent.  Docket No. 168 at 10–11.  The arguments presented in Telebrands's brief are the exact arguments originally presented to and considered by the Court.  Docket No. 99 at 16–18; Docket No. 142 at 9–10.  The mere re-argument of these positions does not explain how the Court clearly erred in its analysis on the preliminary injunction.

### v.  Irreparable Harm

Telebrands argues that the Court's irreparable harm finding was in part based on a terminated relationship between Wal-Mart and ZURU.  Docket No. 168 at 11.  Telebrands contends that because ZURU dropped its suit against Wal-Mart, new evidence now confirms this hold was temporary.  Docket No. 168 at 11.  Whether or not the evidence now provides that the hold was temporary, it remains that the hold existed as a result of Telebrands's alleged sales of infringing products to Wal-Mart, which necessitated ZURU to bring suit against Wal-Mart. Regardless, this evidence was not in the record before the Court in considering the injunction and therefore cannot result in an abuse of discretion.  Moreover, the Court relied on additional evidence to support its finding that Plaintiffs had shown a likelihood of irreparable harm absent an injunction.  Docket No. 99 at 25–26; Docket No. 142 at 11–12.  Accordingly, Telebrands has not

provided evidence of an abuse of discretion in the Court's irreparable harm findings that would favor a stay.

Finally, Telebrands argues that the PTAB's institution of the '066 Patent PGR establishes there is a substantial question of obviousness for the patents-in-suit.  Docket No. 168 at 12–13. First, as the Court has already explained, the '066 Patent is not the subject of this injunction. Second, while the PTAB has since issued a final written decision concluding that the claims of the '066 Patent are indefinite, the PTAB's decision was based on indefiniteness of the term "substantially filled," which is not found in either of the patents-in-suit.  Docket No. 301-1 in Case No. 6:15-cv-551.  Moreover, as the Federal Circuit recently explained in upholding the injunction on the '066 Patent, that decision by the PTAB is not binding on the Court of Appeals.  *See Tinnus Enterprises, LLC*, No. 16-1410 2017 WL 344324 at *4 n. 7.  Accordingly, the Court does not see this decision as a basis to stay the instant action pending the appeal of the injunction on the '282 and '749 Patents.

Ultimately, nothing in Telebrands's present arguments elicits for the Court how it has abused its discretion in rendering it opinions.  Rather, these arguments present disagreements for which Telebrands may eventually subsequently appeal the Court's decision after the issuance of a final judgment; they do not provide evidence of abuse of discretion in entering an injunction. Based on the arguments presented, and for the reasons explained herein, the Court does not agree that this factor weighs in favor of a stay.

### b.  *Irreparable Harm to Telebrands*

Telebrands argues that absent a stay it will suffer irreparable injury because it will lose its entire market share for Summer 2017 and likely beyond, and because its goodwill with its customers will be damaged.  Docket No. 168 at 13–14.  These arguments pertain to the harm

Telebrands might experience from the issuance of an injunction, which is already in place; they do not elicit how Telebrands might be harmed absent a stay.  Moreover, Plaintiffs have pointed to testimony from Telebrands's Chief Operating Officer ("COO") regarding plans to launch alternative designs for multiple-balloon filling products for the Summer 2017 season.  Docket No. 189 at 10 (citing Docket No. 155-2 at 93:15–20).  After the Court's previous injunction against Telebrands, Telebrands did successfully redesign a product during the appeal and launch those products for the Summer 2016 selling season.[2]  Given the testimony of Telebrands's COO that several redesigns are already in the works, the Court finds it difficult to believe that Telebrands will be irreparably harmed by losing its market share for Summer 2017.  Additionally, any loss of goodwill from the removal of the Battle Balloons products is diminished by the fact that Telebrands can maintain its relationships with its retailers through the sale of its numerous other "As Seen on TV" products testified to by Telebrands's COO.  Docket No. 97, Prelim. Inj. Tr. at 53:16–19.  Accordingly, this factor does not weigh in favor of a stay.

### c.  *Substantial Harm to Other Parties*

Plaintiffs contend they will experience substantial harm if this Court were to stay the preliminary injunction because Plaintiff ZURU and Defendant Telebrands are direct competitors in the water balloon market place.  Docket No. 189 at 12.   Telebrands does not contest that harm would come to Plaintiff ZURU by a stay, but that ZURU's alleged injuries pale in comparison to Telebrands's injuries as Telebrands is under an injunction.  Docket No. 168 at 15.  As this Court has previously recognized, Defendant Telebrands and Plaintiff ZURU are direct competitors in a two-player dominated market for selling water balloon devices.  Thus, the Court finds that at least

---

[2] These products are the Battle Balloons products that are the subject of the Court's injunction in this matter.

some foreseeable harm would come to Plaintiffs by staying the injunction pending appeal. Thus, this factor weighs slightly against a stay.

### d. Public Interest

With regard to the public interest, Telebrands contends that a stay would favor the public interest because Plaintiffs have failed to provide sufficient evidence that they can fill the market's demand for balloon filling devices left from Telebrands's void. Docket No. 168 at 15. Plaintiffs contend that Telebrands improperly shifts the burden to Plaintiffs and that the public interest favors the enforcement of patent rights. Docket No. 111 at 15. The Court agrees that Plaintiffs had no burden to show that they can fulfill the market's demands as Telebrands is the movant on its Rule 62(c) Motion, where it raised this argument for the first time. Regardless, any contention regarding this point is merely speculative based on the record before the Court. The Court agrees that the public interest in the enforcement of patents weighs against a stay.

The Court has considered each of the relevant factors based on the arguments presented and the record before it and finds that a stay of the injunction is not proper here. Because Telebrands has not established a likelihood of success on appeal or irreparable harm that would result from declining to stay the preliminary injunction, and Plaintiffs have provided uncontested evidence of harm by staying the injunction, the Court declines to stay the preliminary injunction pending appeal.

### CONCLUSION

For the reasons stated herein, Telebrands's Motion for Reconsideration (Docket No. 153) is **DENIED** and Telebrands's Motion to Stay (Docket No. 168) is **DENIED**.

Appx6867

**SIGNED this 16th day of February, 2017.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

Appx6868

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **TINNUS ENTERPRISES, LLC, and** | § | |
| **ZURU LTD.** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **No. 6:16-cv-0033 RWS-JDL** |
| **v.** | § | |
| | § | **JURY DEMANDED** |
| **TELEBRANDS CORP.,** | § | |
| | § | |
| **Defendant.** | § | |

**REDACTED ORDER ON INJUNCTION**

Before the Court are the parties' Motions for Bond Amount and Injunctive Order. Docket Nos. 213, 215.  On October 31, 2016, the Court issued an injunction against Defendant Telebrands as to U.S. Patent Nos. 9,232,749 ("the '749 Patent") and 9,315,282 ("the '282 Patent"), and assessed a bond in the amount of $4.8 million.  Docket No. 159.  For reasons that have been set forth by the Court, the Court was required to separately consider whether an additional injunction and bond should issue as to the Retailer Defendants. On November 21, 2016, the Magistrate Judge issued his Report and Recommendation ("R&R") recommending that the Retailers be enjoined from the sale of Telebrands' Battle Balloon products currently in inventory.  Docket No. 182.  On January 3, 2017, the Court issued an order adopting the findings of the Magistrate Judge and overruling all objections ("Order Adopting"), and ordered the parties to meet and confer regarding the appropriate amount for bond and the injunctive order.  Docket No. 211.  The parties filed separate motions on January 10, 2017, setting forth their disputes with regard to the bond amount. Upon consideration of the arguments, the Court resolves this dispute and sets forth the terms of the injunction herein.

1

The parties dispute whether an additional bond is needed, and if so, whether bond should

be set at $10,000 or $3,750,000.

As a preliminary matter, ███████ of the bond amount requested by Defendants is

directed to the lost profits of Telebrands.  Docket No. 213 at 4.  As discussed above, the Court

has already issued an injunction with respect to Telebrands and ordered that Plaintiffs post bond

in the amount of $4.8 million for that injunction.  Docket No. 159.  As this present injunction

pertains specifically to the Retailers, the Court will consider what bond amount is appropriate to

be posted as to the Retailers only.

The Retailers argue that they will cumulatively suffer at least ███████ in losses from

the preliminary injunction if it is found to be improper.  Docket No. 213 at 3.  The Retailers also

argue that removing the products from the shelves will require numerous hours of labor.  *Id.*

Plaintiffs argue that the estimated ███████ in losses is entirely speculative.  Docket No. 215

at 7–8.  Plaintiffs argue that they still have not received any discovery from the Retailers to

substantiate these claims and note that the Retailers' estimates of remaining inventory have

shifted throughout this litigation. *Id.* at 8.

The Retailers bear the burden of showing the extent of its injury resulting from an

injunction prohibiting the sale, or offering for sale, of the remaining stocked Battle Balloon

products.  *See Oakley, Inc. v. Sunglass Hot Inter.*, No. SA CV 01-1065 AHS, 2001 WL 1683252,

at *12 (C.D. Cal. Dec. 7, 2001), *aff'd on other grounds*, 316 F.3d 1331 (Fed. Cir. 2003) ("A

successful movant for a TRO or preliminary injunction must post security 'for the payment of

such costs and damages as may be incurred or suffered by any party who is found to have been

wrongfully enjoined or restrained.'  It is Defendants' burden to reasonably estimate the extent to

which they would be damaged if this preliminary injunction were improvidently granted."
(quoting Fed.R.Civ.P. 65(c)). "The amount of a bond is a determination that rests within the
sound discretion of a trial court." *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1386 (Fed.
Cir. 2006).

The Retailers have submitted declarations from two named Retailers, Bed Bath &
Beyond and Walgreens. Docket Nos. 213-2, 213-3. In its declaration, Bed Bath & Beyond
estimates there are ███████ units of Battle Balloons Color Burst left in inventory that would result
in a loss of ██████ in profits, and ████████ Battle Balloons basic units that will result in a loss of
███████ n profits. Docket No. 213-2 at ¶¶ 5–6. Therefore, Bed Bath & Beyond estimates a
total loss of ████████ in profits based on sales in 2016. *Id.* at ¶ 7. Walgreens estimates that
approximately ██████ units of Battle Balloons Color Burst remain in stores which would result
in a loss of ██████ in profits based on 2016 sales. Docket No. 213-3 at ¶ 5.

Based on the declarations submitted from Bed Bath & Beyond and Walgreens, there are
an alleged ██████ products remaining in inventory. This number, of course, only represents
two of the larger retailers. Previously, on November 17, 2016, the Retailers represented that all
named Retailer Defendants had approximately ██████ units of Battle Balloons products in
inventory. Docket No. 179 at 5. While the Court understands that ██████ units was an
approximation, it is unclear how that number went up from mid-November to present date
considering the current number covers only two named Retailers and the Retailers were
continuing to sell off inventory since the time of that estimation. Further, the Retailer
Defendants have produced no discovery to date on the state of their inventory. Indeed, none of
the Retailer's submissions include accounts for the inventory, documents that should exist in the
ordinary course of business. Nor are any profit or loss data included for the 2016 sales.
Therefore, the Court finds the numbers attested to be speculative estimations. Given that the

3

Retailers bear the burden to come forth with evidence of the extent of their injury from the injunction, the Court finds it cannot assess the requested ████████ bond.  Instead, under the circumstances, the Court finds a bond of $25,000 to be appropriate.

Accordingly, it is hereby **ORDERED** as follows:

- The Court **FINDS** that Plaintiffs have carried their burden of showing (a) that Plaintiffs will likely succeed on the merits of their patent infringement claim by showing that U.S. Patent Nos. 9,242,749 ("'749 Patent") and 9,315,282 ("'282 Patent") are valid and enforceable and that the Retailers have infringed the '749 and '282 Patents, (b) that Plaintiffs have suffered and will continue to suffer irreparable harm if a preliminary injunction is not granted, (c) that the balance of hardships between Plaintiffs and the Retailers favors the Plaintiffs and (d) that the public interest would be served by issuing a preliminary injunction in the present case.  Docket Nos. 99, 142, 182, 211.

- Pursuant to Federal Rule of Civil Procedure 65, 35 U.S.C. § 271, 35 U.S.C. § 283, and the inherent equitable powers of the Court, the Court hereby preliminarily **RESTRAINS AND ENJOINS** the Retailers, their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with the Retailers who receive actual

4

notice of this Order by personal service or otherwise from making, using, importing, marketing, advertising, offering to sell, or selling in the United States the Battle Balloons products or any colorable imitation of the same that infringes the '749 and/or the '282 Patent. *See* Fed.R.Civ.P. 65(d).

- This preliminary injunction shall remain in effect until further order of this Court.

- Plaintiffs are directed to file proof of bond in the amount of twenty-five thousand dollars ($25,000) within seven business days of this Order. *See* Fed.R.Civ.P. 65(c). The bond shall serve as security for all claims with respect to this preliminary injunction

Pursuant to this Order, the Clerk of Court is directed to terminate the parties' Motions (Docket Nos. 213, 215). Within **7 days** of the issuance of this Order the parties shall file a notice with the Court as to whether this Order can be unsealed, or request appropriate redaction.

**SIGNED this 14th day of February, 2017.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

5

## **<u>CERTIFICATE OF SERVICE</u>**

This is to certify that I have this day served the foregoing via the Court's

CM/ECF system on counsel of record.

Paper copies will also be mailed to the principal counsel at the time paper

copies are sent to the Court.  Upon acceptance by the Court of the e-filed

document, six paper copies will be filed with the Court within the time provided in

the Court's rules.


Dated:  May 19, 2017          */s/ D. Michael Underhill*
D. Michael Underhill
BOIES, SCHILLER & FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
Telephone:  202.237.2727

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and the Rules of this Court because the foregoing brief contains 11,801 words (excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and by Federal Circuit Rule 32(b)).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:  May 19, 2017            */s/ D. Michael Underhill*

D. Michael Underhill
BOIES, SCHILLER & FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
Telephone:  202.237.2727